UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV 09 5603

( S.I. )

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D N Y

★ DEC 22 2009 ★

LONG ISLAND OFFICE

WEXLER, J.

LINDSAY, M.

| | |
|---|---|
| MICHAEL J. GOODMAN and LINDA BROWN, individually and on behalf of all others similarly situated, | ) ) ) |
| | ) CIVIL ACTION NO. |
| | ) |
| | ) CLASS ACTION |
| Plaintiffs, | ) |
| | ) COMPLAINT |
| v. | ) |
| | ) |
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC., GENWORTH FINANCIAL, INC., and GURINDER S. AHLUWALIA, | ) JURY TRIAL DEMANDED ) ) ) |
| | ) |
| Defendants. | ) ) |

Plaintiffs Michael J. Goodman and Linda Brown, by their attorneys allege for their

complaint as follows:

## SUMMARY OF THE ACTION

1.     This is a class action prosecuted by clients of Genworth Financial Wealth

Management (formerly Genworth Financial Asset Management) ("GFAM" or "Genworth") who

invested in GFAM's BJ Group Services Portfolios (the "Portfolio") between December 22, 2003

and December 22, 2009 (the "Class Period"), to recover damages caused by Defendants'

violations of the federal securities laws and common law (the "Class").  This case arises from the

fraudulent scheme perpetrated by Defendants through Genworth's marketing, solicitation, sale

and management of the Portfolio.  The scheme was facilitated by Defendants, who knowingly,

recklessly and/or with intent to deceive disseminated to prospective and current investors

materially misleading representations regarding the Portfolio and its "exclusive" management

agreement with Robert "Bob" Brinker.

ORIGINAL

2.      According to all of its sales, marketing and disclosure materials disseminated to prospective and current investors in Genworth's Private Client Group, "The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of Marketimer newsletter." Defendants represented that "Bob recommends asset allocations and fund selection for GFAM's management of accounts for the BJ Group Advisory Services." The materials explicitly state: "This portfolio is based on the Bob Brinker model, offered through our exclusive partnership with him" and that "[o]ur experienced professionals work to implement Bob's investment strategy utilizing his proprietary tactical asset allocation model."

3.      Contrary to Defendants' representations that the Portfolio was being managed based upon the Brinker recommendations, the percentage of non-Brinker recommended Funds being purchased for the Portfolio routinely exceeded 50%. By not implementing Brinker's tactical asset allocation and fund selection, Genworth was able to generate for itself extra revenues by selecting alternate mutual funds that paid higher administrative and service fees. Defendants purchased these funds, instead of purchasing funds recommended by Brinker, notwithstanding that these funds routinely underperformed Funds recommended by Brinker.

## JURISDICTION AND VENUE

4.      Plaintiffs seek damage caused by Defendants' violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Defendants' common law fraud, breaches of contract, negligent misrepresentation and breaches of fiduciary duty.

5.    Jurisdiction is conferred over the subject matter of this action by Section 27 or the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78aa] and 28 U.S.C. §§ 1331 and 1337, and as part of the supplemental jurisdiction of this Court under 28 U.S.C. § 1367.

6.    Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud and its effects have occurred within this District.

7.    In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### THE PARTIES

8.    Plaintiffs Michael J. Goodman and Linda Brown were, during the Class Period, investors in the Private Client Group of Genworth.

9.    Genworth Financial, Inc. is an international financial services organization that offers a portfolio of primarily consumer-focused products through its various companies, including annuities, combination products, investment services, life insurance, long term care insurance, medicare supplement insurance, mortgage insurance, and payment protection insurance.  Genworth Financial is headquartered in Richmond, Virginia, and employs over 6,000 people in 25 difference countries.

10.    Genworth Financial Wealth Management, Inc. is a wholly owned subsidiary of Genworth Financial, Inc.  GFAM is an investment adviser registered with the U.S. Securities and Exchange Commission, and its sole business activity is serving as an investment adviser.  GFAM

provides various investment supervisory services to a variety of clients, including individuals, corporations, partnerships, pension and profit-sharing plans, trusts and others.  GFAM maintains headquarters at 2300 Contra Costa Blvd., Suite 600, Pleasant Hill, CA and 3001 Summer Street, Stamford, CT.

11.     Gurinder S. Ahluwalia ("Ahluwalia") is the president and Chief Executive Officer of GFAM.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

12.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class to recover damages caused by Defendants' violations of law during the Class Period.

13.     Excluded from the Class are Defendants, the officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

14.     The members of the Class are so numerous and geographically dispersed throughout the country that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class. Members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

15.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

16.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

17.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

A.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

B.     whether statements made by Defendants during the Class Period misrepresented material facts about the business, operations and investments of the Portfolio;

C.     whether Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

D.     whether Defendants' conduct alleged herein was intentional, reckless, and/or in violation of fiduciary duties owed to Plaintiffs and other Class members and therefore violated common law; and

E.     to what extent the members of the Class have sustained damages and the proper measure of damages.

18.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

5

## GENERAL ALLEGATIONS

19.     According to the Defendants, BJ Group Services was founded in 1986 and was created to offer customized investment solutions tailored to meet clients' personal objectives.  In 2000, the BJ Group was purchased by Centurion Capital Group.  Thereafter, in late 2001 Centurion Capital Group was purchased by GE and managed under GE Private Asset Management, Inc.

20.     In 2005, GE Private Asset Management became Genworth Financial Asset Management, Inc., as General Electric sold its remaining shares to the public.  Assets under management of GFAM's Private Client Group peaked at approximately $1.1 billion in 2007. Recently, Genworth Financial Asset Management changed its name to Genworth Financial Wealth Management.

21.     During the Class Period, Defendants through their various sales, marketing and disclosure materials disseminated to prospective and current Genworth clients, continuously touted its exclusive management agreement with Bob Brinker.  The Defendants routinely represented to prospective and current private clients that the BJ Group Services Portfolio was being managed by Bob Brinker, or at a minimum, GFAM was going to implement Brinker's recommendations, including mutual fund selection and asset allocation.  According to the Defendants' marketing materials sent to clients in the BJ Group Services Private Client Group, Defendants represent that "Bob recommends asset allocations and fund selection for GFAM's management of accounts for the BJ Group Advisory Services."

22.     The "Account Application" that is sent out to all prospective clients expressly identifies the Portfolio as the "BJ Group (Brinker) Services" portfolios.  Moreover, under the

6

heading "Genworth Financial Asset Management's responsibilities, as Investment Advisor,"

Defendants expressly represent that "GFAM shall provide the investment advisory services

selected by the client."

23.     Similarly, this "Account Application" describes the BJ Group Services portfolios

as follows:

**The BJ Group Service**

The BJ Group Service offers clients tactical asset allocation by implementing
recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer*
newsletter.  Mr. Brinker analyzes economic trends and financial markets and
makes asset allocation recommendations to GFAM based on that analysis.
GFAM implements Mr. Brinker's recommendations by selecting mutual funds for
client accounts.  (Emphasis added).

24.     In an information booklet sent to new and existing clients to inform them of "all

material assets of [the] organization, its fees and services, and key personnel," Defendants

explained the management aspects of the BJ Group Portfolio.  According to the Defendants:

The BJ Group Service offers clients tactical asset allocation by implementing
recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer*
newsletter.  Mr. Brinker analyzes economic trends and financial markets and
makes asset allocation recommendations to [GFAM] based on that analysis.
[GFAM]'s Investment Management ("IM") Department implements Mr. Brinker's
recommendations by selecting mutual funds for client accounts. [GRAM] pays
Mr. Brinker annual fees, not based on assets under management, for his services,
which include investment management services and marketing services, including
referring potential clients to [GFAM]'s Private Client Group division.  (Emphasis
added).

25.     Throughout the Class Period, Defendants solicited new investors and kept existing

ones through their continuous representations regarding Brinker's success and Genworth's

exclusive management agreement with Brinker.  In a 2004 Genworth report, Defendants

emphasized, "Balanced Growth: This portfolio is based on the Bob Brinker model, offered

7

through our <u>exclusive</u> partnership with him.  This objective is designed for clients' core holdings. This portfolio consists of a diversified, broad base of domestic and international equities in addition to a fixed income component to provide balance and diversification.  With a conservative growth and income objective, emphasis is placed on preserving capital and reducing volatility.  When Brinker is bullish, maximum targeted equity exposure is 60%."  (Emphasis added).

26.      In Defendants' 2007 and 2008 "Disclosure Brochures for the Private Client Group," Defendants again touted Genworth's exclusive agreement with Brinker and that the portfolio is based on Brinker recommendations.  The brochure states:

> These portfolios are constructed primarily using mutual funds.  Other investments may also be purchased by GFAM for client accounts, including, without limitation, closed-end investment companies, exchange-traded funds ("ETFs"), U.S. Treasury bonds, notes and bills, and bank notes.  Clients may choose from a variety of investment objectives depending upon their individual needs.  Some client accounts will experience significant fluctuation in value, and higher risk of loss in the pursuit of potentially higher returns, based on the investment objective selected.

The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the Marketimer newsletter.  Mr. Brinker analyses economic trends and financial markets and makes asset allocation recommendations to GFAM based on that analysis.  GFAM's Investment Management ("IM") Department implements Mr. Brinker's recommendations by selecting mutual funds for client accounts.  GFAM pays Mr. Brinker annual fees, not based on assets under management, for his services,

8

which include investment management services and marketing services, including referring potential clients to GFAM's Private Client Group division.

27.     Defendants also regularly touted Brinker's professional track record.  In a recent Introductory Brochure, Defendants represented:

> Bob Brinker is a rare breed in the investment field.  An independent strategist with more than 25 years of experience, he makes bold pronouncements.  He isn't beholden to Wall Street.
>
> Of course, you know him from his radio show, MoneyTalk, which has been informing and entertaining weekend listeners for more than 20 years.  You also may know about his monthly newsletter, "Marketimer," which focuses on asset allocation and regularly receives top ratings for accuracy.
>
> We at Genworth Financial Asset Management, Inc. ("GFAM") have a long standing relationship with Bob to offer one of the nation's most well-known tactical asset allocation strategies.  Founded in 1986 and acquired by GFAM in 2000, BJ Group Services offers customized investment solutions tailored to meet clients' personal objectives.  Long considered an expert in identifying market trends through his proprietary Marketimer model, Bob recommends asset allocation and fund selection for GFAM's management of accounts for the BJ Group advisory services.
>
> Our experienced professionals work to implement Bob's investment strategy utilizing his proprietary tactical asset allocation model.  Understanding that cycles exist in the stock market, our goal is to participate in market gains during a rising market and preserve capital during market declines.  (Emphasis added).

28.     Throughout the Class Period, Defendants also sent letters to potential clients emphasizing Genworth's relationship with Bob Brinker.  According to the letter, "Thank you for your interest in Bob Brinker and Genworth Financial.  We are excited that you are considering our services and look forward to sharing with you the tremendous difference that the combination of Brinker and Genworth Financial has made to so many investors like you."

29.     Similarly, to this day Defendants continue to advertise Bob Brinker on their website (www.gfampcg.com/pcgv2/do/pcgPublic).  Not only do Defendants use a picture of Bob Brinker, but they continue to represent that "Bob directs the asset allocation of the BJ Group portfolios" and does "fund selection for GFAM's management of accounts for the BJ Group advisory services."  (Emphasis added).

30.     Contrary to Defendants' representations that Defendants were purchasing Funds based on the recommendations or selection by Bob Brinker, in truth, the percentage of Funds being purchased for the Portfolio that were not Brinker recommended Funds routinely exceeded 50%.  In fact, as demonstrated by the examples in the following chart, during the Class Period the percentage of non-Brinker recommended funds being purchased for GFAM clients reached nearly 65%.

Non-Brinker Recommended Funds

Quarter End

| | |
|---|---|
| 3/31/2003 | 64.50% |
| 6/30/2003 | 63.50% |
| 9/30/2003 | 63.00% |
| 12/31/2003 | 62.00% |
| 3/31/2004 | 56.50% |
| 6/30/2004 | 61.50% |
| 9/30/2004 | 61.50% |
| 12/31/2004 | 52.00% |
| 3/31/2005 | 53.00% |
| 6/30/2005 | 52.50% |
| 9/30/2005 | 52.00% |
| 12/31/2005 | 53.00% |
| 3/31/2006 | 53.00% |
| 6/30/2006 | 54.00% |
| 9/30/2006 | 55.00% |
| 12/31/2006 | 55.50% |
| 3/31/2007 | 41.00% |

| | |
|---|---|
| 6/30/2007 | 41.00% |
| 9/30/2007 | 40.50% |
| 12/31/2007 | 40.00% |
| 3/31/2008 | 39.50% |
| 6/30/2008 | 39.00% |
| 9/30/2008 | 38.00% |
| 12/31/2008 | 39.00% |
| 3/31/2009 | 38.00% |
| 6/30/2009 | 37.00% |

31.     During the Class Period, the Defendants purchased the following Funds that were

not the result of a selection or recommendation by Bob Brinker, but rather to generate higher

service and administrative fees for the Defendants.

Non-Brinker Recommended Funds

2003    Federated Max Cap
        GMO Growth
        Tweedy Browne Global Value
        BlackRock MuniFund
        Fidelity Advisor Equity Income

2004    Fidelity Advisor Equity Income
        Franklin Flex Cap
        GMO Growth
        Tweedy Browne Global Value
        BlackRock Prov. Inst. MuniFund
        Fidelity Advisor Overseas

2005    Fidelity Advisor Equity Income
        Franklin Flex Cap
        GMO Growth
        Fidelity Advisor Overseas
        Tweedy Browne Global Value
        BlackRock Prov. Inst. MuniFund
        Legg Mason Value

2006    Franklin Flex Cap
        Legg Mason Value
        Julius Baer International 2
        Templeton Foreign

11

BlackRock Prov. Inst. MuniFund
Oppenheimer Quest Capital Value

> 2007   Delaware American Services
> Wilshire 5000 Index
> Julius Baer International 2
> BlackRock Prov. Inst. MuniFund
>
> 2008   Delaware American Services
> Dow Jones Wilshire 5000 Index
> Julius Baer International 2 (Artio Intl)
> BlackRock Prov. Inst. MuniFund
> Janus Enterprise
>
> 2009   Artio International Equity II
> Janus Enterprise
> Dow Jones Wilshire 5000 Index
> BlackRock Liquidity MuniFund

32.     Moreover, contrary to Defendants' representations that "Bob recommends asset allocation and fund selection for GFAM's management of accounts for the BJ Group advisory services," Defendants completely failed to follow the asset allocation being recommended by Brinker.  During the Class Period, Defendants veered as much as 20% from the asset allocation being recommended by Brinker.  According to a former high level employee with Genworth's Private Client Group, during the 2003-2006 period, Genworth's allocation to large cap stock funds was roughly double the allocation that Bob Brinker recommended.  Genworth also significantly underweighted the Brinker recommended allocation to small cap funds.  Again, driven by additional fees that Genworth could collect.  Witnesses recall emails in which Defendants referenced 23 basis points in account servicing fees for each model portfolio, on average, as a target.

33.     According to the witnesses, during the Class Period, the non-Brinker recommended Funds that were being purchased by the Defendants for the Portfolio significantly

underperformed the Funds that were being recommended by Brinker.  In particular, according to

a former high level employee in the Private Client Group Division:

> What is worse, as a result of Genworth selecting non-Brinker recommended
> mutual funds, several of Genworth portfolios significantly underperformed Bob's
> published models by approximately 16 percentage points from 2003-2006.  In
> 2006 alone, as I recall, Genworth portfolios underperformed Bob's published
> models by roughly 50%.

> Before Legg Mason was added to the Genworth portfolios, I protested vehemently
> to the President and CEO of Genworth Asset Management, Gurinder Ahluwalia,
> to no avail.  I argued, and documented, that purchasing Legg Mason was
> essentially a bet, one that would not work out well.  Nevertheless, for Gurinder
> Ahluwalia, generating additional revenue superseded doing the right thing for the
> clients, never mind that what Genworth was doing was totally inconsistent with
> Bob Brinker's recommendations and how the service was marketed and sold.

34.     For example, the following chart demonstrates how significantly Genworth's BJ

Group (Brinker) Growth Portfolio underperformed the funds actually being recommended by

Brinker.

|  | BJ Group Performance | Brinker Marketimer Performance |
|---|---|---|
| 2003 | 29.06% | 43.40% |
| 2004 | 9.75% | 14.30% |
| 2005 | 4.71% | 5.90% |
| 2006 | 9.29% | 15.40% |
| 2007 | 6.01% | 9.00% |
| 2008 | -39.59% | -37.40% |
| YTD 6/30/09 | 8.28% | 9.23% |

35.     Additionally, according to this witness, the non-Brinker recommended Funds

purchased by the Defendants for the Portfolio, which amounted to approximately 50%, not only

underperformed the Brinker recommended funds, but all of the non-Brinker Funds purchased

were selected because they paid Defendants extra administrative and service fees.  These non-

Brinker Funds included, among others, Legg Mason Value FI, Franklin Flex Cap Growth, Templeton Foreign A, Julius Baer Int'l 2A and Oppenheimer Quest Capital Value Fund.

36.     According to the witness, the Funds purchased by Defendants are completely contrary to the Brinker strategy, a strategy that is touted to solicit new clients and keep existing ones.  As stated by the witness:

> Although Bob Brinker has preached for more than 25 years about the need to keep expenses low, every single alternate/substitute fund that Genworth selected paid them extra, which came directly out of clients' returns.  This practice goes completely against Bob's philosophy.  Of the more than 9000 mutual funds available, Genworth did not select one that didn't pay them extra.  In addition, Genworth has the ability to use Baron Partners Fund institutional shares (symbol BPTIX), which came out in early June 2009, but since Genworth doesn't do much in the way of due diligence, they are not aware of that.  So they stick with the retail shares (symbol BPTRX) to get paid an extra 25 basis points.

37.     Furthermore, Defendants never published annual investment returns to clients comparing the performance of the Portfolio to Bob Brinker's published returns.  In fact, according to former high-level employees with the Private Client Group, the Defendants actually maintained two portfolios for the aggressive model, growth model and balanced model.  The portfolios that were used for new and existing clients were the portfolios that were comprised of approximately 50% of non-Brinker recommended funds that paid Defendants higher fees. However, Defendants also maintained an internal, undisclosed portfolio for aggressive, growth and balanced models that were internally referred to as "Brinker Basic."  According to witnesses, these "Basic Brinker" portfolios, which were designed to mimic Bob Brinker's Marketimer Portfolios, were never disclosed to clients and were only used as a "last ditch effort to retain clients."  Simply put, Genworth Private Client Group employees were directed to use them as a

retention tool and were not used for new and existing clients because they generated less fees for the Defendants.

38.     Overall, Plaintiffs and other Class members suffered millions of dollars of lost earnings as a result of Defendants' blatant misrepresentations regarding the Portfolio, as well as Defendants' scheme to purchase Funds that generated higher fees for the Defendants.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 of the Securities and Exchange Commission
(Against All Defendants)**

39.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

40.     The Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and made various deceptive and untrue statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiffs to invest in the Portfolio.

41.     Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of deceptive and materially false and misleading statements to Plaintiffs as particularized above.

42.     In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiffs

16

relied, to their detriment, on such misleading statements and omissions in investing in the Portfolio.

43.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their investments in the Portfolio.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### (Against Defendant Ahluwalia)

44.     Defendant Ahluwalia acted as a controlling person of the Portfolio within the meaning of Section 20(2) of the Exchange Act as alleged herein.  By virtue of his high-level position, participation and awareness of the Portfolio's operations, and intimate knowledge of Genworth's products, sales, accounting, plans and implementation thereof, he had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Genworth, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Defendant Ahluwalia had the ability to prevent the issuance of the statements or cause the statements to be corrected.

45.     Defendant Ahluwalia had directly and supervisory involvement in the day-to-day operations of the model portfolios and therefore is presumed to have had the power to control or

influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

46.     By virtue of his position as a controlling person, Defendant Ahluwalia is liable pursuant to Section 20(a) of the Exchange Act.

### COUNT III

### For Breach of Fiduciary Duty
### (Against All Defendants)

47.     Plaintiffs entrusted capital to Defendants in exchange for substantial fees. Defendants' therefore assumed, and owed Plaintiffs, the following fiduciary duties (among others):

    A.     The duty to use reasonable care and the competence of a skilled investment advisory when performing due diligence and ensuring the legitimacy of opportunities for investing Plaintiffs' capital;

    B.     The duty to use reasonable care and the competence of a skilled investment advisor in managing, overseeing and safeguarding Plaintiffs' invested capital;

    C.     The duty to use reasonable care and the competence of a skilled investment advisor in disseminating proper account statements;

    D.     The duty to deal fairly and in good faith with Plaintiffs;

    E.     The duty to avoid and disclose conflicts of interests with Plaintiffs; and

    F.     The duty to warn Plaintiffs when capital has been placed at an undue risk of loss.

48. Defendants breached their fiduciary duties owed to Plaintiffs. Among other things:

A. Defendants failed to use reasonable care, competence or skill of a professional investment advisor to perform proper due diligence in deciding to invest in funds not recommended by Brinker;

B. Defendants failed to use reasonable care, competence or skill of a professional advisor to "provide the investment advising services selected by clients.";

C. Defendants failed to use reasonable care, competence or skill of a professional investment advisor to manage the investment of Plaintiffs;

D. Defendants failed to use reasonable care or the competence or skill of a professional investment advisor and/or administrator, when they failed to follow the Brinker strategy, including Brinker's asset allocation and fund selection, as represented in their marketing and sales materials;

E. Defendants failed to use reasonable care, competence or skill of a professional investment advisor through their purchase of non-Brinker funds thereby incurring higher administrative and service fees for their clients;

F. Defendants breached their duty of loyalty and good faith by failing to purchase funds recommended by Brinker, but instead in purchasing funds that paid Defendants higher administrative and services fees; and

G. Defendants failed to deal fairly and in good faith.

49. Defendants' fraudulent acts were willful, wanton and aimed at the public generally. Therefore, Plaintiffs are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief an judgment, as follows:

A.      Awarding compensatory damages in favor of Plaintiffs and against Defendants,

jointly and severally, for all damages sustained, including pre-judgment interest;

B.      Awarding punitive damages in favor of Plaintiffs and against Defendants, jointly

and severally;

C.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

including counsel fees and expert fees, costs and expenses;

D.      Placing the challenged fees received by Defendants in a constructive trust for the

benefit of Plaintiffs; and

E.      Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs hereby demand a trial by jury

of all issues so triable.

Dated: December 22, 2009

LEEDS, MORELLI & BROWN, P.C.

By: _____
Lenard Leeds
Matthew Marks
One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 873-9550

Joseph H. Weiss
James E. Tullman
WEISS & LURIE
551 Fifth Avenue
New York, New York 10176
(212) 682-3010 (Fax)

Attorneys for Plaintiffs

## PLAINTIFF'S CERTIFICATION

MICHAEL J. GOODMAN ("Plaintiff") certifies as follows:

1.      Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security at issue on this lawsuit at the direction of Plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transaction in Genworth during the Class Period specified in the Complaint is as follows:

Contributions - See attached.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

8.      I hereby certify, under penalty of perjury, that the foregoing is true and correct to the best of my current knowledge, information and belief.

DATED: December 21, 2009

Michael J. Goodman Trustee
Michael Goodman DDS PSP

_____
MICHAEL J. GOODMAN

# GOODMAN CONTRIBUTIONS

| DATE | AMOUNT |
|---|---|
| 9/5/2003 | $5000. |
| 9/19/2003 | $12,661.03 |
| 2/18/2004 | $6000. |
| 3/23/2004 | $4000. |
| 5/14/2004 | $4000. |
| 7/14/2004 | $805. |
| 11/30/2004 | 2000. |
| 3/15/2005 | $5000. |
| 8/22/2005 | $7,959.47 |
| 10/17/2005 | $12,500. |
| 10/17/2005 | $1400. |
| 10/4/2006 | $3076.13 |
| 9/17/07 | $13,850.57 |
| 5/2/2008 | $7000. |
| | |
| Total | $85,252.20 |

## PLAINTIFF'S CERTIFICATION

LINDA BROWN ("Plaintiff") certifies as follows:

1.      Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security at issue on this lawsuit at the direction of Plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transaction in Genworth during the Class Period specified in the Complaint is as follows:

Contributions - 06/2006 - $14,659.08

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

8.      I hereby certify, under penalty of perjury, that the foregoing is true and correct to the best of my current knowledge, information and belief.

DATED: December 21, 2009

_____
LINDA BROWN