UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| MICHAEL J. GOODMAN and LINDA BROWN, individually and on behalf of all others similarly situated, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC., GENWORTH FINANCIAL, INC., and GURINDER S. AHLUWALIA, | ) ) ) ) |
| | ) |
| Defendants. | ) ) |

CASE NO. CV-09-5603 (LDW) (ARL)

CLASS ACTION

<u>AMENDED COMPLAINT</u>

<u>JURY TRIAL DEMANDED</u>

_____

   Plaintiffs Michael J. Goodman, Steven Yoelin, Clarice Yassick and Martin Wasser ("Lead Plaintiffs" or "Plaintiffs") by their attorneys allege for their complaint as follows:

<b>SUMMARY OF THE ACTION</b>

   1.  This is a class action prosecuted by clients of Genworth Financial Wealth Management, Inc. (formerly Genworth Financial Asset Management) ("GFAM" or "Genworth") who invested in GFAM's BJ Group Services Portfolios (the "Portfolio") between December 22, 2003 and December 22, 2009 (the "Class Period"), to recover damages caused by Defendants' violations of the federal securities laws and common law (the "Class"). This case arises from the fraudulent scheme perpetrated by Defendants through Genworth's marketing, solicitation, sale and management of the Portfolio. The scheme was facilitated by Defendants, who knowingly, recklessly and/or with intent to deceive disseminated to prospective and current investors materially misleading representations regarding the Portfolio and its "exclusive" management agreement with Robert "Bob" Brinker ("Brinker").

2.       According to all of its sales, marketing and disclosure materials disseminated to prospective and current investors in Genworth's Private Client Group, "The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of Marketimer newsletter."  Defendants represented that "Bob recommends asset allocations and fund selection for GFAM's management of accounts for the BJ Group Advisory Services."  The materials explicitly state:  "This portfolio is based on the Bob Brinker model, offered through our exclusive partnership with him" and that "[o]ur experienced professionals work to implement Bob's investment strategy utilizing his proprietary tactical asset allocation model."

3.       Contrary to Defendants' representations that the Portfolio was being managed based upon the Brinker recommendations, the percentage of non-Brinker recommended Funds being purchased for the Portfolio routinely exceeded 50%.  By not implementing Brinker's tactical asset allocation and fund selection, Genworth was able to generate for itself extra revenues by selecting alternate mutual funds that paid higher administrative and service fees. Defendants purchased these funds, instead of purchasing funds recommended by Brinker, notwithstanding that these funds routinely underperformed Funds recommended by Brinker. Moreover, contrary to Defendants' representation, Genworth did not have an "exclusive" management agreement with Brinker.

4.       Defendants' wrongful conduct, including gross misrepresentations and omissions and repeated breaches of fiduciary duty, caused Plaintiffs and the Class to suffer millions of dollars in damages.

## JURISDICTION AND VENUE

5.      Plaintiffs seek damages caused by Defendants' violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Defendants' breaches of fiduciary duty.

6.      Jurisdiction is conferred over the subject matter of this action by Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78aa] and 28 U.S.C. §§ 1331 and 1337, and as part of the supplemental jurisdiction of this Court under 28 U.S.C. § 1367.

7.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud and its effects have occurred within this District.

8.      In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

9.      Lead Plaintiffs Michael J. Goodman, Steven Yoelin, Clarice Yassick and Martin Wasser were, during the Class Period, investors in the Private Client Group of Genworth.

10.      Genworth Financial, Inc. is an international financial services organization that offers a portfolio of primarily consumer-focused products through its various companies, including annuities, combination products, investment services, life insurance, long term care insurance, medicare supplement insurance, mortgage insurance, and payment protection

insurance.  Genworth Financial, Inc. is headquartered in Richmond, Virginia, and employs over 6,000 people in 25 different countries.

11.     Genworth Financial Wealth Management, Inc. is a wholly owned subsidiary of Genworth Financial, Inc.  GFAM is an investment adviser registered with the U.S. Securities and Exchange Commission, and its sole business activity is serving as an investment adviser.  GFAM provides various investment supervisory services to a variety of clients, including individuals, corporations, partnerships, pension and profit-sharing plans, trusts and others.  GFAM maintains headquarters at 2300 Contra Costa Blvd., Suite 600, Pleasant Hill, CA and 3001 Summer Street, Stamford, CT.

12.     Gurinder S. Ahluwalia ("Ahluwalia") is the President and Chief Executive Officer of GFAM.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

13.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class to recover damages caused by Defendants' violations of law during the Class Period.

14.     Excluded from the Class are Defendants, the officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous and geographically dispersed throughout the country that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class.

Members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

17.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b.     whether statements made by Defendants during the Class Period misrepresented material facts about the business, operations and investments of the Portfolio;

        c.     whether Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

        d.     whether Defendants' conduct alleged herein was intentional, reckless, and/or in violation of fiduciary duties owed to Plaintiffs and other Class members and therefore violated common law; and

        e.     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

### BACKGROUND AND GENERAL ALLEGATIONS

20.    According to the Defendants, BJ Group Services was founded in 1986 and was

created to offer customized investment solutions tailored to meet clients' personal objectives.  In

2000, BJ Group Services was purchased by Centurion Capital Group.  Thereafter, in late 2001

Centurion Capital Group was purchased by General Electric ("GE") and managed under GE

Private Asset Management, Inc.

21.    In 2005, GE Private Asset Management became Genworth Financial Asset

Management, Inc., as GE sold its remaining shares to the public.  Assets under management of

GFAM's Private Client Group peaked at approximately $1.1 billion in 2007.  Recently,

Genworth Financial Asset Management, Inc. changed its name to Genworth Financial Wealth

Management.

22.    During the Class Period, Defendants through their various sales, marketing and

disclosure materials disseminated to prospective and current Genworth clients, continuously

touted its exclusive management agreement with Brinker.  The Defendants routinely represented

to prospective and current private clients that the Portfolio was being managed by Brinker, or at

a minimum, GFAM was going to implement Brinker's recommendations, including mutual fund

selection and asset allocation.  According to the Defendants' marketing materials sent to clients in the BJ Group Services Private Client Group, "Bob recommends asset allocations and fund selection for GFAM's management of accounts for the BJ Group Advisory Services."

23.     The "Account Application" that is sent out to all prospective clients expressly identifies the Portfolio as the "BJ Group (Brinker) Services" portfolios.  Moreover, under the heading "Genworth Financial Asset Management's responsibilities, as Investment Advisor," Defendants expressly represent that "GFAM shall provide the investment advisory services selected by the client."

24.     Similarly, this "Account Application" describes the Portfolio as follows:

**The BJ Group Service**

The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer* newsletter.  Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to GFAM based on that analysis. GFAM implements Mr. Brinker's recommendations by selecting mutual funds for client accounts.  (Emphasis added)

25.     In an information booklet sent to new and existing clients to inform them of "all material assets of [the] organization, its fees and services, and key personnel," Defendants explained the management aspects of the Portfolio.  According to the Defendants:

The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer* newsletter.  Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to [GFAM] based on that analysis. [GFAM]'s Investment Management ("IM") Department implements Mr. Brinker's recommendations by selecting mutual funds for client accounts. [GFAM] pays Mr. Brinker annual fees, not based on assets under management, for his services, which include investment management services and marketing services, including referring potential clients to [GFAM]'s Private Client Group division.  (Emphasis added)

7

26.     Throughout the Class Period, Defendants solicited new investors and kept existing ones through their continuous representations regarding Brinker's success and Genworth's exclusive management agreement with Brinker.  In a 2004 Genworth report, Defendants emphasized, "Balanced Growth: This portfolio is based on the Bob Brinker model, offered through our exclusive partnership with him.  This objective is designed for clients' core holdings.  This portfolio consists of a diversified, broad base of domestic and international equities in addition to a fixed income component to provide balance and diversification.  With a conservative growth and income objective, emphasis is placed on preserving capital and reducing volatility.  When Brinker is bullish, maximum targeted equity exposure is 60%." (Emphasis added)

27.     In Defendants' 2007 and 2008 "Disclosure Brochures for the Private Client Group," Defendants again touted Genworth's exclusive agreement with Brinker and that the Portfolio is based on Brinker recommendations.  The brochure states:

> These portfolios are constructed primarily using mutual funds.  Other investments may also be purchased by GFAM for client accounts, including, without limitation, closed-end investment companies, exchange-traded funds ("ETFs"), U.S. Treasury bonds, notes and bills, and bank notes.  Clients may choose from a variety of investment objectives depending upon their individual needs.  Some client accounts will experience significant fluctuation in value, and higher risk of loss in the pursuit of potentially higher returns, based on the investment objective selected.

> The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the Marketimer newsletter.  Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to GFAM based on that analysis. GFAM's Investment Management ("IM") Department implements Mr. Brinker's recommendations by selecting mutual funds for client accounts.  GFAM pays Mr. Brinker annual fees, not based on assets under management, for his services, which include investment management services and marketing services, including referring potential clients to GFAM's Private Client Group division.

28.     Defendants also regularly touted Brinker's professional track record.  In a recent

Introductory Brochure, Defendants represented:

> Bob Brinker is a rare breed in the investment field.  An independent strategist
> with more than 25 years of experience, he makes bold pronouncements.  He isn't
> beholden to Wall Street.
>
> Of course, you know him from his radio show, MoneyTalk, which has been
> informing and entertaining weekend listeners for more than 20 years.  You also
> may know about his monthly newsletter, "Marketimer," which focuses on asset
> allocation and regularly receives top ratings for accuracy.
>
> We at Genworth Financial Asset Management, Inc. ("GFAM") <u>have a long
> standing relationship with Bob to offer one of the nation's most well-known
> tactical asset allocation strategies</u>.  Founded in 1986 and acquired by GFAM in
> 2000, BJ Group Services offers customized investment solutions tailored to meet
> clients' personal objectives.  Long considered an expert in identifying market
> trends through his proprietary Marketimer model, Bob recommends asset
> allocation and fund selection for GFAM's management of accounts for the BJ
> Group advisory services.
>
> <u>Our experienced professionals work to implement Bob's investment strategy
> utilizing his proprietary tactical asset allocation model</u>.  Understanding that cycles
> exist in the stock market, our goal is to participate in market gains during a rising
> market and preserve capital during market declines.  (Emphasis added)

29.     Throughout the Class Period, Defendants also sent letters to potential clients

emphasizing Genworth's relationship with Brinker.  According to the letter, "Thank you for your

interest in Bob Brinker and Genworth Financial.  We are excited that you are considering our

services and look forward to sharing with you the tremendous difference that the combination of

Brinker and Genworth Financial has made to so many investors like you."

30.     In Genworth's "BJ Group Services Overview," dated August 2009, Defendants

not only emphasized Genworth's "longstanding relationship" with Brinker, but further stressed

in a block quote:

When it comes to helping affluent investors reach their financial goals, GFAM takes a unique perspective: yours.  Let GFAM and Bob Brinker simplify your investment life.  Call one of our Account Executives at 800.252.2044 or e-mail us at GFAMpcginfo@Genworth.com for more information.

31.     Similarly, up to the time that Plaintiffs commenced this Action, Defendants continued to advertise Brinker on their website (www.gfampcg.com/pcgv2/do/pcgPublic). Not only did Defendants use a picture of Brinker, but they continued to represent that "Bob directs the asset allocation of the BJ Group portfolios" and does "fund selection for GFAM's management of accounts for the BJ Group advisory services."  (Emphasis added)

32.     Contrary to Defendants' representations that Brinker was selecting Funds for the Portfolio or that Defendants were purchasing Funds based on the recommendations by Brinker, in truth, the percentage of Funds being purchased for the Portfolio that were not Brinker selected/ recommended Funds routinely exceeded 50%.  In fact, as demonstrated by the examples in the following chart, during the Class Period the percentage of non-Brinker selected/recommended Funds being purchased for GFAM clients reached nearly 65%.

Non-Brinker Selected/Recommended Funds

Quarter End

| | |
|---|---|
| 3/31/2003 | 64.50% |
| 6/30/2003 | 63.50% |
| 9/30/2003 | 63.00% |
| 12/31/2003 | 62.00% |
| 3/31/2004 | 56.50% |
| 6/30/2004 | 61.50% |
| 9/30/2004 | 61.50% |
| 12/31/2004 | 52.00% |
| 3/31/2005 | 53.00% |
| 6/30/2005 | 52.50% |
| 9/30/2005 | 52.00% |
| 12/31/2005 | 53.00% |
| 3/31/2006 | 53.00% |

10

| | |
|---|---|
| 6/30/2006 | 54.00% |
| 9/30/2006 | 55.00% |
| 12/31/2006 | 55.50% |
| 3/31/2007 | 41.00% |
| 6/30/2007 | 41.00% |
| 9/30/2007 | 40.50% |
| 12/31/2007 | 40.00% |
| 3/31/2008 | 39.50% |
| 6/30/2008 | 39.00% |
| 9/30/2008 | 38.00% |
| 12/31/2008 | 39.00% |
| 3/31/2009 | 38.00% |
| 6/30/2009 | 37.00% |

33.    During the Class Period, the Defendants purchased the following Funds that were not the result of a selection or recommendation by Brinker, but rather to generate higher service and administrative fees for the Defendants.

Non-Brinker Selected/Recommended Funds

2003    Federated Max Cap
        GMO Growth
        Tweedy Browne Global Value
        BlackRock MuniFund
        Fidelity Advisor Equity Income

2004    Fidelity Advisor Equity Income
        Franklin Flex Cap
        GMO Growth
        Tweedy Browne Global Value
        BlackRock Prov. Inst. MuniFund
        Fidelity Advisor Overseas

2005    Fidelity Advisor Equity Income
        Franklin Flex Cap
        GMO Growth
        Fidelity Advisor Overseas
        Tweedy Browne Global Value
        BlackRock Prov. Inst. MuniFund
        Legg Mason Value

11

2006   Franklin Flex Cap
Legg Mason Value
Julius Baer International 2
Templeton Foreign
BlackRock Prov. Inst. MuniFund
Oppenheimer Quest Capital Value

2007   Delaware American Services
Wilshire 5000 Index
Julius Baer International 2
BlackRock Prov. Inst. MuniFund

2008   Delaware American Services
Dow Jones Wilshire 5000 Index
Julius Baer International 2 (Artio Intl)
BlackRock Prov. Inst. MuniFund
Janus Enterprise

2009   Artio International Equity II
Janus Enterprise
Dow Jones Wilshire 5000 Index
BlackRock Liquidity MuniFund

34.    Moreover, contrary to Defendants' representations that "Bob recommends asset allocation and fund selection for GFAM's management of accounts for the BJ Group advisory services," Defendants completely failed to follow the asset allocation being recommended by Brinker.  During the Class Period, Defendants veered as much as 20% from the asset allocation being recommended by Brinker.  According to a former high level employee with Genworth's Private Client Group, during the 2003-2006 period, Genworth's allocation to large cap stock funds was roughly double the allocation that Brinker recommended.  Genworth also significantly underweighted the Brinker recommended allocation to small cap funds, again, driven by additional fees that Genworth could collect.  Witnesses recall emails in which Defendants referenced 23 basis points in account servicing fees for each model portfolio, on average, as a target.

35.     According to the witnesses, during the Class Period, the non-Brinker selected/ recommended Funds that were being purchased by the Defendants for the Portfolio significantly underperformed the Funds that were being recommended by Brinker.  In particular, according to a former high level employee in the Private Client Group Division:

> What is worse, as a result of Genworth selecting non-Brinker recommended mutual funds, several of Genworth portfolios significantly underperformed Bob's published models by approximately 16 percentage points from 2003-2006.  In 2006 alone, as I recall, Genworth portfolios underperformed Bob's published models by roughly 50%.
>
> Before Legg Mason was added to the Genworth portfolios, I protested vehemently to the President and CEO of Genworth Asset Management, Gurinder Ahluwalia, to no avail.  I argued, and documented, that purchasing Legg Mason was essentially a bet, one that would not work out well.  Nevertheless, for Gurinder Ahluwalia, generating additional revenue superseded doing the right thing for the clients, never mind that what Genworth was doing was totally inconsistent with Bob Brinker's recommendations and how the service was marketed and sold.

36.     For example, the following chart demonstrates how significantly Genworth's BJ Group (Brinker) Growth Portfolio underperformed the funds actually being recommended by Brinker.

| | BJ Group Performance | Brinker Marketimer Performance |
|---|---|---|
| 2003 | 29.06% | 43.40% |
| 2004 | 9.75% | 14.30% |
| 2005 | 4.71% | 5.90% |
| 2006 | 9.29% | 15.40% |
| 2007 | 6.01% | 9.00% |
| 2008 | -39.59% | -37.40% |
| YTD 6/30/09 | 8.28% | 9.23% |

37.     Additionally, according to this witness, the non-Brinker recommended Funds purchased by the Defendants for the Portfolio, which amounted to approximately 50%, not only underperformed the Brinker recommended Funds, but all of the non-Brinker Funds purchased

were selected because they paid Defendants extra administrative and service fees.  These non-Brinker Funds included, among others, Legg Mason Value FI, Franklin Flex Cap Growth, Templeton Foreign A, Julius Baer Int'l 2A and Oppenheimer Quest Capital Value Fund.

38.     According to the witness, the Funds purchased by Defendants are completely contrary to the Brinker strategy, a strategy that is touted to solicit new clients and keep existing ones.  As stated by the witness:

> Although Bob Brinker has preached for more than 25 years about the need to keep expenses low, every single alternate/substitute fund that Genworth selected paid them extra, which came directly out of clients' returns.  This practice goes completely against Bob's philosophy.  Of the more than 9000 mutual funds available, Genworth did not select one that didn't pay them extra.  In addition, Genworth has the ability to use Baron Partners Fund institutional shares (symbol BPTIX), which came out in early June 2009, but since Genworth doesn't do much in the way of due diligence, they are not aware of that.  So they stick with the retail shares (symbol BPTRX) to get paid an extra 25 basis points.

39.     Furthermore, Defendants never published annual investment returns to clients comparing the performance of the Portfolio to Brinker's published returns.  In fact, according to former high-level employees with the Private Client Group, the Defendants actually maintained two portfolios for the aggressive model, growth model and balanced model.  The portfolios that were used for new and existing clients were the portfolios that were comprised of approximately 50% of non-Brinker recommended funds that paid Defendants higher fees.  However, Defendants also maintained an internal, undisclosed portfolio for aggressive, growth and balanced models that were internally referred to as "Brinker Basic."  According to witnesses, these "Brinker Basic" portfolios, which were designed to mimic Brinker's Marketimer Portfolios, were never disclosed to clients and were only used as a "last ditch effort to retain clients."  Simply put, Genworth Private Client Group employees were directed to use "Brinker

14

Basic" portfolios as a retention tool and not for new and existing clients because they generated

less fees for the Defendants.

40.     Defendants' fraudulent conduct and fiduciary breaches are further supported in

the pleadings filed in a parallel action in Connecticut captioned <u>Genworth Financial Wealth</u>

<u>Management, Inc. v. McMullan, et al. and McMullan, et al. v. Ahluwalia</u>, C.A. No. 09-cv-1521-

VLB.  In Defendants' Answer, Affirmative Defenses, Counterclaims and Third-Party Complaint

dated October 21, 2009, Third-Party Plaintiffs Timothy McMullan, James Cook, Timothy

McFadden, and TJT Capital Group, LLC (the "TJT Plaintiffs") stated:

- •    Defendants-Counterclaimants - Third Party Plaintiffs McMullan, Cook
and McFadden resigned from Genworth, in part, after becoming
increasingly concerned by Genworth's management of accounts, asset
allocation for accounts, and selection of mutual funds which were being
represented to Genworth clients as being managed in a manner consistent
with and pursuant to the investment philosophy, strategy and guidance
provided by Robert J. Brinker ("Bob Brinker") when, in fact, they were
not.

- •    Defendant-Counterclaimant - Third Party Plaintiff McMullan complained
about and reported to management at Genworth, and specifically to Third-
Party Defendant Genworth President and CEO Gurinder Ahluwalia
("CEO Ahluwalia"), the fact that client accounts were grossly
under-performing due to Genworth's inappropriate selection of
non-Brinker recommended mutual funds in a manner inconsistent and
often contrary to Bob Brinker's recommendations; that inappropriate
funds were clearly being selected in a manner calculated solely to obtain
additional revenue at the clients' expense; that Genworth was fraudulently
representing to clients that it "implements Bob Brinker's
recommendations by selecting mutual funds for client accounts" when, in
fact, it very often did not; that there was significant evidence of "double
dipping" practices at Genworth - at the clients' expense and contrary to
both good practice and the law; and that Genworth was failing to properly
monitor and report on the performance of accounts under its control and
within its custody.

41.     Furthermore, contrary to Defendants' constant representations that Genworth had

an "exclusive" agreement with Brinker, the TJT Plaintiffs stated:

- Since resigning from the employ of Genworth, agents of Genworth,
including Ahluwalia, its President and CEO, have defamed and disparaged
Defendants Counterclaimants—Third-Party Plaintiffs and have tortiously
interfered with TJT, by fraudulently and intentionally misrepresenting to
clients, prospective clients and third parties both that Genworth has an
exclusive agreement with Bob Brinker and that TJT does not have any
relationship or agreement with Bob Brinker causing Defendants-
Counterclaimants— Third-Party Plaintiffs' damage.

- Genworth and CEO Ahluwalia, however, were, at all times, aware of the
fact that TJT has a relationship/affiliation with Bob Brinker and, in fact,
had been told, and had been provided a copy, of TJT's agreement with
Bob Brinker.

42.     Similarly, in the TJT Plaintiffs' Responses and Objections to the First Set of

Interrogatories the TJT Plaintiffs stated:

- In or around mid-July, 2009, McMullan advised Bob Brinker of the
formation of TJT Capital and subsequently negotiated and entered into a
consulting agreement with Brinker.  McMullan, Bob Brinker and Zandy
were involved in the communications regarding the negotiation and
execution of TJT Capital's agreement with Brinker.  Pursuant to the
agreement, TJT Capital is permitted to use the model portfolios published
in Brinker's Marktetimer newsletter as the basis on which to construct
model portfolios.  Bob Brinker signed the agreement and dated it
August 1, 2009.  McMullan, Cook and McFadden signed the agreement
on August 18, 2009, upon their receipt of the agreement.

- Subsequent to McMullan's resignation from Genworth and after learning
that Genworth and its agents, including but not limited to Gurinder
Ahluwalia, had been advising clients, Genworth employees and third
parties that TJT Capital did not have any agreement with Brinker,
McMullan exchanged several communications via telephone and e-mail
with Zandy regarding the situation, including the fact that Genworth's
agreement with Brinker was non-exclusive and discussing the threats
made by Genworth to Zandy and Brinker to sue both of them if Brinker
did not "tear up" its agreement with TJT Capital.

16

- Defendants/Third Party Plaintiffs have been told by TJT Capital clients that Genworth employees have repeatedly said/advised that Genworth has an exclusive relationship with Bob Brinker and that Genworth is the only advisory firm associated with Brinker.  Until October 28, 2009, Genworth's website continued to represent that it maintained an exclusive relationship with Bob Brinker and Bob Carlson, knowing that such representations were false.  It is believed that Genworth used a forged Bob Brinker signature on a letter dated September 17, 2009, which was sent to Genworth clients formerly serviced by Cook and McFadden. While Genworth employees were misleading and/or providing knowingly false information to clients about Genworth and TJT Capital's relationships with Brinker, they were also offering incentives that included cutting annual management fees to keep accounts - actions which would have been unnecessary if Genworth had an exclusive agreement with Brinker. Such actions and misrepresentations were undertaken in an attempt to defame Defendants/Third Party Plaintiffs, to damage and/or destroy Defendants/Third Party Plaintiffs' relationship with Brinker, including, but not limited to TJT Capital's contractual relationship with Brinker, to discredit any assertions made by TJT Capital that it had/has a relationship with Brinker, to keep clients from discovering the truth about how Genworth actually managed the Brinker portfolios, and to unfairly compete against TJT Capital.  Defendants/Third Party Plaintiffs have been damaged by the actions of Plaintiff/Third Party Defendant.

43.     Overall, Plaintiffs and other Class members suffered millions of dollars in damages as a result of Defendants' blatant misrepresentations regarding the Portfolio, as well as Defendants' scheme to purchase Funds that generated higher fees for the Defendants.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 of the Securities and Exchange Commission
### (Against All Defendants)

44.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

45.     The Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and

17

courses of business which operated as a fraud and deceit upon Plaintiffs and made various deceptive and untrue statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiffs to invest in the Portfolio.

46.    Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of deceptive and materially false and misleading statements to Plaintiffs as particularized above.

47.    In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiffs relied, to their detriment, on such misleading statements and omissions in investing in the Portfolio.

48.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their investments in the Portfolio.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### (Against Defendant Ahluwalia)

49.     Defendant Ahluwalia acted as a controlling person of the Portfolio within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, participation and awareness of the Portfolio's operations, and intimate knowledge of Genworth's products, sales, accounting, marketing materials, plans, and implementation thereof, he had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Genworth, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Defendant Ahluwalia had the ability to prevent the issuance of the statements or cause the statements to be corrected.

50.     Defendant Ahluwalia had direct and supervisory involvement in the day-to-day operations of the model portfolios and therefore is presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

51.     By virtue of his position as a controlling person, Defendant Ahluwalia is liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

### For Breach of Fiduciary Duty
### (Against All Defendants)

52.     Plaintiffs entrusted capital to Defendants in exchange for substantial fees. Defendants' therefore assumed, and owed Plaintiffs, the following fiduciary duties (among others):

a.      The duty to use reasonable care and the competence of a skilled investment advisor when performing due diligence and ensuring the legitimacy of opportunities for investing Plaintiffs' capital;

b.      The duty to use reasonable care and the competence of a skilled investment advisor in managing, overseeing and safeguarding Plaintiffs' invested capital;

c.      The duty to use reasonable care and the competence of a skilled investment advisor in disseminating disclosure materials and Portfolio statements;

d.      The duty to deal fairly and in good faith with Plaintiffs;

e.      The duty to avoid and disclose conflicts of interests with Plaintiffs; and

f.      The duty to warn Plaintiffs when capital has been placed at an undue risk of loss.

53.     Defendants breached their fiduciary duties owed to Plaintiffs.  Among other things:

a.      Defendants failed to use reasonable care, competence or skill of a professional investment advisor to perform proper due diligence in deciding to invest in Funds not selected/recommended by Brinker;

b.      Defendants failed to use reasonable care, competence or skill of a professional advisor to "provide the investment advising services selected by clients.";

c.      Defendants failed to use reasonable care, competence or skill of a professional investment advisor to manage the investment of Plaintiffs;

d.      Defendants failed to use reasonable care, competence or skill of a professional investment advisor and/or administrator, when they failed to follow the

Brinker strategy, including Brinker's asset allocation and fund selection, as represented in their marketing and sales materials;

      e.     Defendants failed to use reasonable care, competence or skill of a professional investment advisor through their purchase of non-Brinker Funds thereby incurring higher administrative and service fees for their clients;

      f.     Defendants breached their duty of loyalty and good faith by failing to purchase Funds selected/recommended by Brinker, but instead in purchasing Funds that paid Defendants higher administrative and services fees; and

      g.     Defendants failed to deal fairly and in good faith.

54.     Defendants' fraudulent acts were willful, wanton and aimed at the public generally.  Therefore, Plaintiffs are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Awarding compensatory damages in favor of Plaintiffs and against Defendants, jointly and severally, for all damages sustained, including pre-judgment interest;

B.     Awarding punitive damages in favor of Plaintiffs and against Defendants, jointly and severally;

C.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees, costs and expenses;

D.     Placing the challenged fees received by Defendants in a constructive trust for the benefit of Plaintiffs; and

E.     Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  May 24, 2010                                              WEISS & LURIE


                                                        By:/s/ Joseph H. Weiss
                                                           Joseph H. Weiss
                                                           James E. Tullman
                                                           551 Fifth Avenue
                                                           New York, New York 10176
                                                           (212) 682-3025
                                                           (212) 682-3010 (Fax)

                                                           Lenard Leeds
                                                           Jeffrey K. Brown
                                                           LEEDS, MORELLI & BROWN, P.C.
                                                           One Old Country Road, Suite 347
                                                           Carle Place, New York 11514
                                                           (516) 873-9550

                                                           Co-Lead Counsel for Plaintiffs