UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MICHAEL J. GOODMAN and LINDA BROWN,
individually and on behalf of all others similarly
situated,

                              Plaintiffs,

    v.

GENWORTH FINANCIAL WEALTH
MANAGEMENT, INC., GENWORTH FINANCIAL,
INC. and GURINDER S. AHLUWALIA,

                              Defendants.

---

Civ. No. 09-5603(LDW)(ARL)

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT

**SONNENSCHEIN NATH & ROSENTHAL LLP**
Reid L. Ashinoff
Sandra D. Hauser
Brendan E. Zahner

1221 Avenue of the Americas
New York, New York 10020-1089
Tel:  (212) 768-6700
Fax:  (212) 768-6800
rashinoff@sonnenschein.com
shauser@sonnenschein.com
bzahner@sonnenschein.com

*Counsel for Genworth Financial Wealth
Management, Inc., Genworth Financial, Inc. and
Gurinder S. Ahluwalia*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES ...................................................................... iii

SUMMARY OF MOTION ............................................................................1

THE ALLEGATIONS OF THE AMENDED COMPLAINT ...........................5

A.    Genworth's Private Client Group ("PCG") ...................................5

    1.    The PCG Investment Process.......................................................6

    2.    The Investment Services Offered by PCG ..................................7

B.    There Are No Specific Allegations Concerning the Plaintiffs.........8

C.    The Generalized Allegations of Genworth's Misrepresentations Both Are Insufficiently Pled and Are Contradicted by the Complaint Itself and By the Documents it References ....................................................10

    1.    Plaintiffs' "Fund Selection" Allegations Are Undermined By The Same Documents and Disclosures that Plaintiffs Invoke and Reference .......................10

    2.    Plaintiffs' "Asset Allocation" Allegations Are Undermined By Both Their Implausibility and By Plaintiffs' Contractual Documents with PCG..........14

    3.    Genworth Expressly and Repeatedly Disclosed to Plaintiffs that its Custodian Affiliate Would Receive ASF from Mutual Funds Investments ...............15

    4.    Plaintiffs' "Exclusivity Allegation" is Contradicted By the Complaint Itself and Lacks Credibility..................17

ARGUMENT ...............................................................................................17

I.    EACH PLAINTIFF'S SECTION 10(B) CLAIM (COUNT I) FAILS ...........17

A.    The Heightened Pleading Standard for Securities Fraud .............17

B.    Plaintiffs Do Not Allege Any Actual Misrepresentation in Connection with the Purchase or Sale of a Security ....................19

    1.    The "Fund Selection" Allegation: Genworth Expressly Told its Clients that Genworth Would Select Mutual Funds for Client Accounts. ...............20

|  | 2. | The Asset Allocation Allegations are Insufficient | 21 |
|  | 3. | Genworth Neither Hid Nor Disguised ASF, but Rather Explicitly and Repeatedly Informed Clients About Mutual Fund Fees | 22 |
|  | 4. | Genworth Had an Exclusive Relationship with Robert Brinker | 22 |
| C. | | The Amount of ASF Fees Alleged is Not Material | 23 |
| D. | | Plaintiffs Fail to Successfully Plead Reliance/Transaction Causation | 24 |
| E. | | Plaintiffs Fail to Plead the Requisite Loss Causation | 25 |
| F. | | Plaintiffs Fail to Sufficiently Allege Scienter | 28 |

II. PLAINTIFFS FAIL TO STATE A 10(b)(5) OR A CLAIM UNDER SECTION 20(A) AGAINST MR. AHLUWALIA (COUNTS I AND II) .......... 34

III. PLAINTIFFS CLAIM FOR BREACH OF FIDUCIARY DUTY (COUNT III) IS BARRED BY SLUSA ......... 34

IV. PLAINTIFFS STATE NO CLAIM AGAINST GENWORTH FINANCIAL INC. ......... 37

CONCLUSION ......... 38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ascension Health v. Am. Int'l Group, Inc.*,
    No. 08-7765, 2009 WL 2195916 (S.D.N.Y. July 23, 2009).....................................................37

*Ashland v. Morgan Stanley*,
    -- F. Supp. 2d --, 2010 WL 1253932 (S.D.N.Y. March 30, 2010)..........................................25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...............................................................................................6, 18

*Basic v. Levinson*,
    485 U.S. 224 (1988)..............................................................................................................22

*Cortec Indus. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)......................................................................................................6

*Denton v. H&R Block Financial Advisors, Inc.*,
    2001 WL 1183292 (N.D. Ill. 2001) ..............................................................................35, 36

*Echostar DBS Corp. v. Gemstar-TV Guide Int'l., Inc.*,
    No. 05 Civ. 8510 (DAB), 2007 WL 438088 (S.D.N.Y. Feb. 8, 2007) ...................................19

*Feinman v. Dean Witter Reynolds, Inc.*,
    84 F.3d 539 (2d Cir. 2006).............................................................................................24, 25

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..........................................................................................17, 18

*Genworth v. McMullan, et al.*,
    Civ. No. 3:09-CV-1521 (VLB), (D. Conn)...................................................................10, 33

*Gunther v. Capital One*,
    2010 WL 1404122 (E.D.N.Y)...............................................................................................37

*Haney v. USAA Cas. Ins. Co.*,
    331 Fed. Appx. 223 (4th Cir. 2009)......................................................................................37

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008)..........................................................................23, 25, 31

*In re Aegon N.V. Sec. Litig.*,
    No. 03 CIV 0603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004)...........................................19

*In re Bayou Hedge Fund Litig.,*
    534 F. Supp. 2d 405 (S.D.N.Y. 2007)..................................................28

*In re Edward Jones Holders Litigation,*
    453 F. Supp. 2d 1210 (C.D. Cal. 2006) ...........................................35, 36

*In re GeoPharma, Inc. Sec. Litig.,*
    411 F. Supp. 2d 434 (S.D.N.Y. 2006)..................................................29

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,*
    434 F. Supp. 2d 233 (S.D.N.Y. 2006)...............................................26, 27

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,*
    434 F. Supp. 2d 233,238 (S.D.N.Y. 2006)..............................................26

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,*
    No. 03-CV-8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ................23, 25, 26

*In re Salomon Smith Barney Mut. Fund Fees Litigation,*
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)...............................................34, 36

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001).......................................................28, 29

*Laub v. Faessel,*
    981 F. Supp. 870 (S.D.N.Y. 1997) ....................................................26

*Lee v. Am. Nat'l Ins. Co.,*
    260 F.3d 997 (9th Cir. 2001) ........................................................37

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005).......................................................25, 27

*Lesavoy v. Gattullo-Wilson,*
    170 Fed. Appx. 721 (2d Cir. 2006) ....................................................19

*Medis Investor Group v. Medis Technologies, Ltd.,*
    586 F. Supp. 2d 136 (S.D.N.Y. 2008), *aff'd* 328 F.................................28, 29

*Merck v. Reynolds,*
    130 S. Ct. 1784 (2010)...........................................................4, 27, 28

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
    126 S. Ct. 1503 (2006)...........................................................34, 35

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000).......................................................19, 32

*Pacific Inv. Management Co. LLC v. Mayer Brown LLP,*
    603 F.3d 144 (2d Cir. 2010).........................................................33

*Rombach v. Chang,*
　　355 F.3d 164 (2d Cir. 2004) ..................................................................18, 34

*SEC v. Mayhew,*
　　121 F.3d 44 (2d Cir. 1997)..............................................................................22

*Segal v. Fifth Third Bank,*
　　581 F.3d 305 (6th Cir. 2009) .....................................................................34, 36

*Siepel v. Bank of America,*
　　526 F.3d 1122 (8th Cir. 2008) ...................................................................34, 36

*Starr v. Georgeson Shareholder Inc.,*
　　412 F.3d 103 (2d Cir. 2005) ..........................................................................24

*Tellabs Inc. v. Makor Issues & Rights Ltd.,*
　　551 U.S. 308, 127 S.Ct. 2499 (2007).....................................................4, 17, 28

*The Limited, Inc. v. McCrory Corp.,*
　　645 F. Supp. 1038 (S.D.N.Y. 1986).................................................................37

*Thomson-CSF, S.A. v. Am. Arbitration Assoc.,*
　　64 F.3d 773 (2d Cir. 1995)..............................................................................37

**STATUTES**

15 U.S.C. § 77p(b) ...................................................................................................34

15 U.S.C. § 78bb(f)(1) ......................................................................................34, 35

15 U.S.C. § 78bb(f)(5)(B)(i)(I) .........................................................................35, 36

15 U.S.C. §78u-4(b)(1)-(2) ....................................................................................18

15 U.S.C. § 78u-4(b)(4) ..........................................................................................25

Securities Litigation Uniform Standards Act of 1998 ("SLUSA") ...................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ....................................................................................................35

Fed. R. Civ. P. 12(b)(6)...........................................................................1, 28, 36, 37

Defendants Genworth Financial Wealth Management, Inc. ("Genworth"), Genworth

Financial, Inc. ("GFI"), and Gurinder Ahluwalia (together with Genworth and GFI, the

"Defendants"), by and through their undersigned counsel, hereby file their Motion to Dismiss the

Amended Complaint (hereafter the "Complaint" or "AC") pursuant to Federal Rule of Civil

Procedure ("FRCP") 12(b)(6), FRCP 9(b), the Private Securities Litigation Reform Act

("PSLRA") and the Securities Litigation Uniform Standards Act ("SLUSA").

## SUMMARY OF MOTION

Plaintiffs' Complaint alleges securities fraud under Section 10(b) and Rule 10b-5 of the

Exchange Act, and raises claims of breach of fiduciary duty.  However, the very documents the

four Plaintiffs claim they received when they each invested, and which are referenced in the

Complaint, belie their claims of misrepresentation or omission in connection with their investment

purchases with Genworth.  Their claims do not and cannot state either actual or actionable material

misrepresentations or omissions, the actual loss of any money, or "cogent and compelling"

evidence of scienter.  And SLUSA squarely bars Plaintiffs' fiduciary duty claims.  This Complaint

fails entirely to state any claim against the Defendants, and is also facially deficient under the well-

established heightened pleading standards applicable to each Plaintiff's individual claims.

The Complaint's basic allegation is that Genworth conducted an implausible scheme to

defraud investors by falsely promising to invest their money in accordance with the asset

allocation strategies and recommendations of Mr. Robert Brinker, a nationally known newsletter

publisher (*MarkeTimer*) and radio commentator -- while at the same time intending _not_ to follow

Mr. Brinker's recommendations.  However, Plaintiffs' allegations, and the logic of their theory,

are entirely undermined by the Complaint itself, and the same Genworth documents that

Plaintiffs cite purportedly to support their claims.  For example, those documents make clear that

Genworth, and not Mr. Brinker, was responsible for selecting the mutual funds to comport with Mr. Brinker's asset allocation recommendations.

Fatal substantive defects undermine Plaintiffs' core allegations.  Plaintiffs assert that Genworth misrepresented that Mr. Brinker would select mutual funds, and imply that instead, Genworth chose funds that secretly paid administrative service fees ("ASF") to a Genworth affiliate.  The Complaint alleges this was misrepresented in "all" of Genworth's account applications, marketing, sales and disclosure materials (though no Plaintiff identifies the particular marketing or sales material s/he relied upon in making his/her securities purchase). But the very documents cited in the Complaint that Plaintiffs invoke -- including an account application and Genworth's disclosure brochures -- entirely contradict Plaintiffs' claims, and disclose *every single element alleged to be misrepresented or omitted*.  Specifically, Genworth disclosed and Plaintiffs agreed (sometimes repeatedly) that:

> **In this advisory service, client accounts are invested primarily in mutual funds that are selected by GFAM.**
>
> **Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to GFAM based on that analysis.  GFAM implements Mr. Brinker's recommendations by selecting mutual funds for client accounts.**
>
> **The Client hereby *grants GFAM full authority* as the Client's agent and attorney-in-fact to manage the assets in the Client's account on a fully discretionary basis . . .**
>
> **In addition to the payments it receives from GFAM for client custodial services, GFTC [Genworth's custodian] receives administrative services or other fees ("ASFs") either directly from certain mutual funds . . .**

These and other related disclosures, detailed below, defeat any claim of misrepresentations or omissions by Genworth, and show the implausibility of Plaintiffs being able to show scienter (intent to deceive.)  In addition, Mr. Brinker's recommendations were at all times available to Genworth's clients -- and Genworth's selection of mutual funds for these clients was also totally

transparent and reported to each of its clients quarterly.

The Complaint's substantive flaws do not end there. Plaintiffs' failures to even plead the required elements of their claims include, but are not limited to the following:

i) The *de minimis* amount of "targeted" ASF that Plaintiffs allege -- a 23 or 25 basis point target (i.e., .23 - .25 of one percent), which amount is not even claimed to have been *received* by Genworth -- is immaterial as a matter of law, under established caselaw in this Circuit. This fraction of one percent simply could not influence an investment decision, nor does any Plaintiff claim it actually did. Moreover, Plaintiffs make conclusory assertions but there are no factual allegations in the Complaint with the requisite specificity that the mutual funds selected by Genworth, whether they paid *de minimis* ASF or not, did not also satisfy Mr. Brinker's asset allocation recommendations.

ii) Plaintiffs do not allege that they suffered any cognizable losses. Not one of them even sets forth in what mutual funds his/her money was invested, or how they fared. They claim only in the aggregate that if, *hypothetically*, they had been invested in different mutual funds, they would have made more money. But this does not satisfy loss causation, a required element of Plaintiffs' 10(b) claim.

iii) Plaintiffs allege no evidence that the Defendants acted with intent to deceive, let alone the strong, "cogent and compelling" case of scienter that Section 10(b) and the PSLRA demand. Given Genworth's clear disclosures, and the transparency of each Plaintiff's mutual fund choices, no strong evidence or inference of scienter can be pled here. Plaintiffs' "hindsight" allegations of fraud based on alleged underperformance of investments are legally insufficient to allege scienter. Moreover, it is implausible that Genworth would risk losing a billion dollar business and its client credibility to chase fractional percents of ASF.

iv) Plaintiffs are barred altogether from bringing state law fiduciary duty claims on behalf of a class, under SLUSA and the caselaw interpreting that statute.

The Complaint also fails because not one of the four Plaintiffs provides details of any claimed misrepresentations made to him/her, or any of the other required facts about his/her own securities purchases. Under the "heightened pleadings requirements" of the PSLRA and Rule 9(b), strongly reaffirmed in the U.S. Supreme Court's recent decisions in *Tellabs* and *Merck v. Reynolds*, this Court is required: (1) to insist that each plaintiff plead with specificity and factual detail all the required elements and details of his/her securities fraud claim, and particularly the element of scienter; (2) to critically assess the plausibility of fraud allegations at the pleadings stage; and (3) to determine whether the fraud claim, even if properly pled with the required factual particularity, also supports a "cogent and compelling" inference of fraud. In doing so, the Court must weigh competing, non-culpable inferences which can be drawn from the facts.

Here, the required "who, what, when, where" of the alleged misrepresentations to each Plaintiff are absent from the Complaint. To a person, each Plaintiff fails to indicate who made the purported misrepresentations, to whom, when, where, and what was said, what actual, plausible evidence they have of scienter, and what losses he/she suffered, if any. Incredibly, the sole allegation concerning the Plaintiffs and their investments is that the Plaintiffs "were, during the Class Period, investors in the Private Client Group of Genworth." Plaintiffs have not come close to satisfying their heightened pleading standards, and the Complaint also must be dismissed for this reason alone.

Finally, the Complaint should be evaluated in its true context -- instigated by disgruntled former Genworth employees who left to compete with Genworth, and who were sued in Connecticut federal court for misappropriating Genworth's trade secrets and confidential information. The class action Complaint in this case relies heavily upon quotes and allegations

of former employee Tim McMullan, devoting approximately 4-5 pages to his claims.  This is a particular concern, given that Mr. McMullan was recently found to have "falsely testified" before the Connecticut court.  Specifically, in the case in federal court in Hartford, Connecticut, the Hon. Vanessa Bryant issued scathing rulings on June 1 and June 10, 2010, submitted herewith, which granted Genworth sanctions and injunctive relief against all these individuals.  Judge Bryant, after full briefing and a two-day evidentiary hearing, found that the principal source of the material in this class action Complaint, Tim McMullan (a principal of TJT Capital Group LLC) "falsely testified before the Court."  Judge Bryant further found that McMullan and his co-defendants "misappropriated Genworth's confidential information" with "consciousness of wrongdoing," misused this information in an "unabashed attempt to destroy Genworth's goodwill and customer relations," for their own personal gain, engaged in "apparent deceit," knowingly destroyed "incriminating evidence" and "relevant information," and made numerous claims and assertions that were "utterly incredulous."  Judge Bryant also stated that McMullan disclosed Genworth's proprietary information to class counsel here with the motivation of impairing Genworth's reputation and client relationships, as well as taking Genworth's clients.

Especially against this background, the Court must exercise its gatekeeping function to protect the Defendants from having to defend themselves against improperly motivated, insufficiently pled and utterly implausible fraud allegations.

## THE ALLEGATIONS OF THE AMENDED COMPLAINT[1]

### A.   GENWORTH'S PRIVATE CLIENT GROUP ("PCG")

Genworth's Private Client Group ("PCG") serves as an investment advisor to high net worth individuals, corporations, partnerships, pension and profit-sharing plans, and trusts. (AC ¶ 11)  GFI is the parent corporation of Genworth.  (*Id.*)  Gurinder Ahluwalia is the President and Chief Executive

---

[1]    Solely for purposes of this motion, Defendants accept these facts as true.

Officer of Genworth.  (AC ¶ 12) While the Complaint makes repeated allegations lumping the "Defendants" together, in almost every instance it fails to allege facts claiming any wrongdoing by GFI or Mr. Ahluwalia.

PCG offers investment strategies after consulting with clients to assess their overall financial profile and identify their investment objectives and risk tolerance.  (Exh.[2] 2-3 at 3). Clients select among a variety of services, including but not limited to the "BJ Group Services." (*Id.*).

As set forth in Genworth's Disclosure Brochures, the advisory strategies of PCG's BJ Group Services were developed based upon tactical asset allocation recommendations offered by Robert "Bob" Brinker.  (Exhs. 2-3 at 5).  Bob Brinker is the host of the publicly-aired financial talk program "MoneyTalk" and he also publishes a monthly investment newsletter called *MarkeTimer*.  (AC ¶ 28).  *MarkeTimer* includes hypothetical portfolios of mutual funds reflecting different asset allocation strategies, e.g. Aggressive Growth, Long Term Growth, and Balanced (AC ¶ 39).[3]

1.      **The PCG Investment Process**

The Complaint repeatedly references Defendants' "Account Application," including the Investment Management Agreement incorporated therein (AC¶ 23, 24), as well as the accompanying "information booklet" or "Disclosure Brochure" that Defendants provided to its

---

[2]  Exhibits are to the Transmittal Declaration of Jeffrey Joseph dated June 24, 2010, and are cited as "Exh. __."  The Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to plaintiff and upon which it relied in bringing the suit," to assess whether plaintiffs have adequately stated a claim.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (*citing Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)); *see generally Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).
[3]  Mr. Brinker's own former investment management firm, called the BJ Group, was purchased by Centurion Capital in 2000, and Centurion was in turn purchased by Genworth's former corporate parent, the General Electric Corporation, in 2003.  The BJ Group name survived these transitions, and about half of the current clients were initial BJ Group investors pre-2000.

new clients when they invested with Genworth, (AC¶¶ 25, 27), but does not specify what was given to each Plaintiff. (AC¶¶ 23, 25). In addition to providing critical background, the documents provided to each Plaintiff undermine his/her allegations. Defendants submit the documents cited in the Complaint as Exhibits to the Joseph Decl., filed simultaneously herewith.

Although the specific forms changed over time, Genworth's Account Applications always incorporated both (i) Genworth's (or predecessors') Investment Management Agreement between Genworth and each of its clients, (ii) Genworth's "Information Booklet" and/or "Disclosure Brochure," (including at minimum the disclosures set forth in the Form ADV Part II, required by the United States Securities and Exchange Commission (SEC)), and (iii) a separate Agreement for clients who created a custodial account to hold their assets at Genworth's (or its predecessor's) Trust Company. Each client of PCG acknowledged receipt of these documents when investing with Genworth, through language appearing directly above their signature on the Account Application.

2.    **The Investment Services Offered by PCG**

PCG clients who selected the BJ Group Service chose among different investment objectives depending upon their individual needs. (Exh. 2 at 5-6; Exh. 3 at 5-6) These objectives are listed in the Account Application and detailed in the Disclosure Brochure. Clients' choices varied quite dramatically, based on their individual circumstances and goals. For example, some clients choose an "Aggressive Growth" objective, designed for those who choose to accept higher volatility in pursuit of potentially higher returns. Others choose any of the following objectives: "Growth" (for emphasis on growth of capital); "Balanced Growth" (for a conservative growth and income objective emphasizing preservation of capital for core holdings); "Balanced" (for clients focused on preservation of capital with solid weighting in fixed income positions); "Growth-Income" (for moderate growth of capital with minor emphasis

on income); or "Fixed Income" (for primary objective of current income).

Genworth's Disclosure Brochures provided clients with further detail regarding the specific types of assets that would be found in a portfolio -- for example, a "Growth-Income" strategy utilizes "mutual funds that invest in domestic large-cap and international equities in addition to fixed income securities." (Exhs. 2-3 at 5).   Clients could choose either a taxable investment or a non-taxable retirement account, and could also choose to keep a portion of their account in cash, or in client-directed assets not directly managed by PCG. (Exh. 1 at Part A, p. 3)

**B.      THERE ARE NO SPECIFIC ALLEGATIONS CONCERNING THE PLAINTIFFS**

The four named plaintiffs in this case are Michael Goodman, Clarice Yassick, Martin Wasser and Steven Yoelin ("Plaintiffs"). (AC ¶9).  The Complaint alleges that these Plaintiffs invested with PCG between December 22, 2003 and December 22, 2009, the alleged Class Period. (*Id.*)  That is all the Complaint tells us about each plaintiff.  Far from pleading specific facts about the securities purchase(s) through which these Plaintiffs were allegedly defrauded, nowhere does the Complaint even state, let alone with the specificity required, any of the following critical facts with respect to even a single plaintiff:

(1)      *when* that plaintiff initially invested or subsequently opened accounts with PCG -- or whether in fact that plaintiff's securities investment was made with Genworth at all, as opposed to years earlier with either the BJ Group or Centurion Capital Group, prior to Genworth's acquisition of the PCG group business;

(2)      specifically what written disclosures and alleged written misrepresentations were provided to that plaintiff in connection with his/her purchase, by whom, how and where;

(3)      what alleged oral misrepresentations were made to that plaintiff in connection with his/her purchases, and who made them, when, and where;

(4)      *specifically*, what did those materials and/or what did that person tell plaintiff

about his/her asset allocation, mutual fund selection, and the payment of ASF by some funds;

(5)     what alleged misrepresentations did that plaintiff consider to be material to his/her investment decision at the time of purchase;

(6)     what alleged misstatement(s) did that plaintiff rely upon to his/her detriment;

(7)     how, if at all, did any alleged misrepresentation cause loss to plaintiff, and what precisely was lost, by whom, and when;

(8)     in which mutual funds plaintiff invested;

(9)     did that plaintiff transfer or consider transferring his/her investment to different mutual funds, or open any new accounts, and if so, when, based on what discussions, with whom, and why;

(10)     what that plaintiff was told when he/she switched his/her funds into a different PCG portfolio of mutual funds or opened a new account to buy different mutual funds; or

(11)     what specific, cogent evidence of scienter existed at the time each such alleged misrepresentation or omission was made to that plaintiff.

These specific missing facts are not random or extraneous.  They go to the heart of a Section 10(b) securities fraud claim, and are required of any plaintiff seeking to meet the heightened pleading requirements of the PSLRA and Rule 9(b).  In the same vein, the Complaint contains no allegation that Mr. Ahluwalia made any misrepresentations or even had any contact with any Plaintiff, or that GFI did anything wrong other than being Genworth's corporate parent. This Complaint utterly fails to comply with current requirements; not a single plaintiff adequately pleads his/her claim.

### C.   THE GENERALIZED ALLEGATIONS OF GENWORTH'S MISREPRESENTATIONS BOTH ARE INSUFFICIENTLY PLED AND ARE CONTRADICTED BY THE COMPLAINT ITSELF AND BY THE DOCUMENTS IT REFERENCES

Instead of detailing specific misrepresentations allegedly made to each Plaintiff "in connection with" their purchase or sale of securities, the Complaint makes sweeping allegations that the Defendants made misrepresentations "throughout the [six year] Class Period", in "all" of its sales and marketing material, account applications and disclosure brochures. (AC ¶¶ 2, 22-23). But the Complaint and the documents cited therein undermine Plaintiffs' assertions.

The Complaint charges that the Defendants made essentially four misrepresentations during the Class Period about its BJ Group Services:

- That Mr. Brinker, and not Defendants, selected the mutual funds for all of the PCG portfolios and clients' accounts (the **"fund selection"** allegation);

- That Defendants followed Mr. Brinker's asset allocation recommendations in their selection of mutual funds for client accounts (the **"asset allocation"** allegation);

- That Defendants did not disclose that some of the mutual funds they were selecting for client accounts paid administrative service fees (ASF) to Genworth's Trust Company, which served as securities custodian for many PCG clients (the **"ASF"** allegation); and finally

- That Defendants' relationship with Mr. Brinker was exclusive (the **"exclusivity"** allegation).

*See e.g.*, AC ¶¶ 2, 3, 22, 26, 27, 32, 34, 37, 38, 40-42. The Complaint completely fails to allege particulars about what each named Plaintiff actually received, was told, by whom, or understood regarding any of these so-called misrepresentations.

### 1.   Plaintiffs' "Fund Selection" Allegations Are Undermined By The Same Documents and Disclosures that Plaintiffs Invoke and Reference

Although the Complaint fails to delineate with specificity what documents were received

and relied upon by each named plaintiff in connection with his/her investment decision, Plaintiffs allege that two documents were given to *all* new Genworth clients "in connection with" their investment with Genworth: (a) the "Account Application," (which included an Investment Management Agreement ("IMA")), and (b) Genworth's "Disclosure Brochure."[4] (AC¶¶ 24, 25). Even as quoted in the Complaint, however, both documents clearly disclose that Mr. Brinker "makes asset allocation recommendations" but that <u>Genworth</u> -- not Mr. Brinker -- "implements Mr. Brinker's recommendations <u>by selecting mutual funds for client accounts</u>." (AC ¶¶ 24, 27)(emphasis added).  In fact, the documents cited in the Complaint contain multiple disclosures directly contradicting Plaintiffs' claims that they were told either that Mr. Brinker would manage their accounts, or that he, and not Genworth, would select mutual funds.

     i)    <u>Disclosure Brochures</u>

As the Complaint itself quotes, the Disclosure Brochures explain that Genworth would select mutual funds for client accounts:

> The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer* newsletter. Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to GFAM based on that analysis. **GFAM's Investment Management ("IM") Department implements Mr. Brinker's recommendations by selecting mutual funds for client accounts.**

(AC ¶27)(emphasis added).  The "information booklet sent to new and existing clients" quoted by the Plaintiffs also contains the exact same language above, stating that Genworth is responsible for "selecting mutual funds for client accounts."  (AC ¶25).

The Disclosure Brochures also state that Genworth has full discretion over client accounts with regard to the selection of mutual funds and asset allocations:

---

[4]  Solely for purposes of this 12(b)(6) motion, Defendants assume that the four Plaintiffs here received these two (or substantively the same versions of these two) documents cited in the Complaint when they invested with Genworth.

**GFAM's Management Agreement.** Pursuant to the Management Agreement, clients grant GFAM full discretionary authority to manage the assets in their accounts on a fully discretionary basis and authorize GFAM to establish a custodial account for the clients' benefit at GFAM affiliate, Genworth Financial Trust Company ("GFTC"). The grant of discretionary authority to GFAM includes:

> • the authority to determine the portion of assets on the Client's account that shall be allocated to each asset class or investment and to change such allocation from time to time,

> • the authority to buy and sell securities and other investments for client accounts,

*      *      *

(Exh. 2 at p. 4, Exh. 3 at p. 4)

In addition, the Disclosure Brochures also list each Executive Officer and the Investment Management Staff of Genworth, including extensive detail on their year of birth, their educational and business background, and other information required by the SEC. (Exh. 2 at p. 49-53, Exh. 3 at p. 52-54).  Mr. Brinker is not listed as either an officer or a member of Genworth's investment management staff.

> ii)   Account Application

The Account Application cited in the Complaint states just as explicitly that Genworth, and not Mr. Brinker, selects mutual funds for client accounts:

**The BJ Group Service**

**In this advisory service, client accounts are invested primarily in mutual funds that are selected by GFAM**. GFAM may also purchase other investments for client accounts, including, without limitation, closed-end investment companies, exchange-traded funds ("ETFs"), U.S. Treasury bonds, notes and bills, and bank notes.

The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the Marketimer newsletter. Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to GFAM based on that analysis. **GFAM implements Mr. Brinker's recommendations by selecting mutual funds for client accounts** . . . (Emphasis added)

(Exh. 1 at Part B, p. 1)

The Account Application also states that Genworth has full discretionary authority to select asset allocations and investments:

> **Discretionary authority.** The Client hereby grants GFAM full authority as the Client's agent and attorney-in-fact to manage the assets in the Client's account on a fully discretionary basis. This grant of discretionary authority includes the authority, without first consulting Client: to determine the portion of assets in the Client's account that shall be allocated to each investment and to change such allocation of assets from time to time; to buy, sell, redeem, select, remove and replace securities, including mutual fund shares, and other investments for the account; to select broker-dealers or others with which transactions for the account will be effected . . .

(*Id.* at Part B, p. 3)

If any plaintiff was told something different *when he/she invested* with Genworth, they do not plead, with particularity or at all, the who, what, when, where of such alleged misrepresentation -- and any oral statement would be expressly contradicted by the integrated contract documents.

Plaintiffs attempt to gloss over this problem by quoting from a "recent Introductory Brochure." (AC ¶ 28). But no Plaintiff claims to have ever seen this document. Plaintiffs cannot claim this document played any role in any of their investment decisions. The document also does not state that Mr. Brinker would select mutual funds or that Genworth would only select funds recommended by Mr. Brinker.

Plaintiffs also claim that a document posted on Genworth's *current* website states that Mr. Brinker "does 'fund selection for GFAM's management of accounts for the BJ Group advisory services.'" (AC ¶ 31). Again Plaintiffs do not claim -- cannot claim -- that they saw or relied on Genworth's current website, or any document on the current website, when they each invested with Genworth years earlier. The document also does <u>not</u> say Mr. Brinker makes the "fund selection" decisions (Exh. 4).

Significantly, another marketing piece cited by Plaintiffs <u>from the same website</u> makes

clear -- parallel to the contract documents -- that Genworth -- not Mr. Brinker -- selects funds:

> Mr. Brinker analyzes economic trends and financial markets and makes asset
> allocation recommendations to GFAM based on that analysis. GFAM implements
> Mr. Brinker's recommendations by selecting mutual funds for client accounts.

(Exh. 5).

### 2. Plaintiffs' "Asset Allocation" Allegations Are Undermined By Both Their Implausibility and By Plaintiffs' Contractual Documents with PCG

Plaintiffs' "asset allocation" allegation is that instead of investing in mutual funds that

followed Mr. Brinker's asset allocations strategies, Genworth chose funds that paid ASF in the

targeted range of 23 basis points -- i.e., 0.23% -- to Genworth's affiliated custodian. (*See* AC ¶¶

34, 38). There are fundamental problems with this assertion.

Mr. Brinker's asset allocation recommendations were reflected in his *MarketTimer*

newsletter and other periodic investment "calls" he made to buy or sell particular asset categories

(such as domestic small cap mutual funds, international mutual funds, or aggressive growth

mutual funds). As the Complaint acknowledges, there are thousands of mutual funds, any

number of which might satisfy Mr. Brinker's broad asset allocation categories. (AC ¶ 38

acknowledges more than 9,000 mutual funds available). And whether a fund pays a *de minimis*

23 basis points of ASF (as Plaintiffs allege) simply has *nothing to do* with whether its investment

focus and composition satisfy one of Mr. Brinker's asset allocation categories. A fund can both

satisfy an asset allocation recommendation and pay ASF. Thus, the implicit dichotomy between

asset allocation and ASF set up by the Complaint makes no sense. The Complaint underscores

this point by listing numerous mutual funds selected for client portfolios by Genworth that were

allegedly improper  (AC ¶ 33), while never asserting that any of the specific funds listed by

Plaintiffs failed to satisfy Mr. Brinker's respective tactical asset allocation criteria.

The Complaint attempts to avoid this glaring problem by alleging, in hindsight, that at

various points during the Class Period Defendants' mutual fund portfolios in the aggregate

varied from the asset allocations being recommended by Mr. Brinker. (AC ¶ 34).  But the Genworth mutual fund selections in the aggregate (AC ¶ 34) could not possibly be expected to match any of Mr. Brinker's specific hypothetical models.  The Complaint's allegations that the PCG portfolios may have digressed over time from Mr. Brinker's asset allocation percentages is neither logically nor legally sufficient to show that Genworth's investment of its clients' funds was not intended to comport, or did not comport, with Mr. Brinker's asset allocation recommendations when those investments were made.

For these reasons, the Complaint's hindsight allegations provide no factual support for the conclusory claim that Genworth (or the "Defendants") misrepresented that they would follow Mr. Brinker's asset allocation strategies with a pre-formed intent and plan not to do so.

### 3.   Genworth Expressly and Repeatedly Disclosed to Plaintiffs that its Custodian Affiliate Would Receive ASF from Mutual Funds Investments

Genworth's Account Application (which included its IMA) and Disclosure Brochures contain extensive information regarding the fees charged to client accounts.  Genworth's general (and disclosed) approach is to charge a management fee based on assets under management, and to waive transaction fees (i.e., fees for buying and selling securities) and custody fees (i.e., fees for holding assets) for PCG clients.  Throughout the period at issue here, clients paid Genworth an annual management fee ranging from 0.85% - 2.00%, based upon the total amount of client assets under management ("AUM") (Exh. 1 at Part B, p. 5).  The documents further disclosed other fees that impacted accounts -- and critically, contained extensive disclosures regarding Mutual Fund Fees, including ASF that certain mutual funds pay directly to Genworth or one of its affiliates.  These specific disclosures in Plaintiffs' contractual documents discredit Plaintiffs' various allegations of fraud.

i)     Disclosure Brochures

The Plaintiffs fail to quote highly material provisions of the same Disclosure Brochures that their Complaint relies upon, provisions that clearly state: (i) some mutual funds pay ASF that may impact the net asset value of the mutual fund; (ii) ASF is a separate expense borne by investors; and (iii) Genworth's custodian receives ASF:

**Mutual Fund and Bank Fees**

Some expenses are inherent within the investments held in client accounts. Mutual funds pay management fees to their investment advisers, and certain funds and bank money market accounts have other types of fees or charges, including 12b-1, administrative or shareholder servicing fees, bank servicing or certain other fees, which may be reflected in the net asset value of the mutual funds held in client accounts. Such expenses are borne by all investors and are separate from GFAM's fees or charges.

The GFAM Management Fee includes payment for custodial services from GFTC. **In addition to the payments it receives from GFAM for client custodial services, GFTC receives administrative services or other fees ("ASFs") either directly from certain mutual funds**, banks and insurance companies, or from their service providers. Any such income received by GFTC is in payment of services it provides. These payments may be used to offset the annual custody fees that are otherwise payable IRA and ERISA clients.

(Exh. 2 at p. 43; Exh. 3 at 45-46)(emphasis added).

ii)     Account Application

Likely because it also undermines the notion of a fraudulent scheme as alleged in the Complaint, Plaintiffs ignore the disclosure in the Account Application that Genworth may select mutual funds for client accounts that pay compensation to Genworth or it affiliates for services provided:

**Mutual Fund fees.** Mutual funds pay management fees as well as certain other fees.  A Client with assets invested in mutual funds will indirectly pay their share of fund expenses, in addition to the fees they pay directly to GFAM. Certain mutual funds in which Client assets are invested pay fees to GFAM or its affiliates for services provided.  **Mutual funds selected by GFAM for the Client's account for the program may include funds advised or serviced by GFAM or affiliates from which GFAM or affiliates may receive compensation in addition to the fees paid under this Agreement.** While

- 16 -

> GFAM does not invest Client assets in funds that impose front-end or deferred
> sales charges or "loads" on the purchase or sale of fund shares, Client assets may
> be invested in funds that pay "12b-1 fees," which are fees paid based on fund
> assets. Additionally, some funds may assess redemption fees.

(Exh. 1 at Part B, p. 5) (emphasis added).

Moreover, not a single Plaintiff alleges that these minimal ASF payments were material to their investment decision. To the contrary, as discussed below, the alleged 23 basis point target is an immaterial, *de minimis* amount, and courts in this Circuit regularly dismiss securities law complaints alleging that the payment of such a fee was even material enough to require disclosure.

### 4. Plaintiffs' "Exclusivity Allegation" is Contradicted By the Complaint Itself and Lacks Credibility

Plaintiffs can and do only claim that Genworth's advisory relationship with Mr. Brinker was non-exclusive starting in August of 2009 when TJT Capital Group LLC formed a relationship with Mr. Brinker. (AC ¶ 42). But none of the Plaintiffs claim to have purchased mutual funds with Genworth after August of 2009, when Plaintiffs claim that the relationship was non-exclusive. And they cannot, because the Brinker relationship became non-exclusive *years* after each named plaintiff made their securities investments with Genworth. (AC ¶ 42). This allegation fails to state a material misrepresentation to the Plaintiffs when they invested with Genworth.

## ARGUMENT

## I. EACH PLAINTIFF'S SECTION 10(B) CLAIM (COUNT I) FAILS

### A. THE HEIGHTENED PLEADING STANDARD FOR SECURITIES FRAUD

To state a *prima facie* case for securities fraud under Section 10(b) and Rule 10b-5 of the Exchange Act, an individual plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

As the U.S. Supreme Court has recently reiterated in the seminal case *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 127 S.Ct. 2499 (2007), in assessing the adequacy of a pleading of a Section 10(b), Rule 10b-5 complaint, private securities law actions "if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law. *Id.* at 313 (citations omitted). As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995" ("PSLRA".) "Exacting pleading requirements are among the control measures Congress included in the PSLRA. The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's 'intention to deceive, manipulate or defraud.'" *Id.*

The PSLRA further requires that a plaintiff: (1) identify each statement alleged to be misleading ; (2) specify the reasons why the statement is misleading; (3) state with particularity all facts supporting each allegation made "on information and belief;" and (4) state with particularity sufficient facts to allow a "*strong inference*" to be drawn that the defendant has acted with scienter, or an intent to deceive. 15 U.S.C. §78u-4(b)(1)-(2) (emphasis added).

While these heightened pleading requirements apply to all elements of plaintiffs' securities fraud claims, the standards for pleading scienter are especially exacting. Allegations of scienter are given close scrutiny in the Second Circuit, even on a motion to dismiss. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (fraud allegations must meet particularity standards, *inter alia*, to "safeguard a defendant's reputation from improvident charges of wrongdoing"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Moreover, the Second Circuit has made clear that Rule 9(b) governs all fraud and fraud-based pleadings, and requires plaintiffs to satisfy a heightened pleading standard -- i.e., pleading

"with particularity" and enumerating each alleged misstatement made, when, where, and by whom, and how it was fraudulent. *Rombach*, 355 F.3d at 170; *Ganino*, 228 F.3d at 168.

In the Complaint, not one of the individual plaintiffs states a claim for relief under the heightened pleadings requirements of the PSLRA and Rule 9(b).  Not one of the plaintiffs sets forth the who, what, where, when of any alleged false representation made to him/her in connection with his/her purchase of any PCG portfolio mutual funds.  Each plaintiff also fails to plead with particularity how/why the alleged misrepresentation(s)/omission was material to his or her investment decision, how they relied, or what compensable loss (if any) they suffered. Moreover,  the allegations of scienter on Defendants' part are wholly conclusory and non-factual, impermissibly alleging fraud "in hindsight" based on alleged investment performance results. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[W]e have refused to allow [securities fraud] plaintiffs to proceed with allegations of 'fraud by hindsight.')

Moreover, the very documents identified by the Complaint undermine its generalized claims of deception. The court should not accept the truth of factual or conclusory allegations that are "contradicted by documents properly considered on a motion to dismiss." *In re Aegon N.V. Sec. Litig.*, No. 03 CIV 0603, 2004 WL 1415973, at *5 (S.D.N.Y. June 23, 2004); *Echostar DBS Corp. v. Gemstar-TV Guide Int'l., Inc.*, No. 05 Civ. 8510 (DAB), 2007 WL 438088 at *4 (S.D.N.Y. Feb. 8, 2007); *Lesavoy v. Gattullo-Wilson*, 170 Fed. Appx. 721, 724 (2d Cir. 2006).

**B.    PLAINTIFFS DO NOT ALLEGE ANY ACTUAL MISREPRESENTATION IN CONNECTION WITH THE PURCHASE OR SALE OF A SECURITY**

Plaintiffs failed to allege any material misrepresentations made to them by the Defendants, because each and every one of their core allegations is: i) pled with no specifics as to what was represented to whom, by whom and when, failing the exacting pleading standards of the PSLRA and Rule 9(b), ii) undermined by written disclosures, or iii) immaterial as a matter of law.

**1.      The "Fund Selection" Allegation: Genworth Expressly Told its Clients that
Genworth Would Select Mutual Funds for Client Accounts.**

The documents provided to each Plaintiff "in connection with" his/her purchase, as

alleged in the Complaint, all provide that Genworth has sole discretion over plaintiffs' accounts

and that Genworth would select the mutual funds and managing the account assets:

**The BJ Group Service**

**In this advisory service, client accounts are invested primarily in mutual
funds that are selected by GFAM.** GFAM may also purchase other investments
for client accounts, including, without limitation, closed-end investment
companies, exchange-traded funds ("ETFs"), U.S. Treasury bonds, notes and
bills, and bank notes.

*      *      *

**Mr. Brinker** analyzes economic trends and financial markets and **makes asset
allocation recommendations** to GFAM based on that analysis. **GFAM's**
Investment Management ("<u>IM</u>") Department **implements** Mr. Brinker's
recommendations **by selecting mutual funds for client accounts.**

(AC ¶¶ 24, 25, 27)  *See* complete Account Application, Exh. 1 at Part B, p. 1.  (emphasis added)

The closest the Plaintiffs come to alleging that Defendants claimed Mr. Brinker selected

funds is a phrase in a "recent" Genworth website marketing document, created well after these

Plaintiffs made their investment decisions, that states Mr. Brinker "recommends asset allocations

and fund selection for [Genworth's] management of accounts . . ."  (AC ¶¶ 2, 22, 28, 31, 34)

Beyond the failure to allege that any Plaintiff saw, was given or relied on this document at the

time of his/her purchases, the document does not even say that Mr. Brinker was directing or

choosing mutual funds, or that Genworth would not exercise its own judgment in selecting funds.

Plaintiffs' claim that they were misled about fund selection is also undermined by the

transparency of both the funds in which they were invested, and of Brinker's *MarkeTimer*

recommendations.  Plaintiffs received quarterly reports listing all transactions and funds in which

they were invested. (Exh. 2 at 40; Exh. 3 at 42).  Mr. Brinker publishes his models in his monthly

- 20 -

*Marketimer* newsletter, to which these Plaintiffs maintained, were provided, or could have easily obtained a subscription.  The idea that the Defendants maintained a "deceitful scheme" to select "improper" mutual funds for client accounts is entirely implausible.  Plaintiffs were given clear disclosures, were regularly informed of their investments, and could easily determine whether the funds selected for them were listed in *Marketimer*, if that was their concern.

### 2.    The Asset Allocation Allegations are Insufficient

Without referring to any specific portfolio or mutual fund, Plaintiffs claim that Defendants' asset allocation "veered as much as 20%" from Mr. Brinker's recommendations, that Defendants' allocation to large cap funds was double what Brinker recommended from 2003-2006, and that Genworth underweighted small cap funds.  (AC ¶ 34).  Given that: i) there are multiple portfolios, ii) each portfolio contains multiple mutual funds, and iii) PCG's portfolios are described in the aggregate, a conclusory and non-specific allegation that "the" asset allocation was double, or 20% different from, Mr. Brinker's is meaningless and inadequate. There is no single aggregate asset allocation from which to veer.  Moreover, the Complaint's failure to refer to a particular plaintiff's portfolio, and instead to discuss all the portfolios in the aggregate, is improper pleading under the PSLRA and Rule 9(b), and fails to adequately allege with particularity for any Plaintiff that Genworth (or the other Defendants) did not follow Mr. Brinker's various asset allocations recommendations in investing that plaintiff's funds.

And while the Complaint discusses various mutual funds, there are no allegations that any of these funds failed to match the asset allocation they were meant to fulfill.  (AC ¶ 33).  The only apparent basis to claim that asset allocations were not being followed are the further generalized allegations that Defendants' portfolios collectively "performed worse" than Mr. Brinker's model portfolios.  This allegation wholly fails to articulate any actual deception. Instead, this is nothing more than hindsight second-guessing of performance, based on flawed

assumptions and no facts, and which does not state a claim of material misrepresentation at the point of sale.

### 3.    Genworth Neither Hid Nor Disguised ASF, but Rather Explicitly and Repeatedly Informed Clients About Mutual Fund Fees

The claim that the Defendants failed to disclose a hidden scheme to obtain ASF is belied by the repeated written disclosures cited in the Complaint that Genworth or its affiliates would receive ASF from some mutual funds:

> **Mutual funds selected by GFAM for the Client's account for the program may include funds advised or serviced by GFAM or affiliates from which GFAM or affiliates may receive compensation in addition to the fees paid under this Agreement.** (Exh. 1 at Part B, p. 5)(emphasis added).

> **In addition to the payments it receives from GFAM for client custodial services, GFTC receives administrative services or other fees ("ASFs") either directly from certain mutual funds . . .** (Exh. 2 at 43; Exh. 3 at 46)(emphasis added).

Genworth's disclosures also noted that these ASF compensate Genworth's custodian for services it provides. (Exh. 2 at 43; Exh. 3 at 46). These functions include buying and selling shares, generating and sending out quarterly statements and similar administrative tasks, for which Genworth charges clients no transaction fees or custody fees.

In the face of these disclosures, there is no stated misrepresentation or omission.

### 4.    Genworth Had an Exclusive Relationship with Robert Brinker

The Complaint alleges that Defendants misrepresented that they had an exclusive relationship with Mr. Brinker, because effective August 18, 2009, TJT Capital Group LLC also had a relationship with Mr. Brinker. (AC ¶ 42). In other words, Plaintiffs concede that during the only period that matters for their claims -- the period when Plaintiffs decided to invest with Genworth, well prior to mid-2009 -- Genworth and Brinker actually had an exclusive relationship. Moreover, as the Complaint itself notes, after August of 2009 when the Brinker relationship was no longer exclusive, Genworth properly began calling it a "longstanding relationship." (AC ¶ 30).

## C.     THE AMOUNT OF ASF FEES ALLEGED IS NOT MATERIAL

Plaintiffs allege that Genworth made investment decisions with a target of obtaining 23 or 25 basis points of administrative service fees from certain mutual funds -- i.e., 0.23 to 0.25 percent.  (AC ¶¶ 34, 38).  Even setting aside the repeated, express disclosure of ASF, nominal compensation like the fraction of a percent alleged in this case has been repeatedly held immaterial as a matter of law in the context of investment decisions.

Information is only considered material if "a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *Basic v. Levinson*, 485 U.S. 224, 231 (1988); *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (citations omitted)  Here, the Lead Plaintiffs have alleged that Defendants strayed from Mr. Brinker's recommendations to chase what courts have referred to as "mere fractions of a percentage point." *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03-CV-8208, 2006 WL 1008138, at *8 (S.D.N.Y. Apr. 18, 2006).  That is implausible, and this level of fee (alleged here only to be a target, not what was obtained) has been repeatedly held to be immaterial.  An immaterial fee does not need to be disclosed, and it also does not support scienter or any other element of Plaintiffs' claims.

Here, Genworth allegedly received nominal ASF from certain mutual funds in return for custodial services it performed.  However, nowhere does the Complaint allege that these mutual funds did not otherwise satisfy Mr. Brinker's asset allocation criteria.  In addition, outright incentive fees four times greater than the targeted fees alleged here, where <u>no</u> services were provided in return, have been held to be immaterial and insufficient to support securities fraud pleading.

In *Hoffman v. UBS-AG*, 591 F. Supp. 2d  522 (S.D.N.Y. 2008), the same central allegation was that financial advisors steered investors to funds regardless of how well the fund performed, because the funds paid fees to the financial advisors.  *Id.* at 528.  Specifically, the

- 23 -

financial advisors were given a 100 basis point incentive to sell a particular mutual fund.  The plaintiffs claimed that these incentives should have been disclosed but were not, in violation of Section 10(b) of the Exchange Act.  *Id.* at 530.  After reviewing cases in which undisclosed fees of 25 basis points or 15 to 20 basis points were held immaterial, the *Hoffman* court ruled that an incentive fee of 100 basis points was immaterial for purposes of establishing a duty to disclose. *Id.* at 536, *citing In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d  233, 236 (S.D.N.Y. 2006) (25 basis points of incentive compensation not material); *In re Morgan Stanley*, 2006 WL 1008138, at *7 (15-20 basis points of incentive compensation not material).

Even if Genworth was receiving up to 25 basis points of ASF (*i.e.*  not merely setting a target, as is alleged), that amount is immaterial as a matter of law.  This is especially so here, because the documents cited in the Complaint fully disclosed that such fees were being paid to Genworth's custodian by some mutual funds.

### D.    PLAINTIFFS FAIL TO SUCCESSFULLY PLEAD RELIANCE/TRANSACTION CAUSATION

In order to state a claim under Section 10(b), each Plaintiff must successfully plead that he/she actually and justifiably relied on an alleged misrepresentation or omission by Defendants in connection with his/her purchase or sale of securities.  *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 2006).  Reliance in the context of 10(b) claims is addressed as "transaction causation" -- *i.e.*, each Plaintiff must demonstrate that a misrepresentation or omission by Defendants *induced* him/her to invest with Defendants in the first instance, and that, but for this fraud, the Plaintiff would not have invested with Defendants at all.  *Id.* at 541.

Each Plaintiff entirely fails to plead this element of his/her claim.  Not only have Plaintiffs failed to identify any specific statement or omission by any Defendants or employee thereof that purportedly induced his/her investment, but not one of the Plaintiffs avers that he/she would not have invested with Defendants, but for these purported frauds.  In fact, Plaintiffs' sole

reference to "reliance" is at paragraph 47 of the Complaint, which simply recites the elements of a Section 10(b) and Rule 10b-5 claim and conclusorily claims reliance, by all Plaintiffs collectively, on non-specific representations.  (AC ¶47).

Nor could Plaintiffs credibly aver reliance.  As a matter of law, Plaintiffs cannot "rely" upon non-material misrepresentations or omissions.  *See Feinman*, 84 F. 3d 541-42.  Moreover, "an investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."  *See Starr v. Georgeson Shareholder Inc.*, 412 F.3d 103, 109 (2d Cir. 2005), *quoting Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020 (2d Cir. 1993); *Ashland v. Morgan Stanley*, -- F. Supp. 2d --, 2010 WL 1253932, at *13 (S.D.N.Y. March 30, 2010).

With respect to Plaintiffs' ASF allegations, Plaintiffs do not suggest that they would not have invested with Defendants had they known that certain mutual funds in which they may be invested from time to time pay a *de minimis* amount of ASF to a Genworth affiliate.  Nor could any Plaintiff reasonably rely on purported "omissions" regarding ASF or fund selection, that are directly contradicted by the extensive disclosures relied on by the Complaint.

Plaintiffs cannot fall back on a notion that reliance can simply be "presumed" in securities cases or in cases alleging an "omission."  Although the Supreme Court has held that reliance may be presumed in the narrow context of open-market transactions (because such investors rely on the integrity of the market to set a fair price in an impersonal market), no presumption applies with respect to a purely private and individual decision to invest. *Feinman*, 84 F.3d at 541-42 (no presumed reliance in a case challenging transaction fees paid to brokers). And no presumption applies where a charged "omission" was not material, and/or an item that Defendants had no duty to disclose. *Hoffman*, 591 F. Supp. 2d at 535.

### E.    PLAINTIFFS FAIL TO PLEAD THE REQUISITE LOSS CAUSATION

Among the Complaint's many deficits is the failure to plead "loss causation" -- *i.e.*, that

the acts or omissions of Defendants proximately caused actual losses which any of these
Plaintiffs seeks to recover, and not merely "but for" causes of loss. *See* 15 U.S.C. 78u-4(b)(4).
To adequately plead a Section 10(b) claim, plaintiffs must allege that "the target misstatements
or omissions were 'the cause of the transaction turning out to be a losing one.'" *Morgan Stanley*,
2006 WL 1008128 at *8, *quoting Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir.
1990); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

Most fundamentally, none of the Plaintiffs pleads that he/she actually lost any money at
all with the mutual funds in which he/she was invested, nor that he/she was promised different
funds or different returns. Instead, Plaintiffs' only claim is that *different* investments,
*hypothetically*, might have made them more money. (AC ¶ 36). But, "[i]t is long-established
law that a shareholder cannot recover for 'damages' based on hypothetical investments that he
did not make." *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233,238
(S.D.N.Y. 2006), *citing Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). *See also*,
*Morgan Stanley*, 2006 WL 1008128 at *10.

Plaintiffs sole statements with respect to "loss" are claims that the funds they were invested
in allegedly performed worse than certain other funds (based on alleged, undocumented
hypothetical investment returns for portfolios shown in the *MarkeTimer* newsletter). (AC ¶ 36).
Even if true, Plaintiffs' claims do not constitute actionable "loss." In *Morgan Stanley*, plaintiffs
alleged violations of Section 10(b) arising out of the defendants' practice of rewarding their
financial advisors for recommending certain funds that paid "shelf space" fees back to Morgan
Stanley. The court found that Plaintiffs had failed to plead loss causation because they did not
"state which funds lost money, and they [did] not tie these losses to defendants' actions with the
specificity required by the securities laws," since plaintiffs could not establish any connection
between the conduct of Morgan Stanley and the performance of any fund. *Id.* (citations omitted)

*also citing Castillo v. Dean Witter Discover & Co.*, No. 97-civ-1272, 1998 WL 342050 (S.D.N.Y. 1998) and *Laub v. Faessel*, 981 F. Supp. 870 (S.D.N.Y. 1997).  Likewise, in *In re Merrill Lynch*, 434 F. Supp. 2d at 238, the court rejected plaintiffs' claims of loss causation where securities brokers allegedly had failed to disclose "shelf space" payments to retail brokers.  Importantly, the court also found that fees themselves that were charged to the shareholders of mutual funds -- the existence of which was fully disclosed -- "do not constitute a 'loss' and plaintiffs have not tied the investment performance of any fund to the alleged misrepresentations and omissions." *Id*.  There, like here, the only "damages" asserted by plaintiff were based on "hypothetical investments" that the plaintiffs did not make in purportedly "comparable funds."  434 F. Supp. 2d at 238.

The ASF allegedly related to mutual funds in Plaintiffs' (unspecified) portfolios was both fully disclosed and does not constitute a loss under established Second Circuit law. *See e.g. Merrill*, 434 F. Supp. 2d at 238.  Plaintiffs do not even articulate whether, when and which of their specific funds allegedly underperformed, nor which funds the named Plaintiffs actually held -- let alone tie any purported poor performance to a misrepresentation or omission by Genworth.  Nor could they logically assert any causal linkage.  For example, who it was that chose a fund -- including whether or not it was first chosen by Genworth, or was listed in a newsletter as a Brinker pick -- could not possibly have "negatively affected the value of a security." *Lentell*, 396 F.3d at 173.  And as a matter of law loss causation cannot be established where, like here, the "losses" consist only of missed opportunities for additional gain.  Even if Plaintiffs had pled, and were able to demonstrate, that certain of their account values did in fact decrease, they still have alleged nothing to show that such "losses" flowed directly and foreseeably from Genworth's alleged deceptions, rather than from market forces to which <u>all</u> investors are subject.

In short, Plaintiffs fail to plead loss of any kind, and entirely fail to link any cognizable loss to a misrepresentation or omission by Defendants.  Their claim that they "could have made

more money" in different, hypothetical investments, is simply not recognized by the law.

**F.      PLAINTIFFS FAIL TO SUFFICIENTLY ALLEGE SCIENTER**

In April of 2010, the U.S. Supreme Court again underscored the heightened, exacting

scienter pleading requirement for a securities fraud plaintiff.  The Supreme Court held that

"facts showing scienter (*i.e.* a fraudulent "intent to deceive") . . . 'constitut[e]' an important and

necessary element of a §10(b) 'violation.'"  *Merck v. Reynolds*, 130 S. Ct. 1784, 1788 (2010)

(emphasis added), citing *Tellabs*, 551 U.S. at 328.  "[U]nless a §10(b) plaintiff can set forth *facts*

in the complaint showing that *it is 'at least as likely as' not* that the defendant acted with the

relevant knowledge or intent, the claim will fail."  *Id.* at 1796 (emphasis added).  *See also Kalnit*

*v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (plaintiff must plead *facts demonstrating* that

defendants had an intent to deceive in making the alleged material representations.)

Thus, a plaintiff's theory of scienter "must be more than merely 'reasonable' or

'permissible' — it must be cogent and compelling, thus strong in light of other explanations."

*Tellabs*, 551 U.S. at 324.  Indeed, a "complaint will survive . . . only if a reasonable person

would deem the inference of scienter cogent and at least as compelling as any opposing inference

one could draw from the facts alleged." *Id.*

The Supreme Court also made clear in *Tellabs* that a court adjudicating a Rule 12(b)(6)

motion must parse the allegations closely.  Even a "plausible" claim is not enough.  In the

context of a motion to dismiss, a court must seriously consider and <u>weigh</u> competing

nonculpable explanations for the defendant's conduct:

> **[I]n determining whether the pleaded facts give rise to a**
> **"strong" inference of scienter, the court must take into account**
> **plausible opposing inferences. . . .** Congress did not merely
> require plaintiffs . . . to allege facts from which an inference of
> scienter rationally *could* be drawn.  Instead, Congress required
> plaintiffs to plead with particularity facts that give rise to a
> *"strong" -i.e., a powerful or cogent-inference.. . .* **To determine**
> **whether the plaintiff has alleged facts that give rise to the**

> **requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.**

*Id.* at 232-24 (emphasis added).

The Second Circuit has further underscored that the overall (lack of) plausibility of the alleged fraudulent scheme be considered when evaluating scienter; *Medis Investor Group v. Medis Technologies, Ltd.*, 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008), *aff'd* 328 F. App. 754 (2d Cir. 2009) (hereafter "*Medis*").  *See In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415-18 (S.D.N.Y. 2007); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 443-46 & n.83 (S.D.N.Y. 2006) (requiring inquiry as to whether plaintiffs allege a scheme that "has any chance of achieving its putative ends," noting that "[c]ourts often refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations.")

A plaintiff may establish the requisite intent either: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138. When a plaintiff pleads scienter solely through conscious misbehavior or recklessness, however, "the strength of the circumstantial allegations must be correspondingly greater." *Medis*, 586 F. Supp. 2d at 142; *Kalnit,* 264 F. 3d at 142 (citation omitted).

Simply put, Plaintiffs' scienter allegations against Defendants make no sense and are utterly implausible, are undermined by numerous clear disclosures and by the transparency of its investments, and lack any specificity or particulars, other than impermissible and unpersuasive hindsight allegations based solely on alleged investment performance.

The central theme of the Complaint is that Defendants built the PCG business and lured investors with false representations that they would follow Mr. Brinker's asset allocation strategies and fund selections, when in fact Defendants had a premeditated intention not to do so.

Genworth paid Mr. Brinker millions of dollars over a decade for leads to investors who believed in and wanted to follow his asset allocation and market timing investment philosophies. Many of these investors who became Genworth clients already subscribed to Mr. Brinker's newsletter, which reflected and published his asset allocation strategies, as well as hypothetical mutual fund portfolios. Why would Genworth pay for these leads and sign up these clients, with a premeditated secret plan to ignore Mr. Brinker's asset allocation recommendations? What motive was there for Genworth to jeopardize its entire business model and credibility in this way? Not for a goal of 23 basis points (0.23%) of ASFs, as alleged by Plaintiffs. Genworth's management fees for investing and growing clients' funds was between 0.85 and 2.00%, many multiples of the alleged 23 basis point ASF target for its custodians.[5] What "motive" could Genworth have had to jeopardize an alleged billion dollar AUM business (AC ¶ 21) by doing this? This just makes no business sense. Which is why the Complaint does not contain a single factual allegation that anyone at Defendants ever said, or acted in any way that suggested, that Defendants had the intent not to follow Mr. Brinker's asset allocation recommendations.

Moreover, Plaintiffs fail to allege, let alone provide facts to support, that Defendants had both a cogent and compelling "motive and opportunity to commit this fraud." For reasons clear from the Complaint itself, Defendants had no such opportunity. Mr. Brinker's *MarkeTimer* recommendations were public and available in his newsletter, to which many of Genworth's clients (and several named plaintiffs) subscribed, or were given complimentary subscriptions by Genworth. Genworth at all times provided quarterly reports to all of its clients listing each of their mutual fund investments. Genworth's choice of funds for its clients has always been completely transparent. So there was no opportunity to keep secret from its own clients the

---

[5] Plaintiffs plead that at least half of Defendants' mutual fund selections are Brinker recommended, and in some portfolios, considerably more are Brinker picks. (AC ¶¶ 32, 37).

specific mutual funds in which he/she were invested, or whether those fund selections

followed/matched or did not follow/not match the funds used in Mr. Brinker's models.  There

was no "opportunity" to commit the alleged fraud here, and such a scheme had no "chance of

achieving its putative ends" (*In re Geo Pharma, supra*) since each of Genworth's clients knew

precisely where his/her money was invested.

Equally implausible (and untrue) is Defendants' alleged "secret" plan to select mutual

funds that paid ASF.  First of all, as discussed above, Genworth's disclosures to plaintiffs made

clear (1) that Genworth would be selecting mutual funds and (2) that mutual funds may pay ASF

to a Genworth affiliate.  There was no misrepresentation or omission and no deception in the

face of these disclosures.  Insofar as plaintiffs might claim that Defendants did not actually

disclose the *de minimis* amount (alleged to be 0.23% or 0.25%) of the ASFs, the most plausible

inference here is that Genworth, having fully disclosed the receipt of ASFs from some mutual

funds, did not consider the minimal amount material.  Moreover, scienter cannot be gleaned

from, let alone established by, a purported failure to disclose immaterial amounts.  *Hoffman v.

USB-AG*, 591 F. Supp. 2d 522, 537 (S.D.N.Y. 2008) ("[S]cienter cannot be established for

failure 'to disclose ... information that is [not] material'") (citing *Geiger v. Solomon-Page

Group, Ltd.*, 933 F. Supp. 1180, 1191 (S.D.N.Y. 1996).

While making conclusory allegations that the Defendants didn't follow Brinker's asset

allocations (AC 34), nowhere in the Complaint (including paragraph 33 that lists specific funds)

do plaintiffs specify which funds, if any, were not in asset classes satisfying Brinker's asset

allocation categories.  There is abundant public data, including the mutual fund prospectuses,

summarizing and profiling the investments and objectives (*e.g.* growth, growth and income,

international, small cap) of each mutual fund.  The transparency of Genworth's fund selections

makes these allegations of fraud utterly non-plausible.  And with thousands of mutual funds from

which to choose, many of which pay ASF to numerous entities (since such fees were not paid exclusively to Genworth), what motive would Genworth have not to pick those which also satisfied Mr. Brinker's asset allocation recommendations?  Here as well, these fraud claims make no sense, and are the opposite of "cogent and compelling."

What Plaintiffs are left with, as a factual matter, are after the fact, circumstantial arguments, presumptively crafted by former Genworth employees now competing with Genworth as TJT Capital Group LLC ("TJT") (*see* AC ¶¶35, 40-42), that the mutual funds selected by Genworth "underperformed" in the aggregate Mr. Brinker's newsletter performance (AC ¶¶35, 36.)  As a pleading matter, given that Mr. Brinker's newsletter modeled different portfolios  and Plaintiffs completely fail to plead what portfolio he/she chose to invest in, the alleged comparisons in the aggregate are meaningless.  The Complaint provides none of the required particulars for any named Plaintiff.

In addition, comparing an alleged theoretical return of a static newsletter model, where the allocation percentage never varies with market performance, to an actual invested portfolio, says nothing about whether the funds were properly invested initially from an asset allocation perspective.  Rather than being strong, cogent and compelling evidence of fraud at the time the investments were made, this Complaint is classic "fraud by hindsight" pleading, based on alleged investment performance results.  This is insufficient pleading to allege scienter in this Circuit. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  ("[W]e have refused to allow [securities fraud] Plaintiffs to proceed with allegations of 'fraud by hindsight.'")

Finally, the Supreme Court's and the PSLRA's admonition not to allow class actions to be "employed abusively to impose substantial costs on companies whose conduct conforms to the law" is particularly applicable here, where the entire Complaint is predicated on unsworn assertions by former Genworth employees bent on destroying Genworth's reputation and stealing

its business for their own personal gain.  On June 1 and June 10, 2010, Federal Judge Vanessa

Bryant in Hartford, CT issued two scathing decisions, compelling these former employees -- now

principals of TJT Capital Group LLC -- to produce their personal and business computers for

forensic imaging, sanctioning TJT Capital Group LLC and each of them personally, and

preliminarily enjoining them from further contacting Genworth clients.  In support of these

remedies, Judge Bryant made factual findings about these former Genworth employees:

- Tim McMullan, who contacted Plaintiffs' counsel in this case and is the former "high level employee" at Genworth liberally quoted in the Complaint, "falsely testified before this Court";

- the defendants, including McMullan, misappropriated Genworth's confidential client information and used it in an "unabashed attempt to destroy Genworth's goodwill and customer relations for their own personal gain";

- the defendants, including McMullan, were motivated in their actions to impair Genworth's reputation for their own personal benefit;

- McMullan admitted to destroying "incriminating evidence" in a manner that "evidences a consciousness of wrongdoing";

- McMullan and the other defendants took Genworth's confidential client information knowing they had no legal justification to do so;

- McMullan misappropriated, and improperly and without justification, shared proprietary Genworth information with class counsel in order to instigate counsel (Mr. Brown) to commence this action against Genworth;

- McMullan's and the other defendants' contentions were "utterly incredulous";

- Defendants were sanctioned by Judge Bryant for their "apparent deceit, obstreperousness and destruction of relevant information."

*See* June 1, 2010 and June 10, 2010 Memoranda of Decisions and Orders in *Genworth v.*

*McMullan, et al.*, Civ. No. 3:09-CV-1521 (VLB), (D. Conn), Exhibit 2 and 3 to the Declaration

of Reid Ashinoff.

      In circumstances such as this, this Court's gatekeeping function under the PSLRA, Rule

9(b), and Supreme Court law, to protect Genworth against insufficiently pled, implausible

assertions of securities fraud, is even more crucial.

## II.   PLAINTIFFS FAIL TO STATE A 10(b)(5) OR A CLAIM UNDER SECTION 20(A) AGAINST MR. AHLUWALIA (COUNTS I AND II)

As is apparent from the face of the Complaint, there is not a single allegation that Mr.

Ahluwalia made any misrepresentation to the Plaintiffs, so Count I of the Complaint states no

10(b)(5) claim against him.  Moreover, it is black letter law that a claim of "control person"

liability under Section 20(a) of the Exchange Act requires an underlying violation of securities

law.  *See Pacific Inv. Management Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir.

2010) (dismissing 20(a) claim where no claim was stated for a primary violation); *Rombach v.

Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004).  As discussed above, Plaintiffs have failed to state a

primary violation of the securities law, and therefore their "control person" claim against Mr.

Ahluwalia must be dismissed as well.

## III.   PLAINTIFFS CLAIM FOR BREACH OF FIDUCIARY DUTY (COUNT III) IS BARRED BY SLUSA

Plaintiffs' claim for breach of fiduciary duty, brought on behalf of a putative nationwide

class, is barred in its entirety by the Securities Litigation Uniform Standards Act of 1998

("SLUSA") and thus fails as a matter of law.  SLUSA provides, in relevant part:

> CLASS ACTION LIMITATIONS.  No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging --
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).[6]

---

[6]  SLUSA is codified at both Section 16(b) of the Securities Act of 1933, 15 U.S.C. § 77p(b), and Section 28(f) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(f).

Following clear Supreme Court precedent directing that the provisions of SLUSA are to be broadly construed, federal courts consistently have dismissed common law claims for breach of fiduciary duty where, like here, class action Plaintiffs also plead misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503, 1511 (2006); *Segal v. Fifth Third Bank*, 581 F.3d 305 (6th Cir. 2009); *Siepel v. Bank of America*, 526 F.3d 1122 (8th Cir. 2008); *In re Salomon Smith Barney Mut. Fund Fees Litigation*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006); *In re Edward Jones Holders Litigation*, 453 F. Supp. 2d 1210 (C.D. Cal. 2006); *Denton v. H&R Block Financial Advisors, Inc.*, 2001 WL 1183292 (N.D. Ill. 2001).

The Supreme Court emphasized in *Dabit* that SLUSA was designed precisely to prevent Plaintiffs like those here from pursuing state law causes of action for what are essentially securities law claims, and thereby evade the requirements of the PSLRA. *Dabit*, 126 S. Ct. at 1511.[7] Since Plaintiffs here expressly bring suit for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, they cannot simultaneously allege common law claims for breach of fiduciary duty. *Dabit*, 547 U.S. at 85, 126 S.Ct. at 1513 ("in connection with the purchase or sale of a covered security" has the same meaning in both SLUSA and §10(b) of the Exchange Act).

SLUSA expressly bars common law claims where: 1) the suit is a covered class action; 2) the claim is based on state law; 3) the claim concerns a covered security; and 4) the Plaintiff alleges untrue, manipulative, or deceptive statements or omissions in connection with the purchase or sale of a covered security. 15 U.S.C. § 78bb(f)(1).

This case readily qualifies as a "covered class action," since Plaintiffs seek damages,

---

[7] The PSLRA was legislation "targeted at perceived abuses of the class-action vehicle in litigation involving nationally traded securities." *Dabit*, 126 S. Ct. at 1510. However, instead of facing the "obstacles set in their path by the Reform Act [PSLRA], plaintiffs and their representatives began bringing class actions under state law..." *Id.* at 1511. SLUSA was enacted to prevent class actions based on state law from frustrating the purpose of the PSLRA. *Id.*

brought suit on a representative basis for "thousands" of purported class members, and assert that common questions of law and fact predominate over any individualized issues.  15 U.S.C. § 78bb(f)(5)(B)(i)(I); *see* AC ¶¶ 13-19.[8]  It is equally clear that Plaintiffs' fiduciary duty claim is based on state law, since no federal claim is alleged or available.  Finally, Plaintiffs' core claim is that Defendants are liable for securities fraud, a claim that by definition depends upon allegations that Defendants made untrue, manipulative, or deceptive statements or omissions in connection with the purchase or sale of a covered security (in this case, mutual funds).  Plaintiffs assert that the same "blatant misrepresentations" that underlie their claims of securities fraud constituted a "scheme to purchase Funds that generated higher fees for the Defendants," (AC ¶43), and constituted a breach of Defendants' fiduciary duty allegedly causing Plaintiffs "to suffer millions of dollars in damages."  (*Id.*, ¶ 4.)

Courts routinely dismiss claims of breach of fiduciary duty under SLUSA in circumstances parallel to this case.  For example, in *Segal*, 581 F.3d at 309-11, plaintiffs sued a trust administrator, alleging that the defendant bank had invested assets in proprietary mutual funds in order to earn a fee for the bank, rather than investing in "superior" mutual funds offered by competitors.  Plaintiffs further alleged that the bank mismanaged assets and mutual fund investments.  The Sixth Circuit affirmed dismissal of plaintiff's claims for breach of fiduciary duty, unjust enrichment and breach of contract under Fed. R. Civ. P. 12(b)(6) as barred by SLUSA, holding that each count "revolve[d] around Fifth Third's decision to buy mutual fund shares" and was therefore barred by law.

Similarly in *Siepel*, 526 F.3d at 1124, the Eighth Circuit affirmed dismissal concluding that SLUSA bars "state-law claims that a trustee breached its fiduciary duty by failing to disclose

---

[8]  Genworth would vigorously contest the certifiability of any class in this case under Fed. R. Civ. P. 23 at the appropriate juncture; however, the class pleading itself triggers SLUSA.

conflicts of interest in its selection of nationally-traded investment securities."  Again in *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, the court dismissed fiduciary duty claims because the practices challenged "necessarily 'coincide' with the securities transactions complained of - *i.e.*, the alleged improper steering of Plaintiffs to particular [mutual] funds" and extraction of fees.  *See also In re Edward Jones*, 453 F. Supp. 2d at 1215 (dismissing fiduciary duty claim where "the gravamen of Plaintiffs' Complaint is that Defendant willfully tailored and distorted its investment advice to steer Plaintiffs and the class members to the Preferred Funds" in order to receive retention "kickbacks"); *Denton*, 2001 WL 1183292 at *3 (SLUSA barred fiduciary duty claim that deception induced purchase of high risk stocks).

## IV.    PLAINTIFFS STATE NO CLAIM AGAINST GENWORTH FINANCIAL INC.

Plaintiffs name Genworth's parent company GFI as a Defendant, but do not allege any relationship at all with GFI.  The Complaint does not describe *any* actions of GFI, let alone allege that it engaged in wrongdoing.  Plaintiffs claim only that Genworth is a wholly owned subsidiary of GFI.  (AC ¶ 11)

Plaintiffs are alleged investors with Genworth – *not* GFI (AC ¶ 9).  Plaintiffs have no standing to sue GFI simply because it is alleged to be the parent of Genworth.  *Ascension Health v. Am. Int'l Group, Inc.*, No. 08-7765, 2009 WL 2195916 (S.D.N.Y. July 23, 2009); *Haney v. USAA Cas. Ins. Co.*, 331 Fed. Appx. 223, 227 (4th Cir. 2009); *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1001 (9th Cir. 2001)

In *Ascension Health*, the plaintiff held insurance policies issued by National Union, but brought breach of contract claims based on those policies against National Union and its parent company, AIG.  The Court found the complaint "devoid of factual allegations demonstrating the direct liability of Defendant AIG" and instead, "simply lumps AIG with its subsidiary National Union...and impl[ies] that they acted collectively."  2009 WL 2195916 at *2.  The district court

therefore dismissed the claims against AIG under Rule 12(b)(6). *Id.* Other courts have reached the same conclusion. *See, e.g., Thomson-CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 777-78 (2d Cir. 1995) (general rule is a parent is not liable for the actions of its subsidiary); *Gunther v. Capital One*, 2010 WL 1404122 at *12 (E.D.N.Y) (stating the "basic rule of the corporate form that shareholders are not liable for the acts of a corporation . . ."); *The Limited, Inc. v. McCrory Corp.*, 645 F. Supp. 1038, 1044 (S.D.N.Y. 1986) (shareholder of securities fraud defendant "not automatically or readily responsible for the acts of the entity").

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Amended Complaint be dismissed in its entirety.

Dated: June 24, 2010

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

By: Reid L. Ashinoff
Reid L. Ashinoff
Sandra D. Hauser
Brendan E. Zahner

1221 Avenue of the Americas
New York, New York 10020-1089
Tel: (212) 768-6700
Fax: (212) 768-6800
rashinoff@sonnenschein.com
shauser@sonnenschein.com
bzahner@sonnenschein.com

*Counsel for Genworth Financial Wealth Management, Inc., Genworth Financial, Inc. and Gurinder S. Ahluwalia*