**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL J. GOODMAN and LINDA BROWN, individually and on behalf of all others similarly situated, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC., GENWORTH FINANCIAL, INC., and GURINDER S. AHLUWALIA, | ) ) ) ) |
| | ) |
| Defendants. | ) ) |

CASE NO. CV-09-5603 (LDW) (ARL)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Joseph H. Weiss
James E. Tullman
WEISS & LURIE
551 Fifth Avenue
New York, New York 10176
(212) 682-3025

Lenard Leeds
Jeffrey K. Brown
LEEDS, MORELLI & BROWN, P.C.
One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 873-9550

**Co-Lead Counsel for Plaintiffs**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii - viii

I.   PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Defendants' False And Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.   The Truth Regarding The Brinker Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     C.   Plaintiffs And The Class Suffered Millions Of Dollars
          In Damages As A Result Of Defendants' Fraud . . . . . . . . . . . . . . . . . . . . . . . 9

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     A.   Legal Standard On A Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     B.   Pleading Requirements For A Section 10(b) Claim . . . . . . . . . . . . . . . . . . . . . . 11

     C.   Plaintiffs Allege Actionable, Material Misstatements And Omissions . . . . . . . . 12

          1.   Defendants' Misrepresentations Are Actionable . . . . . . . . . . . . . . . . . . . 12

          2.   Defendants' Statements Are Not Rendered
               Immaterial As A Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     D.   Plaintiffs Have Pled Fraud With Particularity . . . . . . . . . . . . . . . . . . . . . . . . 18

     E.   Plaintiffs Have Alleged Facts Giving Rise
          To A Strong Inference Of Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          1.   Defendants Were Aware Of Facts And/Or Had Access
               To Information Contrary To Their Public Statements . . . . . . . . . . . . . . . 22

          2.   The Complaint Adequately Pleads Defendants' Concrete Benefit . . . . . 25

          3.   Defendants' Attack On Plaintiffs' Sources Have No
               Credible Place In Evaluating Defendants' Motion . . . . . . . . . . . . . . . . . 29

i

F.   Loss Causation Is Adequately Plead ................................. 30

G.   Genworth Is Liable For Its Participation In
     The Manipulative Scheme And Devices .............................. 34

H.   Plaintiffs' Claim For Breach Of Fiduciary
     Duty Is Not Preempted ........................................... 36

I.   Plaintiffs State A Claim For Control Person Liability ..................... 38

IV.  CONCLUSION ....................................................... 40

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re AIG, Inc. Sec. Litigation*,
   265 F.R.D. 157 (S.D.N.Y. 2010) .................................................................. 33, 34

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) ................................................................ 27

*In re Adelphia Comm'ns Corp. Sec. & Deriv. Litigation*,
   398 F. Supp. 2d 244 (S.D.N.Y. 2005) ................................................................ 38

*Ascension Health v. AIG, Inc.*,
   2009 U.S. Dist. LEXIS 64808 (S.D.N.Y. July 23, 2009) .................................... 36

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ....................................................................................... 10

*Baxter v. A.R. Baron & Company*,
   1996 U.S. Dist. LEXIS 15098 (S.D.N.Y. October 11, 1996) .............................. 27

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 10, 34

*Bennett v. Falcone*,
   2009 U.S. Dist. LEXIS 25182 (S.D.N.Y. Mar. 25, 2009) ............................. 29, 30

*In re Bristol Myers Squibb Co. Sec. Litigation*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) ................................................................ 30

*In re CV Therapeutics Sec. Litigation*,
   2004 U.S. Dist. LEXIS 17419 (N.D. Cal. August 5, 2004) ........................... 24, 25

*In re Charles Schwab Corp. Sec. Litigation*,
   257 F.R.D. 534 (N.D. Cal. 2009) ....................................................................... 37

*Chill v. General Electric Co.*,
   101 F.3d 263 (2d Cir. 1996) ............................................................................... 21

*City of Brockton Retirement System v. Shaw Group, Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) ................................................................ 22

*In re Columbia Sec. Litigation*,
   155 F.R.D. 466 (S.D.N.Y. 1994) ....................................................................... 16

*Compudyne Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) ................................................................ 39

*In re Countrywide Finance Corp. Deriv. Litigation*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................ 30

*Cummings v. Paramount Partners, LP*,
    2010 U.S. Dist. LEXIS 51579 (D. Minn. Mar. 1, 2010) ................................... 32

*DiPetto v. U.S. Postal Serv.*,
    2010 U.S. App. LEXIS 14184 (2d Cir. July 12, 2010) ...................................... 11

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................................ 30

*In re Dynex Capital, Inc. Sec. Litigation*,
    2009 U.S. Dist. LEXIS 96527 (S.D.N.Y. Oct. 19, 2009) ................................... 32

*In re EVCI Colleges Holding Corp. Sec. Litigation*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) ................................................................ 25

*Erickson v. Pardus*,
    551 U.S. 89 (2007) .......................................................................................... 11

*Freudenberg v. E*Trade Financial Corp.*,
    2010 U.S. Dist. LEXIS 46053 (S.D.N.Y. May 11, 2010) ............................. 10, 32

*GVA Market Neutral Masters, Ltd., v. Veras Capital Partners Off Shore Fund, Ltd.*,
    580 F. Supp. 2d 321 (S.D.N.Y. 2008) ......................................................... 32, 33

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................................ 16

*In re Global Crossing, Ltd. Sec. Litigation*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) .............................................................. 27

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985) .......................................................................... 16

*Gunther v. Capital One, N.A.*,
    2010 U.S. Dist. LEXIS 35465 (E.D.N.Y. Apr. 8, 2010) .................................... 36

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ............................................... 11, 22, 26, 31

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) ................................................................. 26

*Intelligent Digital System, LLC v. Visual Management System, Inc.,*
    683 F. Supp. 2d 278 (E.D.N.Y. 2010) ........................................... 10, 18, 20, 21

*In re JP Morgan Chase Sec. Litigation,*
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................................. 23

*Jeffreys v. City of New York,*
    426 F.3d 549 (2d Cir. 2005) ............................................................................... 30

*Klein v. PDG Remediation,*
    937 F. Supp. 323 (S.D.N.Y. 1996) ..................................................................... 12

*LaSala v. Bank of Cyprus Public Co. Ltd.,*
    510 F. Supp. 2d 246 (S.D.N.Y. 2007) ................................................................. 37

*Lapin v. Goldman Sachs Group, Inc.,*
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................................. 16

*Lentell v. Merrill Lynch & Co., Inc.,*
    396 F.3d 161 (2d Cir. 2005) ......................................................................... 30, 31

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
    513 F.3d 702 (7th Cir. 2008) ............................................................................. 30

*In re Marsh & McLennan Cos., Inc. Sec. Litigation,*
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ........................................................... 12, 31

*McMahan & Co., v. Wherehouse Entertainment, Inc.,*
    900 F.2d 576 (2d Cir. 1990) ............................................................................... 12

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litigation,*
    2008 U.S. Dist. LEXIS 53923 (S.D.N.Y. June 27, 2008) .................................... 38

*In re Merrill Lynch Investment Management Funds Sec. Litigation,*
    434 F. Supp. 2d 233 (S.D.N.Y. 2006) ........................................................... 26, 34

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
    547 U.S. 71 (2006) ....................................................................................... 37, 38

*In re MoneyGram International, Inc. Sec. Litigation,*
    626 F. Supp. 2d 947 (D. Minn. 2009) ............................................................... 22

*In re Moody's Corp. Sec. Litigation,*
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) ................................................................ 40

*In re Morgan Stanley & Van Kampen Mut. Fund Fees Litigation,*
    2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. April 18, 2006) ............................ 26, 34

*In re NovaGold Resources Inc. Sec. Litigation,*
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ................................................................ 29

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) .......................................................... 21, 22, 25, 29

*Novak v. N.Y. State Electric & Gas Corp.,*
    2006 U.S. Dist. LEXIS 73031 (N.D.N.Y. Oct. 6, 2006) ............................... 20, 21

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC,*
    595 F.3d 86 (2d Cir. 2010) .................................................................... 17, 18, 32

*Osofsky v. Zipf,*
    645 F.2d 107 (2d Cir. 1981) ............................................................................. 33

*In re Oxford Health Plans Inc. Sec. Litigation,*
    187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................................... 39

*In re PXRE Group, Ltd. Sec. Litigation,*
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) .......................................................... 11, 29

*Panos v. Island Gem Enterprises, Ltd., N.V.,*
    880 F. Supp. 169 (S.D.N.Y. 1995) .................................................................... 33

*In re Par Pharm., Inc. Sec. Litigation,*
    733 F. Supp. 668 (S.D.N.Y. 1990) .................................................................... 12

*In re Parmalat Sec. Litigation,*
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) .......................................................... 30, 35

*Paru v. Mut. of America Life Ins. Co.,*
    2006 WL 1292828 (S.D.N.Y. May 11, 2006) .................................................... 37

*Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities,*
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) .......................................................... 26, 37

*Phillips v. County of Allegheny,*
    515 F.3d 224 (3rd Cir. 2008) ............................................................................ 11

*In re Prudential Sec. Ltd. P'ships Litigation,*
    930 F. Supp. 68 (S.D.N.Y. 1996) ...................................................................... 16

*Richardson v. White, Weld & Co.,*
    1978 U.S. Dist. LEXIS 17683 (S.D.N.Y. May 18, 1978) .................................... 21

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ...................................................................... 11, 16

*SEC v. Reserve Management Co.,*
    2010 U.S. Dist. LEXIS 16537 (S.D.N.Y. Feb. 24, 2010) .................................... 26

*SEC v. U.S. Environmental, Inc.,*
    155 F.3d 107 (2d Cir. 1998) ......................................................................... 35

*In re Scholastic Corp. Sec. Litigation,*
    252 F.3d 63 (2d Cir. 2001) .............................................................. 18, 21, 22, 23

*In re Solucorp Industrial, Ltd.,*
    2000 U.S. Dist. LEXIS 16521 (S.D.N.Y. Nov. 15, 2000) .................................... 38

*Somerville v. Major Exploration, Inc.,*
    576 F. Supp. 902 (S.D.N.Y. 1983) ................................................................ 35

*Tellabs, Inc., v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ........................................................................ 11, 21, 22, 25

*The Limited Inc. v. McCrory Corp.,*
    645 F. Supp. 1038 (S.D.N.Y. 1986) ............................................................. 35

*Thomas-CSF, S.A. v. America Arbitration Association,*
    64 F.3d 773 (2d Cir. 1995) ...................................................................... 35, 36

*In re Veeco Instruments, Inc., Sec. Litigation,*
    235 F.R.D. 220 (S.D.N.Y. 2006) .................................................................. 16

*Vital v. Interfaith Medical Ctr.,*
    168 F.3d 615 (2d Cir. 1999) ........................................................................ 30

*Wood v. Capital One Services, LLC,*
    2010 U.S. Dist. LEXIS 60662 (N.D.N.Y. June 18, 2010) .................................. 11

*In re WorldCom, Inc. Sec. Litigation,*
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) ........................................................... 38

*In re Xerox Corp. Sec. Litigation,*
    165 F. Supp. 2d 208 (D. Conn. 2001) ................................................................. 15

## STATE CASES

*The People of the State of New York v. J. Ezra Merkin,*
    2010 N.Y. Misc. LEXIS 523 (N.Y. Sup. Ct. Feb. 8, 2010) ................................. 17

## DOCKETED CASES

*Genworth Financial Wealth Management, Inc. v. McMullan, et al. and McMullan, et al.*
    *v. Ahluwalia,*
    C.A. No. 09-cv-1521-VLB ...................................................................................... 8

## FEDERAL STATUTES

15 U.S.C. §7241(a)(4)(2005) ........................................................................................ 36

15 U.S.C. §78u-5(c)(1)(A)(i) ........................................................................................ 16

Fed. R. Civ. P. 8(a) ............................................................................................. Passim

Fed. R. Civ. P. 9(b) ............................................................................................. Passim

Rule 10b-5, 17 C.F.R. 240.10b-5(b) ..................................................................... 11, 12

SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45150, 45152 (1999) ............... 12

Section 10(b) of the Exchange Act, 15 U.S.C. §78(b) ................................................. 11

Plaintiffs, through their counsel, respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss (the "MTD") the Amended Complaint (the "Complaint").[1]

## I. PRELIMINARY STATEMENT

Over the course of many years, and through the use of a comprehensive set of marketing materials, Defendants repeatedly touted the success of its investment portfolios, and more specifically, the Genworth portfolio that was being managed and/or based on the fund selection and asset allocation of Bob Brinker ("Brinker"). The purpose of Defendants' marketing campaign was, and still is, to solicit millions of dollars from potential and current investors seeking to invest that money in Defendants' BJ Group Services Portfolios ("Portfolio"). There was absolutely no ambiguity with respect to Defendants' sales pitch. Defendants consistently represented to Genworth clients that the Portfolio was being managed by Bob Brinker, or at a minimum, that Defendants were going to implement Brinker's mutual fund selection and asset allocation recommendations. Defendants' statements were false and misleading.

Indeed, contrary to Defendants' representations at the time Plaintiffs and other investors invested in the Portfolio, Defendants now admit (and actually insist), that Genworth and not Brinker selected the mutual funds. In fact, during the Class Period the percentage of non-Brinker recommended funds being purchased for the Portfolio reached nearly 65% and routinely exceeded 50% – a fact Defendants nowhere deny. By not implementing Brinker's tactical asset allocation and fund selection – which routinely stress the minimization of expenses – Genworth was able to generate for itself millions of dollars in extra revenues by selecting alternate mutual funds that paid significantly higher administrative and service fees ("ASFs" or "12b-1 fees") than those received by Brinker recommended funds. Defendants purchased these non-Brinker funds,

---

[1] The term "Defendants" refers to Genworth Financial, Inc. ("Genworth"), Genworth Financial Asset Management ("GFAM") and Gurinder Ahluwalia (GFAM's President and CEO). References to the Complaint are identified as "¶ __."

1

notwithstanding the fact that they underperformed the funds recommended by Brinker.[2] Since the ASFs were only one of the two possible ways that Defendants could earn revenue and the Brinker model (with its emphasis on investing in funds that paid no such fees) foreclosed the revenue stream that could be derived from receipt of ASFs, the steering of clients' funds to non-Brinker recommended or selected funds that paid higher ASFs supports a strong inference of fraud; especially when considered in conjunction with all of the other relevant allegations as to Defendants' knowledge and/or recklessness.

Defendants' prolonged fraud is further demonstrated by the existence of internal, undisclosed portfolios that Defendants referred to as "Brinker Basic," which were actually designed to implement Brinker's recommendations and mimiced Brinker's Marketimer Portfolios. The "Brinker Basic" Portfolio, however, was only made available as a "last ditch effort to retain clients" who were disappointed in the performance of their investment. Notably, Defendants in their motion to dismiss nowhere discuss "Brinker Basic," let alone argue that the Plaintiffs' allegations regarding the "Brinker Basic" scheme was anything other than indicative of fraud. As such, for the purposes of Defendants' Motion these allegations must be deemed conceded.

Plaintiffs have not only identified the numerous false and misleading statements that Defendants made to the Class during the Class Period, Plaintiffs have also pled with particularity how and why these statements were false and misleading. Plaintiffs have further demonstrated that Defendants were motivated to commit this fraud against the Class and/or acted with knowledge and reckless disregard for the truth. In sum, Defendants violated section 10(b) of the

---

[2]   Moreover, contrary to Defendants' representation, Genworth did not have an "exclusive" management agreement with Brinker. In fact, Defendants now claim that they paid Brinker millions of dollars merely for "leads." This is nothing less than an admission of fraud since their Class-Period materials, in addition to being plastered with Brinker's name and likeness, plainly state that Brinker was paid such fees for "investment management services."

Securities and Exchange Act of 1934, and the Securities and Exchange Commission ("SEC") Rule 10b-5, as well as committed various breaches of fiduciary duty.

Now that the truth is out, Defendants seek to distance themselves from the statements they admittedly made regarding the Portfolio and Bob Brinker's role. Moreover, in a dire effort to avoid culpability for their securities violations and fiduciary breaches, Defendants seek to convince this Court that no claim exists through (1) mischaracterizing Plaintiffs' claims; (2) distorting the record; (3) application of legal standards not recognized by this Court; and (4) begging the Court to ignore or summarily reject the well-pled facts in this case, especially those facts received from confidential witnesses. Irrespective of Defendants' efforts, the simple truth is that Plaintiffs have alleged sufficient facts demonstrating that Defendants misrepresented the truth regarding the Portfolio with the purpose of attracting investments into the Portfolio and generate greater profits through the purchase of mutual funds that provided them with significant ASFs. There is absolutely nothing in Defendants' brief that undermines these well-pled allegations.

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

## II. STATEMENT OF FACTS

### A. Defendants' False And Misleading Statements

During the Class Period, Defendants through their various sales, marketing and disclosure materials, continuously touted the Portfolio, Brinker's remarkable success in fund selection and asset allocation and Genworth's exclusive management agreement with Brinker. According to the Defendants' marketing materials sent to clients in the BJ Group Services Private Client Group, "Bob recommends asset allocations and fund selection for GFAM's management of accounts for the BJ Group Advisory Services." ¶ 22.

The "Account Application" that is sent out to all prospective clients expressly identifies the Portfolio as the "BJ Group (Brinker) Services" portfolios. Moreover, under the heading "Genworth Financial Asset Management's responsibilities, as Investment Advisor," Defendants

3

expressly represent that "GFAM shall provide the investment advisory services selected by the client." *Id.* at ¶ 23. Defendants further represented:

> The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer* newsletter. Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to GFAM based on that analysis. <u>GFAM implements Mr. Brinker's recommendations</u> by selecting mutual funds for client accounts.[3] ¶ 24.

In an information booklet sent to new and existing clients to inform them of "all material assets of [the] organization, its fees and services, and key personnel," Defendants explained the management aspects of the Portfolio. According to the Defendants:

> [GFAM]'s Investment Management ("IM") Department <u>implements Mr. Brinker's recommendations by selecting mutual funds for client accounts</u>. [GFAM] pays Mr. Brinker annual fees, not based on assets under management, for his services, which include <u>investment management services</u> and marketing services, including referring potential clients to [GFAM]'s Private Client Group division. ¶ 25.

In a 2004 Genworth report, Defendants emphasized, "Balanced Growth: <u>This portfolio is based on the Bob Brinker model</u>, offered through our <u>exclusive</u> partnership with him. This objective is designed for clients' core holdings. This portfolio consists of a diversified, broad base of domestic and international equities in addition to a fixed income component to provide balance and diversification. With a conservative growth and income objective, emphasis is placed on preserving capital and reducing volatility. When Brinker is bullish, maximum targeted equity exposure is 60%." ¶ 26.

In Defendants' 2007 and 2008 "Disclosure Brochures for the Private Client Group," Defendants again touted Genworth's exclusive agreement with Brinker and that the Portfolio is based on Brinker recommendations. The brochure states:

> The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer*

---

[3] Emphasis added unless otherwise indicated.

4

newsletter.  Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to GFAM based on that analysis. GFAM's Investment Management ("IM") Department implements Mr. Brinker's recommendations by selecting mutual funds for client accounts.  GFAM pays Mr. Brinker annual fees, not based on assets under management, for his services, which include <u>investment management services</u> and marketing services, including referring potential clients to GFAM's Private Client Group division.  ¶ 27.

Defendants also regularly touted Brinker's professional track record.  In a recent Introductory Brochure, Defendants represented:

> Bob Brinker is a rare breed in the investment field.  An independent strategist with more than 25 years of experience, he makes bold pronouncements.  He isn't beholden to Wall Street.

> Of course, you know him from his radio show, MoneyTalk, which has been informing and entertaining weekend listeners for more than 20 years.  <u>You also may know about his monthly newsletter, "Marketimer," which focuses on asset allocation and regularly receives top ratings for accuracy.</u>

> We at Genworth Financial Asset Management, Inc. ("GFAM") <u>have a long standing relationship with Bob to offer one of the nation's most well-known tactical asset allocation strategies.</u>  Founded in 1986 and acquired by GFAM in 2000, BJ Group Services offers customized investment solutions tailored to meet clients' personal objectives.  <u>Long considered an expert in identifying market trends through his proprietary Marketimer model, Bob recommends asset allocation and fund selection for GFAM's management of accounts for the BJ Group advisory services.</u>

> <u>Our experienced professionals work to implement Bob's investment strategy utilizing his proprietary tactical asset allocation model.</u>  ¶ 28.

Throughout the Class Period, Defendants also sent letters to potential clients emphasizing Genworth's relationship with Brinker.  According to the letter, "Thank you for your interest in Bob Brinker and Genworth Financial.  We are excited that you are considering our services and look forward to sharing with you the tremendous difference that the combination of Brinker and Genworth Financial has made to so many investors like you."  ¶ 29.

In Genworth's "BJ Group Services Overview," dated August 2009, Defendants not only emphasized Genworth's "longstanding relationship" with Brinker, but further stressed:

When it comes to helping affluent investors reach their financial goals, GFAM takes a unique perspective: yours. <u>Let GFAM and Bob Brinker</u> simplify your investment life. Call one of our Account Executives at 800.252.2044 or e-mail us at GFAMpcginfo@Genworth.com for more information. ¶ 30.

Similarly, up to the time that Plaintiffs commenced this Action, Defendants continued to advertise Brinker on their website (<u>www.gfampcg.com/pcgv2/do/pcgPublic</u>). Not only did Defendants use a picture of Brinker, but they continued to represent that "<u>Bob directs the asset allocation of the BJ Group portfolios" and "fund selection for GFAM's management of accounts for the BJ Group advisory services</u>." ¶ 31.

### B.     The Truth Regarding The Brinker Portfolio

Contrary to Defendants' representations that Brinker was selecting funds and making asset allocations for the Portfolio or that Defendants were purchasing funds and making asset allocations based on the recommendations by Brinker, in truth, the percentage of funds being purchased for the Portfolio that were non-Brinker selected/recommended funds routinely exceeded 50%. In fact, as demonstrated by the examples in the following chart, during the Class Period the percentage of non-Brinker selected/recommended funds being purchased for GFAM clients reached nearly 65%. ¶ 32.

Percent Non-Brinker Selected/Recommended Funds

| Qtr. End | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|----------|------|------|------|------|------|------|------|
| 03/31 | 64.50% | 56.50% | 53.00% | 53.00% | 41.00% | 39.50% | 38.00% |
| 06/30 | 63.50% | 61.50% | 52.50% | 54.00% | 41.00% | 39.00% | 37.00% |
| 09/30 | 63.00% | 61.50% | 52.00% | 55.00% | 40.50% | 38.00% | |
| 12/31 | 62.00% | 52.00% | 53.00% | 55.50% | 40.00% | 39.00% | |

The Complaint identifies the specific funds Defendants purchased that were not the result of a selection or recommendation by Brinker, but rather selected to generate higher service and administrative fees for the Defendants. ¶ 33.

Moreover, contrary to Defendants' representations, Defendants completely failed to follow the asset allocation being recommended by Brinker. During the Class Period, Defendants veered as much as 20% from the asset allocation being recommended by Brinker. According to a former high level employee with Genworth's Private Client Group, during the 2003-2006 period, Genworth's allocation to large cap stock funds was roughly double the allocation that Brinker recommended. Genworth also significantly underweighted the Brinker recommended allocation to small cap funds, again, driven by additional fees that Genworth could collect. Insiders recall emails in which Defendants referenced 23 basis points in account servicing fees for each model portfolio, on average, as a target. ¶ 34.

According to the insider, the funds purchased by Defendants are completely contrary to the Brinker strategy, *i.e.*, the strategy that Defendants touted to solicit new clients and keep existing ones. As stated by the insider:

> Although Bob Brinker has preached for more than 25 years about the need to keep expenses low, every single alternate/substitute fund that Genworth selected paid them extra, which came directly out of clients' returns. This practice goes completely against Bob's philosophy. Of the more than 9000 mutual funds available, Genworth did not select one that didn't pay them extra. In addition, Genworth has the ability to use Baron Partners Fund institutional shares (symbol BPTIX), which came out in early June 2009, but since Genworth doesn't do much in the way of due diligence, they are not aware of that. So they stick with the retail shares (symbol BPTRX) to get paid an extra 25 basis points. ¶ 38.

Furthermore, Defendants never published annual investment returns to clients comparing the performance of the Portfolio to Brinker's returns. In fact, according to former high-level employees with the Private Client Group, the Defendants actually maintained two portfolios for the aggressive model, growth model and balanced model. The portfolios that were used for new and existing clients were the portfolios that were comprised of approximately 50% (or more) of non-Brinker recommended funds that paid Defendants higher fees. However, Defendants also maintained an internal, undisclosed portfolio for aggressive, growth and balanced models that were internally referred to as "Brinker Basic." According to insiders, these "Brinker Basic"

7

portfolios, which were designed to mimic Brinker's Marketimer Portfolios, were not disclosed to clients and were only used as a "last ditch effort to retain clients." Simply put, Genworth Private Client Group employees were directed to use "Brinker Basic" portfolios as a retention tool for clients that complained and not for new and existing clients because they generated less fees for the Defendants. ¶ 39.

Defendants' fraudulent conduct and fiduciary breaches are further supported in the pleadings filed in a parallel action in Connecticut captioned Genworth Financial Wealth Management, Inc. v. McMullan, et al. and McMullan, et al. v. Ahluwalia, C.A. No. 09-cv-1521-VLB. In Defendants' Answer, Affirmative Defenses, Counterclaims and Third-Party Complaint dated October 21, 2009, Third-Party Plaintiffs Timothy McMullan, James Cook, Timothy McFadden, and TJT Capital Group, LLC (the "TJT Plaintiffs") stated:

> [The TJT Plaintiffs] resigned from Genworth, in part, after becoming increasingly concerned by Genworth's management of accounts, asset allocation for accounts, and selection of mutual funds which were being represented to Genworth clients as being managed in a manner consistent with and pursuant to the investment philosophy, strategy and guidance provided by Robert J. Brinker ("Bob Brinker") when, in fact, they were not.

> Defendant-Counterclaimant - Third Party Plaintiff McMullan complained about and reported to management at Genworth, and specifically to Third-Party Defendant Genworth President and CEO Gurinder Ahluwalia ("CEO Ahluwalia"), the fact that client accounts were grossly under-performing due to Genworth's inappropriate selection of non-Brinker recommended mutual funds in a manner inconsistent and often contrary to Bob Brinker's recommendations; that inappropriate funds were clearly being selected in a manner calculated solely to obtain additional revenue at the clients' expense; that Genworth was fraudulently representing to clients that it "implements Bob Brinker's recommendations by selecting mutual funds for client accounts" when, in fact, it very often did not; that there was significant evidence of "double dipping" practices at Genworth - at the client's expense and contrary to both good practice and the law; and that Genworth was failing to properly monitor and report on the performance of accounts under its control and within its custody. ¶ 40.

Furthermore, contrary to Defendants' constant representations that Genworth had an "exclusive" agreement with Brinker, the TJT Plaintiffs stated:

8

Since resigning from the employ of Genworth, agents of Genworth, including Ahluwalia, its President and CEO, have defamed and disparaged Defendants Counterclaimants - Third-Party Plaintiffs and have tortiously interfered with TJT, by fraudulently and intentionally misrepresenting to clients, prospective clients and third parties both that Genworth has an exclusive agreement with Bob Brinker and that TJT does not have any relationship or agreement with Bob Brinker causing Defendants-Counterclaimants - Third-Party Plaintiffs' damage.

Genworth and CEO Ahluwalia, however, were, at all times, aware of the fact that TJT has a relationship/affiliation with Bob Brinker and, in fact, had been told, and had been provided a copy, of TJT's agreement with Bob Brinker. ¶ 41.

**C.      Plaintiffs And The Class Suffered Millions Of Dollars In Damages As A Result Of Defendants' Fraud**

According to the witnesses, during the Class Period, the non-Brinker selected/recommended funds that were being purchased by the Defendants for the Portfolio significantly underperformed the funds that were being recommended by Brinker.  In particular, according to a former high level employee in the Private Client Group Division:

What is worse, as a result of Genworth selecting non-Brinker recommended mutual funds, several of Genworth portfolios significantly underperformed Bob's published models by approximately 16 percentage points from 2003-2006.  In 2006 alone, as I recall, Genworth portfolios underperformed Bob's published models by roughly 50%.

Before Legg Mason was added to the Genworth portfolios, I protested vehemently to . . . Gurinder Ahluwalia, to no avail.  I argued, and documented, that purchasing Legg Mason was essentially a bet, one that would not work out well. Nevertheless, for Gurinder Ahluwalia, generating additional revenue superseded doing the right thing for the clients, never mind that what Genworth was doing was totally inconsistent with Bob Brinker's recommendations and how the service was marketed and sold. ¶ 35.

For example, the following chart demonstrates how significantly Genworth's Growth Portfolio underperformed the funds actually being recommended by Brinker (¶ 36):

|       | BJ Group Performance | Brinker Marketimer Performance |
|-------|----------------------|--------------------------------|
| 2003  | 29.06%               | 43.40%                         |
| 2004  | 9.75%                | 14.30%                         |
| 2005  | 4.71%                | 5.90%                          |

| | | |
|---|---|---|
| 2006 | 9.29% | 15.40% |
| 2007 | 6.01% | 9.00% |
| 2008 | -39.59% | -37.40% |
| YTD 06/30/09 | 8.28% | 9.23% |

Thus, over the course of the Class Period, Plaintiffs and the Class lost millions of dollars as a result of Defendants' fraudulent scheme and fiduciary breaches.

## III. ARGUMENT

### A.   Legal Standard On A Motion To Dismiss

Motions to dismiss are generally viewed with disfavor. *See Freudenberg v. E*Trade Fin. Corp.*, 2010 U.S. Dist. LEXIS 46053 at *11 (S.D.N.Y. May 11, 2010). "In the context of a motion to dismiss, this court must, as always, assume that all allegations set forth in the complaint are true and draw all inferences in favor of the non-moving party." *Intelligent Digital Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 283 (E.D.N.Y. 2010) (citation omitted). A complaint need only allege "enough factual matter (***taken as true***)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). The pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." *Id.* at 556. As here, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).[4] Since *Twombly*, the Supreme Court and lower federal courts have clarified that Federal Rule of Civil Procedure 8(a)(2) requires only that the defendant receive "'fair notice of what the . . . claim is and the grounds upon which it rests,'" and that "specific facts" need not be pleaded

---

[4] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. Thus, *Iqbal* makes clear that, for elements of claims subject to Rule 8(a), *Twombly* requires more than pleading the "bare elements of [the] cause of action," but far less than the particularity of pleading required under Fed. R. Civ. P. 9(b). *See id.* at 1954.

except under Rule 9. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *see DiPetto v. U.S. Postal Serv.*, 2010 U.S. App. LEXIS 14184 at *2 (2d Cir. July 12, 2010) ("While '[s]pecific facts are not necessary,' the statement must 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'") (quoting *Erickson*, 551 U.S. at 93).[5]

### B.    Pleading Requirements For A Section 10(b) Claim

Under Section 10(b) of the Exchange Act, 15 U.S.C. §78(b), and Rule 10b-5, 17 C.F.R. 240.10b-5(b), a plaintiff must plead six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 613 (S.D.N.Y. 2008). The heightened pleading standard under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) applies only to the element of scienter; all other elements of a §10(b) claim are governed by traditional pleading standards under Fed. R. Civ. P. 8(a) or 9(b). *See In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 528-29 (S.D.N.Y. 2009). Rule 9(b) merely requires that the complaint "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citation omitted).

---

[5]    *See also Wood v. Capital One Servs., LLC*, 2010 U.S. Dist. LEXIS 60662 at *4 (N.D.N.Y. June 18, 2010) ("a plaintiff need not plead specific facts. Where certain 'facts are peculiarly within the possession and control of the defendant, plaintiffs are not prevented from 'pleading facts alleged upon information and belief.'") (citing *Erickson*, 551 U.S. at 93); *Phillips v. County of Allegheny*, 515 F.3d 224, 230-31 (3d Cir. 2008) (noting that in *Twombly*, "the Supreme Court never said that it intended a drastic change in the law, and indeed strove to convey the opposite impression . . . . The Supreme Court reaffirmed that Fed. R. Civ. P. 8 'requires only a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,' and that this standard does not require 'detailed factual allegations.'").

### C.   Plaintiffs Allege Actionable, Material Misstatements And Omissions

Rule 10b-5(b) prohibits "mak[ing] any untrue statement of material fact or . . . omit[ing] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5. "[C]orporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). "A statement is misleading if a reasonable investor . . . would have received a false impression from the statement." *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677 (S.D.N.Y. 1990). Moreover:

> [S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead . . .

*McMahan & Co., v. Wherehouse Entm't., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (citation omitted).

Material facts include not only information disclosing financial results, "but also facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Klein v. PDG Remediation*, 937 F. Supp. 323, 327 (S.D.N.Y. 1996) (citation omitted). Furthermore, material misrepresentations include those "concern[ing] a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45150, 45152 (1999).

### 1.   Defendants' Misrepresentations Are Actionable

The Complaint pleads in exacting detail misstatements that were made by Defendants with knowledge of present contrary facts. No matter which of the various ways Defendants now attempt to repudiate their statements, during the Class Period Defendants represented that Brinker was the primary source of asset allocation and fund selection for the Portfolio.

12

Defendants repeatedly represented to new and existing clients that "Mr. Brinker . . . makes asset allocation recommendations" and that "GFAM[] . . . implements Mr. Brinker's recommendations by selecting mutual funds for client accounts." Defendants also represented that Brinker "recommends asset allocations and fund selection for [Genworth's] management of accounts . . . ." MTD at 20. Moreover, Defendants represented that they were paying Brinker for "investment management services." ¶ 25.

There is nothing vague or ambiguous about Defendants' statements. Defendants readily admit that they made these statements in the materials Genworth used during the Class Period to market the Portfolio to new and existing clients. Defendants do not argue that these statements were not material. Indeed given the frequency and intensity of their numerous representations regarding Brinker, their materiality is beyond reasonable debate. Instead, Defendants take the extraordinary position of repudiating those myriad statements, arguing that they always represented to potential and current clients that "Genworth, and not Mr. Brinker, was responsible for selecting the mutual funds to comport with Mr. Brinker's asset allocation recommendations." MTD at 2. This is not even a close call. Defendants made it crystal clear that Brinker was making the asset allocation and fund selection, or that GFAM was selecting funds by implementing (not considering) Brinker's recommendations.[6] The fact that Defendants represented that they were paying Brinker for "investment management services" exposes the falsity of Defendants' after-the-fact reinterpretation of their statements. It was reasonable for investors to believe that the asset allocations and fund selections were being made by Brinker in accordance with Defendants' representations. If Defendants knew, which they did, that GFAM, was selecting the mutual funds without regard to Brinker's recommendations, that is exactly

---

[6] According to the *Merriam-Webster Dictionary*, the word "implement" is defined as "to give practical effect to and ensure of actual fulfillment by concrete measures." *See*, merriam-webster.com/dictionary/implement. Defendants' readily admit that they did not "implement" Brinker's recommendations.

what they should have disclosed to investors.  Instead, Defendants traded on Brinker's name without following his strategies.

Plaintiffs have further alleged that Defendants repeatedly misrepresented to potential and current clients that GFAM had an exclusive relationship with Bob Brinker.  Defendants do not argue that the alleged statements regarding Genworth's relationship with Brinker were not material nor could they, given that they plastered his name and likeness on all of the materials provided to investors.  Plaintiffs have further alleged that this statement was false and misleading because, in fact, Brinker was free to enter into another consulting relationship with another investment advisory firm.  Defendants, nevertheless, argue that such statements cannot form the basis of a claim because Plaintiffs somehow concede that the relationship was exclusive until August, 2009, and none of the Plaintiffs purchased mutual funds with Genworth after August of 2009.  MTD at 17, 22.  The fact that Brinker entered into another consulting relationship in August 2009, does not mean that Brinker's relationship with GFAM during the Class Period was exclusive, as represented.  Plaintiffs have alleged that such statements were false and misleading when made.  It will certainly be up to the finder of fact to determine the veracity of Defendants' statements in light of the real facts.[7]

Additionally, Defendants seem to devote an awful amount of pages to some phantom allegations regarding the non-disclosure of ASFs.  MTD at 2, 10, 15-17, 22.  According to Defendants, "Plaintiffs assert that Genworth misrepresented that Mr. Brinker would select mutual funds, and imply that instead, Genworth chose funds that secretly paid administrative service fees ("ASF") to a Genworth affiliate."  MTD at 2.  Irrespective of Defendants' intentional or accidental misreading of Plaintiffs' Complaint, Plaintiffs never alleged that Genworth

---

[7] A simple review of the marketing materials shows that Defendants used the terms "longstanding relationship" and "exclusive agreement" interchangeably throughout the Class Period.  See www.gfampcg.com/pcgv2/do/pcgPublic.  (As of October 27, 2009, Defendants were still using the language "exclusive relationship" with respect to Brinker.)

attempted to "secret[e]," "hide" or "disguise" the receipt of ASFs. Instead, Plaintiffs alleged that Defendants engaged in an undisclosed scheme of representing to investors that they would invest funds in the manner recommended by Brinker while actually purchasing non-Brinker recommended or selected mutual funds in order to reap millions of dollars in higher ASFs. It was this scheme (along with "Brinker Basic") that was secreted and not the receipt of fees. Moreover, Plaintiffs further alleged that the funds selected by Defendants in their pursuit of higher fees grossly underperformed the mutual funds recommended by Brinker, thereby costing the Plaintiffs and the Class millions of dollars in damages. As such, Defendants' attempt to mischaracterize the claims alleged in the Complaint does nothing to undermine Plaintiffs' well-pled allegations of fraud.

Additionally, Defendants' "fraud by hindsight" arguments, MTD at 19, mischaracterize the Complaint. *See, e.g., In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (fraud by hindsight "argument fails to properly characterize the [] complaint," which alleged that defendants made fraudulent statements simultaneously with their knowledge of problems resulting from the restructuring). Plaintiffs are not demanding that Defendants had to be "clairvoyant" – only that they should have told the truth and not misled their investors.

### 2.   Defendants' Statements Are Not Rendered Immaterial As A Matter Of Law

Without citing any supporting case law, Defendants repeatedly argue that the alleged false and misleading statements are rendered immaterial because they are "directly contradict[ed]" by Defendants' "multiple disclosures." MTD at 11. According to Defendants, the documents clearly disclose that: (i) Genworth and not Brinker selects the mutual funds; (ii) "Genworth has full discretionary authority to select asset allocations and investments;" and (iii) Genworth repeatedly disclosed that it would receive ASFs from mutual fund investments. Defendants' argument is both factually and legally unsupported.

Defendants cannot be immunized for making knowingly false statements even if they include some disclaimer or warning. 15 U.S.C. §78u-5(c)(1)(A)(i).[8] As Judge Pollack explained, the law provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies on foot away." *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).[9] Additionally, risk disclosures will not insulate Defendants from liability where the risk allegedly disclosed has already occurred. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

As mentioned above, Defendants in every single marketing material sent to potential and current investors touted Brinker's success and the fact that it was Brinker who was making the asset allocation recommendations and fund selections. Even to the extent that Defendants were selecting mutual funds, the materials make it abundantly clear that in doing so GFAM "implements Mr. Brinker's recommendations." Nonetheless, Defendants attempt to hide behind a disclosure that Genworth has "full authority to select asset allocations and investments." MTD at 13. However, there is absolutely nothing in that disclosure that contradicts or even remotely

---

[8] *See, e.g., In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006) (statements and omissions were not protected because they were not forward-looking, but affirmative representations about current or historical performance, or statements that omitted to disclose material information).

[9] *See also, Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (rejecting defendants' argument that disclaimer was sufficient, court held: "Such a 'truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint to plead materiality.'") (citation omitted); *see also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482 (S.D.N.Y. 1994) ("[D]efendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage."); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (recognizing that "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

suggests that Brinker was not making the asset allocation recommendations or fund selections or
that Genworth was not <u>implementing</u> Brinker's recommendations.[10]

Just as recently as this year, Judge Richard B. Lowe rejected a similar argument.  In *The
People of the State of New York v. J. Ezra Merkin*, 2010 N.Y. Misc. LEXIS 523 (N.Y. Sup. Ct.
Feb. 8, 2010), defendants sought to rely on a provision in their Offering Memoranda that
"Merkin might delegate investment management duties to independent money managers without
first providing notice to, or obtaining the consent of, investors." *Merkin*, 2010 N.Y. Misc.
LEXIS at ***13.  In rejecting Defendants' apparent reliance on the "bespeaks caution" doctrine,
the court held, among other things, that Merkin "had already delegated all investment discretion
to this money manager, a fact Merkin was presently aware of at the time of the Offering
Memoranda." *Id.* at ***15.  In the present case, Defendants' reliance on their generic disclaimer
that they have full authority to manage clients' assets is entirely irrelevant since they had full
knowledge that, contrary to their representations: (i) Brinker <u>was</u> <u>not</u> making asset allocations or
fund selections for the Portfolio; and (ii) GFAM <u>was</u> <u>not</u> implementing Brinker's fund
recommendations.[11]

The Second Circuit has held that an investment adviser may not disclose the basics of an
arrangement, without disclosing its specific details, and escape liability under a theory of
immaterial misrepresentation.   The Circuit held that investment advisers "were obligated to

---

[10]  In fact, Defendants represented that Genworth paid Brinker fees "for his services,
which include <u>investment</u> <u>management</u> <u>services</u>." ¶ 25.  This also was a false and misleading
statement, because, according to Defendants, Brinker has no investment management
responsibilities.

[11]  Defendants argue that their statement indicating they had discretionary authority over
client's funds allowed them to invest clients' funds in any manner they deemed fit.  Not so.  The
discretionary authority given to Defendants was extremely limited to investing in accord with the
parameters expressed by the clients and in accord with the representations made in GFAM's
uniform statements, <u>i.e.</u>, asset allocations and fund selections would follow Brinker's
recommendations.

disclose candidly to shareholders the material features of the arrangements they crafted."
*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 93 (2d
Cir. 2010).  In that case, Smith Barney disclosed repeatedly in its prospectuses that it had a
relationship with a transfer agent, but failed to disclose all the specifics about that relationship
that might change the mix of information available to investors.  *See id.* at 90-91, 93-94.  The
Circuit held that a claim was stated under Section 10(b) and Rule 10(b)(5) noting that: "The
materiality of a misleading statement or omission for § 10(b) purposes is a mixed question of law
and fact, and a complaint may not be dismissed under Rule 12(b)(6) on the ground that the
alleged misstatements or omissions are not material unless they are so obviously unimportant to a
reasonable investor that reasonable minds could not differ on the question of their importance."
*Id.* at 91 (citation and internal quotation marks omitted).

Defendants' generic statement does nothing to neutralize the self apparent materiality of
their repeated references to Brinker, or other misstatements that "GFAM shall provide the
investment advisory services selected by the client" and that Brinker was making asset
allocations and fund selections for the Portfolio.

### D.    Plaintiffs Have Pled Fraud With Particularity

According to this Court in *Intelligent Digital Sys.*, 683 F. Supp. 2d at 286:

> *Rule 9(b) of the Federal Rules of Civil Procedure* ("Rule 9") requires that in "all
> averments of fraud or mistake, the circumstances constituting fraud or mistake
> shall be stated with particularity." *Fed. R. Civ. P. 9(b).*  States of mind such as
> malice, intent or knowledge may be generally averred.  *Id.*  Complaints alleging
> fraud are required to: (1) state the statements that the plaintiff contends were
> fraudulent, (2) identify the speaker, (3) state where and when the statements were
> made, and (4) explain why the statements were fraudulent.  (Citations omitted)

While the Court noted that the standard imposed by Rule 9 is high, it stressed that the
Second Circuit "does not require the pleading of 'detailed evidentiary matter.'" *Id.* quoting *In re
Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).  In accord with this well-established
principle of law, Plaintiffs have alleged in exacting detail sufficient facts putting Defendants on

notice of the alleged fraud and thereby easily satisfying Rule 9(b).  Plaintiffs have identified the specific statements that Plaintiffs contend were false and misleading and form the basis of Plaintiffs' 10b-5 claim.  ¶¶ 21-31.  Plaintiffs further identify the authors of these documents (*i.e.* Genworth, GFAM and Ahluwalia).[12]  Moreover, these Defendants were directly responsible for the dissemination of Genworth's marketing materials as well as the maintenance and content on Genworth's Website.  Additionally, the Complaint identifies the specific publications and dates in which the false and misleading statements are contained.[13]  As Defendants are well aware, the alleged false and misleading statements are contained in the (i) "Account Application," (ii) "Information Booklet," (iii) "Disclosure Brochures," (iv) a 2004 Genworth Report, (v) "BJ Group Services Overview," (iv) letters to potential clients, and (vi) Genworth's Website (www.gfampcg.com/pcgv2/do/pcgPublic).

There is absolutely no ambiguity regarding the source of the alleged misleading statements.  In fact, not only do Defendants not dispute that they are responsible for the authorship of these materials (as opposed to some external source), Defendants acknowledge that Genworth uniformly supplied its clients with the bulk of these materials.

> The Complaint repeatedly references Defendants' "Account Application," including the Investment Management Agreement incorporated therein (AC¶ 23, 24), as well as the accompanying "information booklet" or "Disclosure Brochure" that Defendants provided to its new clients when they invested with Genworth, (AC¶¶ 25, 27), but does not specify what was given to each Plaintiff.  (AC¶¶ 23, 25).  MTD at 6-7.

> Each client of PCG acknowledged receipt of these documents when investing with Genworth, through language appearing directly above their signature on the Account Application.  MTD at 7.

---

[12]  *See* Declaration of Jeffrey Joseph.  Certainly, Defendants are not suggesting that they are not responsible for the statements contained in these materials.

[13]  While Plaintiffs did not have a specific date of the recent "Introductory Brochure," Plaintiffs believe that discovery will show that it was disseminated to Plaintiffs well within the Class Period.  ¶ 28.  Additionally, Defendants' marketing materials routinely refer to Defendants' Website which clearly states that Brinker makes fund selections.

Plaintiffs have also explained in detail why the statements were fraudulent.  In particular, Plaintiffs have alleged specific facts demonstrating that, contrary to their representations that "Bob recommends asset allocation and fund selection for GFAM's management of accounts" and "GFAM implements Mr. Brinker's recommendations by selecting mutual funds for client accounts," Defendants and not Brinker, were actually selecting the mutual funds and making the asset allocations (without regard to Brinker's recommendations).  The Complaint further identifies the particular funds for each year that were non-Brinker recommended funds and the percentages, by quarter, that the non-Brinker funds comprised.  ¶¶ 32-33.  The Complaint further identifies the amounts that the Portfolio underperformed the Brinker *Marketimer* model for each year of the Class Period.  ¶ 36.  Accordingly, Plaintiffs' Complaint easily "puts Defendants on sufficient notice of the claim and the actual ground upon which it is based." *Intelligent Digital Sys.*, 683 F. Supp. 2d at 286.

With full knowledge that Plaintiffs have satisfied Rule 9(b), Defendants seek to create a new requirement entirely unsupported by any cited authority.  Defendants seek to convince this Court that Plaintiffs failed to satisfy Rule 9(b) because the "required who, what, when, where" of the alleged misrepresentations to each Plaintiff are absent from the Complaint.  MTD at 4.[14] Without any basis for support, Defendants seem to suggest that a complaint that was drafted on behalf of all the Plaintiffs and the Class, needs to itemize evidence for each particular plaintiff. Notwithstanding the fact that the Complaint identifies on behalf of all of the named Plaintiffs the false and misleading statements, the author of those statements, where and when those statements were made, and why those statements are false and misleading, there is absolutely no requirement at this stage that Plaintiffs plead the evidence for each particular client for each particular claim.  More specifically, courts have held that "Rule 9(b) provides that 'the

---

[14]   The actual language of the PSLRA is that "the Complaint shall specify . . ." not "a Plaintiff: (1) identify."  MTD at 18.

circumstances constituting fraud . . . shall be stated with particularity,' not that every fact supporting every claim should be stated with particularity." *Novak v. N.Y. State Elec. & Gas Corp.*, 2006 U.S. Dist. LEXIS 73031 at *9 (N.D.N.Y. Oct. 6, 2006). *See also, In re Scholastic Corp.*, 252 F.3d at 74 (reversing dismissal of securities complaint where plaintiffs alleged defendants recklessly failed to disclose a material fact, regardless of whether evidence would absolve them at trial); *Richardson v. White, Weld & Co.*, 1978 U.S. Dist. LEXIS 17683 at *8 (S.D.N.Y. May 18, 1978) ("Rule 9(b), assuredly, does not require an exhaustive cataloguing of facts").[15]

### E.   Plaintiffs Have Alleged Facts Giving Rise To A Strong Inference Of Scienter

The requisite state of mind in 10b-5 claims is "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). The Second Circuit has provided at least five non-exclusive examples of how a plaintiff may adequately plead scienter – namely, allegations that the defendants: "(1) benefitted in a concrete and personal way from the purported fraud . . .; (2) engaged in deliberately illegal behavior . . .; (3) knew facts or had access to information suggesting that their public statements were not accurate . . .; or (4) failed to check information they had a duty to monitory," *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000), or (5) "ignored obvious signs of fraud." *Id.* at 308. *See also Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) ("An egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an inference of . . . recklessness.") (citations and quotations omitted).

---

[15] Similarly, Defendants' argument that Plaintiffs were required to plead an exhaustive list of evidentiary facts identified by them at MTD at 8-9 is yet another attempt to re-write the law in this instance rejecting all well-established authorities and requiring the pleading of evidence at the motion to dismiss stage. While Plaintiffs have pled an exhaustive amount of facts, well beyond what Rule 9(b) requires, the level of pleading argued for by Defendants is clearly contrary to the law in this Circuit. *Intelligent Digital Sys.*, 683 F. Supp. 2d at 286 ("the Second Circuit has held that the rule does not require the pleading of 'detailed evidentiary matter.'") (citation omitted). Moreover, had Plaintiffs done so, the Defendants would no doubt argue that Plaintiffs violated Rule 8.

The inquiry on scienter "*is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.*" *Tellabs*, 551 U.S. at 322-323 (underlined emphasis omitted; bold added).[16] "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citations omitted). An inference "at least as likely as competing inferences" warrants recovery. *Id.* at n. 5. *See also City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) ("the 'tie . . . goes to the plaintiff'").

**1.    Defendants Were Aware Of Facts And/Or Had Access
To Information Contrary To Their Public Statements**

Plaintiffs have met the scienter requirement here by adequately pleading that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311. Such "allegations alone are enough to satisfy the pleading requirement for scienter." *Heller*, 590 F. Supp. 2d at 622 (Defendants' knowledge of undercapitalization that contradicted their public statements alone satisfied scienter). While publicly representing that the Portfolio was being managed by Brinker, or at a minimum, that GFAM was implementing Brinker's recommendations, including mutual fund selection and asset allocation, Defendants were well aware of the fact that it was GFAM, and not Brinker, that was selecting mutual funds and allocating assets without regard to Brinker's recommendations. Throughout their papers, Defendants repeatedly insist that "Genworth, and not Mr. Brinker, was responsible for selecting the mutual funds." MTD at 2, 11, 13. This alone suffices to plead scienter. *See, e.g, In re Scholastic*, 252 F.3d at 77 ("Where the complaint alleges that defendants

---

[16] *See also In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 983 (D. Minn. 2009) ("Despite the shortcomings of some of lead plaintiff's additional allegations of scienter, the court determines that, in consideration of the totality of the circumstances . . . a reasonable person could find [] plaintiff's fraud narrative to be cogent and as plausible as defendants' opposing nonfraudulent narrative.")

knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business.").

While Defendants' admissions end the analysis, the Complaint nevertheless alleges numerous other particularized facts demonstrating that Defendants were aware of facts and/or had access to information contrary to their statements to investors. For example, the Complaint identifies for each year of the Class Period the specific funds that GFAM selected for the Portfolio that were not recommended or selected by Brinker. ¶ 33. The Complaint further demonstrates that these non-Brinker recommended funds (selected by GFAM) at times comprised nearly 65% of the Portfolio and consistently more than 50%. ¶ 32.[17]

Moreover, Defendants' knowledge that it was not following Brinker's fund selection and asset allocation is well supported by high level employees of GFAM during the Class Period. According to a former high level employee with Genworth's Private Client Group, during the 2003-2006 period, Genworth's allocation to large cap stock funds was roughly double the allocation that Brinker recommended.[18] Genworth also significantly underweighted the Brinker recommended allocation to small cap funds, again, driven by additional fees that Genworth could collect. Witnesses recall emails in which Defendants referenced 23 basis points in account servicing fees for each model portfolio, on average, as a target. ¶ 34.

---

[17] Equally compelling is the fact that Defendants' misstatements and omissions concern their core operations. GFAM's entire business model was based on securing money from investors and generating fees through the purchase of mutual funds and assets under management. *See, e.g.*, *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005) (information at the core of a company's business "may be properly ascribable to senior officers.") (citation omitted).

[18] The fact that the asset allocation to large cap stock funds so far exceeded that recommended by Brinker for so long a period thoroughly exposes Defendants' argument as to fluctuations in asset allocation as pure sophistry.

Witnesses further stated that, the funds purchased by Defendants are completely contrary

to the Brinker strategy.

> Although Bob Brinker has preached for more than 25 years about the need to keep
> expenses low, every single alternate/substitute fund that Genworth selected paid
> them extra, which came directly out of clients' returns. <u>This practice goes
> completely against Bob's philosophy.</u> Of the more than 9000 mutual funds
> available, <u>Genworth did not select one that didn't pay them extra.</u> ¶ 38.

> [The TJT Plaintiffs] resigned from Genworth, in part, after becoming increasingly
> concerned by <u>Genworth's management of accounts, asset allocation for accounts,
> and selection of mutual funds which were being represented to Genworth clients
> as being managed in a manner consistent with and pursuant to the investment
> philosophy, strategy and guidance provided by Robert J. Brinker ("Bob Brinker")
> when, in fact, they were not.</u> ¶ 40.

> Defendant-Counterclaimant - <u>Third Party Plaintiff McMullan complained about
> and reported to management at Genworth, and specifically to</u> . . . <u>Ahluwalia
> ("CEO Ahluwalia"), the fact that client accounts were grossly under-performing
> due to Genworth's inappropriate selection of non-Brinker recommended mutual
> funds in a manner inconsistent and often contrary to Bob Brinker's
> recommendations;</u> that inappropriate funds were clearly being selected in a
> manner calculated solely to obtain additional revenue at the clients' expense; <u>that
> Genworth was fraudulently representing to clients that it "implements Bob
> Brinker's recommendations by selecting mutual funds for client accounts" when,
> in fact, it very often did not;</u> that there was significant evidence of "double
> dipping" practices at Genworth - at the client's expense and contrary to both good
> practice and the law. *Id.*

Lastly and equally compelling in raising a strong inference of scienter, especially in

conjunction with Plaintiffs' other allegations, is Defendants' use of "Brinker Basic."  According

to witnesses, Genworth Private Client Group employees were directed to use "Brinker Basic"

portfolios as a retention tool and not for new and existing clients because they generated less fees

for the Defendants.[19] ¶ 39.

---

[19] Defendants argue that if there is no motive, "What Plaintiffs are left with, as a factual
matter, are after the fact, <u>circumstantial</u> arguments presumptively crafted by former Genworth
employees now competing with Genworth as TJT Capital Group LLC." MTD at 32.  Even this
statement is a concession that the Complaint pleads sufficient facts which need to ultimately be
resolved by the trier of fact, since "scienter may be pled and proven by reference to

These well-pled allegations, which have been in no shape or form disputed by

Defendants, clearly support a strong inference that Defendants acted with the requisite scienter.

2.     **The Complaint Adequately Pleads Defendants' Concrete Benefit**

Although personal pecuniary motive is not required to plead scienter, *see Tellabs* 551

U.S. at 325, Defendants' motive to secure investors and generate fees supports an inference of

scienter. *See Novak*, 216 F.3d at 307 (motive includes any "concrete benefits that could be

realized by one or more of the false statements and wrongful nondisclosures alleged"); *In re*

*EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006) ("Scienter can be

alleged in two ways: by pleading facts that evidence conscious misbehavior or recklessness or by

pleading facts that evidence defendant's motive and opportunity to commit fraud").

Defendants challenge Plaintiffs' scienter allegations on two grounds. First, that it is

implausible "For Genworth to jeopardize its entire business model and credibility . . . for a goal

of 23 basis points (0.23%) of ASFs." Second, that Defendants had no opportunity to commit the

alleged fraud. Both arguments are easily dismissed. As discussed in detail in Defendants' papers

(MTD at 15), with respect to the Portfolio, Defendants generate fees in only two ways: (i) assets

under management (ranging from 0.85% - 2.00%); and (ii) administrative services fees (.23% -

.25%) through the purchase of mutual funds. Defendants do not generate revenue based on the

performance of the Portfolio. Thus, while Defendants attempt to convince this Court that the

ASFs are "de minimis," they actually represent a significant percentage of their annual

revenues.[20]  MTD at 3.  Moreover, as Defendants acknowledge, "[t]he central theme of the

---

circumstantial evidence." *In re CV Therapeutics Sec. Litig.*, 2004 U.S. Dist. LEXIS 17419 at
*11 (N.D. Cal. August 5, 2004).

[20]  Defendants attempt to convince this Court that it would be irrational for them to
jeopardize a billion dollar business, and to pay Brinker for leads if it had a premeditated intention
to commit fraud. MTD at 29. Under Defendants' explanation, no corporation or insider could be
found to have the requisite scienter for committing fraud. Some of the most notorious 10(b)
cases (*Enron, Cendant, Worldcom*) concerned corporations that did so jeopardize multi-billion
dollar businesses in the course of a scheme to defraud. Moreover, Defendants claim to have paid

Complaint is that Defendants built the PCG business and lured investors with false representations that they would follow Mr. Brinker's asset allocation strategies and fund selections." *Id.* at 29. Thus, the entirety of Defendants' revenues and profits, and not just the ASFs, are directly tied to Defendants' false and misleading statements. Considering, that these were the only two ways that GFAM generated revenues and profits and that it amounted to millions of dollars, the Complaint adequately alleges that Defendants had a cognizable motive to misrepresent the truth regarding the Portfolio.[21] Moreover, Plaintiffs' motive allegations are

--------

Brinker millions of dollars for leads. MTD at 30. Not only is this a factual assertion outside the record, but according to Defendants' disclosures they were paying Brinker fees for, among other things, "investment management services." ¶ 25.

[21] Defendants try to confuse the issue surrounding the fees generated by Defendants by citing to *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008), *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006), and *In re Morgan Stanley & Van Kampen Mut. Fund Fees Litig.*, 2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. April 18, 2006), for the proposition that undisclosed fees of certain percentage points are immaterial for purposes of establishing a duty to disclose under Section 10(b) of the Exchange Act. Defendants' reliance on these cases is misplaced. Plaintiffs are not arguing over the non-disclosure of ASFs, but rather that the pursuit of those fees provided Defendants with motive for committing fraud. Courts have consistently found the pursuit of fees that otherwise would not be earned to be a sufficient motive to commit fraud. As the Court in *SEC v. Reserve Mgmt. Co.*, 2010 U.S. Dist. LEXIS 16537 at *37-8 (S.D.N.Y. Feb. 24, 2010) stated:

> Several courts within this district have found that a desire to generate additional fee income may provide a sufficient motive to commit fraud, particularly where the defendant possesses a personal stake in the business and the fee income. For example, in *Heller v. Goldin Restructuring Fund*, 590 F. Supp. 2d 603, 620-21 (S.D.N.Y. 2008), the court found sufficient motive where the defendants "possessed the unique incentive, as managers of a struggling, privately-owned investment fund in which they possessed a personal financial stake," to attempt to maximize not only their "personal financial investment" but also their "potential receipt of management fees." *Id.* Similarly, in *Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006), the court held that "[u]nlike a motive to increase stock prices, shared by all corporate insiders, a motive to generate increased fees based on inflated NAV figures would be 'a concrete and personal benefit to the individual defendants'" -- who served as the administrators of the funds in question -- "'resulting from the fraud.'" 446 F. Supp. 2d at 171, 187 (quoting

supported by the facts obtained by high level former employees at Genworth during the Class Period. See ¶¶ 34-41.

In a misguided attempt to counter Plaintiffs' scienter allegations, Defendants also argue that "Defendants had no such opportunity" to commit this fraud. MTD at 30-32. Defendants' lack of opportunity argument suffers from several debilitating flaws. First, the term "opportunity" as used in "motive and opportunity" refers to the ability to engage in the conduct complained of, not the ability to forever conceal the fraud. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 180 (S.D.N.Y. 2009) (opportunity found where "Morgan Stanley was well positioned to cause the false and misleading ratings to be disseminated to investors, thereby establishing Morgan Stanley's opportunity to commit the alleged fraud."). Genworth plainly had the ability, by virtue of the discretion they deceptively secured from clients, to buy non-Brinker recommended or selected funds and employ non-Brinker recommended asset allocation on behalf of clients. Second, Defendants seek to support their argument by offering the Court several factual assertions that are well beyond the scope of the Complaint and thus improper at the motion to dismiss stage. For instance, Defendants assert: (i) "Mr. Brinker's *MarkeTimer* recommendations were public and available in his newsletter . . ."; (ii) "Genworth at all times provided quarterly reports to all of its clients listing each of their mutual fund investments"; and (iii) "There is abundant public data, including the mutual fund

---

Kalnit, 264 F.3d at 139). Likewise, in *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 345-46 (S.D.N.Y. 2004), the court found that the defendant auditing company's motive to increase the size of its consulting business – which generated much higher fees than the firm's auditing business – was "sufficiently concrete to survive a motion to dismiss."

Further, in the *In re Morgan Stanley* case repeatedly cited by Defendants, the court recognized generation of fees as being a proper basis for alleging motive, citing *Baxter v. A.R. Baron & Company,* 1996 U.S. Dist. LEXIS 15098 (S.D.N.Y. October 11, 1996) (finding allegations that defendant's touting stock to the plaintiffs with false information because he would earn a commission on each such sale sufficient to plead motive under Rule 9(b)).

prospectuses, summarizing and profiling the investments and objectives (*e.g.,* growth, growth and income, international, small cap) of each mutual fund." MTD at 30-31. Defendants' unsupported, and entirely speculative, factual assertions are improper and should be rejected.

Additionally, there is absolutely nothing in Defendants' argument to support their contention that they had no opportunity to commit the alleged fraud. In fact, the Complaint demonstrates a completely opposite conclusion. Defendants represented that Brinker was making the asset allocations and fund selections or that GFAM was implementing Brinker's recommendations. Even taking into consideration Defendants' improper factual assertions, there is no reason why an investor would know that Defendants were not doing as represented. While Defendants argue that investors could have compared Genworth's fund selections to the *Marketimer,*[22] Plaintiffs and investors would have no reason to believe that Brinker was, in fact, not making the asset allocations and fund selections or that Defendants were not implementing Brinker's recommendations. If anything, considering Defendants' statements that they were paying Brinker for "investment management services," the only plausible conclusion was that the funds being selected and asset allocations made were by Brinker, whether or not they were as contained in the *Marketimer.* Indeed, it is entirely implausible for Genworth to suggest that it paid Brinker millions for merely a subscription to the *Marketimer* or leads. Rather it would have been entirely reasonable for an investor to assume that Brinker was making recommendations directly to GFAM in exchange for those fees. Additionally, the former employees stated that Defendants never published annual investments returns to clients comparing the performance of the Portfolio to Brinker's published returns. ¶ 39. Lastly, Defendants' use of "Brinker Basic," allowed Defendants to operate under a cloak of darkness and provide them with additional opportunity to (and did) commit acts of fraud against Plaintiffs and GFAM investors.

---

[22] It should be noted that the *Marketimer* was not a public document and was only available by subscription. Defendants' own materials state: "You also may know about his monthly newsletter, *Marketimer.*" ¶ 28.

### 3. Defendants' Attack On Plaintiffs' Sources Have No Credible Place In Evaluating Defendants' Motion

Unable to withstand the compelling evidence of their scienter, Defendants resort to attacking Plaintiffs' well-placed, facially reliable sources. These attempts fail. The Second Circuit and other courts have held that anonymous sources, such as those cited in Plaintiffs' Complaint, satisfy the particularized pleading requirements of Rule 9(b) and the PSLRA. All that is required is that the person in the position occupied by the source "would possess the information alleged," not that there is no matter which could be used to impeach their testimony at trial. *Novak*, 216 F.3d at 312-14; *see also In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 299-300 (S.D.N.Y. 2009) (rejecting credibility challenges under *Novak* because such "witness-by-witness attacks" do not preclude an inference of scienter based on knowledge or recklessness taking all allegations by various informants together); *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 526 n.18 (S.D.N.Y. 2009) (question is whether plaintiff's "witnesses are likely to possess the information contained in their statements," not whether they will turn out to be credible when their identities and background become known) (citation and internal quotations omitted).

Plaintiffs have pled that these witnesses were high level employees within Genworth's Private Client Group during the relevant time period that had first-hand interactions with the Defendants concerning the matters alleged in the Complaint, thereby clearly establishing Defendants' scienter. Defendants, do not in any manner, shape or form argue that these witnesses did not occupy knowledgeable positions to provide information concerning the claims alleged in the Complaint. Instead, Defendants have devoted a tremendous amount of resources in a separate action to discredit these witnesses in an effort to undermine their credibility in the present action.[23] Notwithstanding Defendants' efforts to silence these witnesses, there have been

---

[23] Arguments regarding the credibility of witnesses is clearly an issue properly reserved for trial. "District courts generally 'may not weigh evidence or assess the credibility of witnesses

absolutely no findings of fact in that case that even remotely undermines any of the facts and allegations provided to this Court based on the statements of these confidential witnesses.

As in *Countrywide*, "Plaintiffs' numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards." *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008). The fact that this case involves "[c]orroboration from multiple sources also supports an inference of a scienter." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 712 (7th Cir. 2008).

### F.   Loss Causation Is Adequately Plead

In *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court explained that the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47 (citations omitted). There is no heightened standard for pleading loss causation. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008). For pleading purposes, loss causation exists "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). A "corrective disclosure" is not required under this Court's post-*Dura* case law. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) ("a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss") (citing Second Circuit cases). A risk allegedly concealed by

at the summary judgment stage.'" *Bennett v. Falcone*, 2009 U.S. Dist. LEXIS 25182 at *21 (S.D.N.Y. Mar. 25, 2009) quoting, *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005). *See also, Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury.") (citation omitted).

defendants which materialized and arguably caused the decline in value suffices for the purpose of pleading loss causation. *Id.* at 307. *See also Heller*, 590 F. Supp. 2d at 624 (loss causation satisfied by allegations that plaintiff's loss was caused by foreseeable materialization of concealed risk of fund's undercapitalization).[24]

In this case, Plaintiffs have alleged that Defendants concealed that Brinker was not making asset allocations or fund selections and Defendants were not implementing Brinker's recommendations.  ¶ 27.  Moreover, Defendants used their false and misleading statements to "lure" millions of dollars from investors in order to generate millions of dollars in fees through the assets under management and the purchase of mutual funds.  Plaintiffs have also alleged that as a direct result of Defendants' fraud (*i.e.,* the scheme of purchasing the specific non-Brinker recommended funds identified in the Complaint), Plaintiffs lost millions of dollars due to the fact that the Portfolio grossly underperformed the investment strategy that was promised them by Defendants.  These allegations are sufficient to plead loss causation.

All that loss causation requires be pled is that an investor incurred an economic loss and that had he or she known the truth, he or she would not have entrusted his or her funds to another

---

[24] Plaintiffs' reliance allegations are adequate.  *See Marsh & McLennan*, 501 F. Supp. 2d at 490:

> Reliance, or transaction causation, "requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Lentell*, 396 F.3d at 172 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

As Defendants acknowledge, Plaintiffs in ¶ 47 of the Complaint adequately plead reliance ("In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiffs relied, to their detriment, on such misleading statements and omissions in investing in the Portfolio."). Moreover, the court in *Marsh & McLennan* held, "These allegations are sufficient. The Court is not aware of any case requiring a class to provide proof of purchase for every day of the Class Period at the pleading stage, and will not require such a showing here." *Id.* at 490.

and avoided the loss, or alternatively, in the case of asset management by a fund, that the
defendant charged "excessive" fees that resulted in "the economic diminution in the Funds' net
asset values." *Operating Local 649 Annuity Trust Fund*, 595 F.3d at 95-96. This is because a
plaintiff is entitled to receive from an issuer or an investment adviser an accurate statement as to
the "investment quality" of their securities or mutual funds. *See id.* at 96 ("The defendants'
losses were real ones because the deductions used to fund the transfer agent 'fees' diminished for
[plaintiff] (and other shareholders) money under management and, as a result, negatively and
predictably impacted returns.").

Additionally, Courts have held that complaints alleging misleading statements as to an
investment manager's strategy that causes a fund to underperform adequately plead loss
causation. For example, where E*Trade Financial told its investors that it used conservative
mortgage lending practices, the court held that allegations that E*Trade failed to disclose "the
quality of E*TRADE's mortgage investments sufficed to plead loss causation." *Freudenberg*,
2010 U.S. Dist. LEXIS 46053 at *82. In another case, documents used to solicit investors
indicated that the defendants would "employ a proprietary trading strategy," and the court held
that the allegation "that the hedge fund employed a proprietary trading strategy when, in fact, it
did not," among other things, adequately alleged loss causation. *Cummings v. Paramount
Partners, LP,* 2010 U.S. Dist. LEXIS 51579 at *8, 54 (D. Minn. Mar. 1, 2010); *see also In re
Dynex Capital, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 96527 at *26 (S.D.N.Y. Oct. 19, 2009)
(plaintiff alleges loss causation when defendant violates own stated investment strategy:
"[S]tatements by a defendant that it 'generally' adheres to a particular policy become misleading
when in fact there is no such policy or the policy is something else altogether.").

Defendants' argument that Plaintiffs fail to allege loss causation because Plaintiffs' losses
were "hypothetical" is easily rejected. The Second Circuit has clearly recognized that securities
plaintiffs may seek recovery for damages, including "loss of profits," for wrongs committed in
violation of the 1934 Act, "whether the measure of those compensatory damages be out-of-

pocket loss, the benefit of the bargain, or some other appropriate standard." *GVA Market Neutral Masters, Ltd., v. Veras Capital Partners Off Shore Fund, Ltd.*, 580 F. Supp. 2d 321, 333 (S.D.N.Y. 2008) quoting *Osofsky v. Zipf*, 645 F.2d 107, 114 (2d Cir. 1981). *See also Panos v. Island Gem Enters., Ltd., N.V.*, 880 F. Supp. 169, 177 (S.D.N.Y. 1995) (Loss causation adequately pled "when benefit-of-the-bargain damages can be measured with reasonable certainty and those damages are traceable to a defendants' fraud, courts are free to award them.").

Plaintiffs have alleged that losses are directly related to Defendants' misstatements. There was nothing hypothetical. Plaintiffs were promised that Brinker was making the asset allocations and fund selections or that Genworth was implementing Brinker's recommendations, but, to the detriment of Plaintiffs and the Class these representations were false and misleading. The *Marketimer* models were very real. MTD at 26. And "Brinker Basic" was very real and its superior performance as compared to the other portfolios offered by Defendants that did not implement Brinker recommendations demonstrates loss causation. Plaintiffs' Complaint specifically identified, year-by-year, the non-Brinker recommended funds that caused the Portfolio to grossly underperform Brinker's *Marketimer* model. ¶ 33. Additionally, Defendants used misstatements to "lure" money into the Portfolio since, as Defendants readily acknowledge, they receive substantial fees from the assets under management. Their receipt of those ill gotten fees, however, diminished the value of the Portfolio. As such, Plaintiffs' losses are certain and easily traceable to Defendants' fraud.

Furthermore, causation is a matter of fact for trial regarding the mix of information available to the market. *See In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157, 173, 182 (S.D.N.Y. 2010). The Court need not rule at this stage that Plaintiffs' allegations of loss causation will prevail on the merits, but only that they are "plausible," as the similar allegations in the cases cited above were. A plaintiff should be allowed to discover documents and witness testimony and to submit expert reports that are probative of material facts in the case, only then can the Court decide whether a rational juror could find in favor of the plaintiff. *See AIG*, 265 F.R.D. at

173, 182; *see generally Twombly*, 550 U.S. at 556 (plaintiff need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]").[25]

### G.    Genworth Is Liable For Its Participation In The Manipulative Scheme And Devices

Defendants falsely claim that the "complaint does not describe *any* actions of" Genworth Financial Inc. MTD at 37. This is incorrect because the Complaint distinguishes between the actions of Defendant Genworth and those of GFAM. *See, e.g.,* ¶ 34. The Complaint also alleges that both Genworth and GFAM "through their various sales, marketing and disclosure materials disseminated to prospective and current Genworth clients, continuously touted its exclusive management agreement with Bob Brinker." ¶ 22. The documents on which Defendants themselves rely and invite the Court to accept the truth of, demonstrate that GFAM is a wholly owned subsidiary of its parent corporation Genworth, which also owned Genworth Financial Advisers Corp. ("GFAC"), an investment adviser registered with the Securities and Exchange Commission. *See* Joseph Decl., Ex. 3 at 55. GFAM informed its investors that advisory representatives of GFAC may refer clients to GFAM and that GFAM pays GFAC for such referrals. *See Id.* Additionally, Genworth (along with GFAM) clearly authorized all of the misleading marketing materials distributed to Plaintiffs and the Class. Plaintiffs are entitled to the inference from these well-pled facts that Genworth Financial used one of its subsidiaries, GFAC, to refer investors to GFAM based on the Brinker strategy.

---

[25] Defendants' cited cases are distinguishable even as described in Defendants' brief. For example, the plaintiffs did not identify any funds that lost money in one case relied upon by Defendants, whereas the Complaint in this case properly alleges that the Portfolio grossly underperformed the Brinker recommended funds that Plaintiffs were misled to believe Defendants would invest their money in. *Compare* MTD at 26 (plaintiffs did not "state which funds lost money") citing *In re Morgan Stanley & Van Kampen,* 2006 U.S. Dist. LEXIS 20758, *with* ¶¶ 36-37. Similarly, in Defendants' other cited case, the plaintiffs did not allege the performance of any fund. *See* MTD at 27 (citing *In re Merrill Lynch,* 434 F. Supp. 2d 233).

The Complaint clearly alleges that Genworth used its own Account Executives to promote its longstanding relationship with Brinker as a way for investors to simplify their investments. *See* ¶ 30. The email address listed on the marketing materials making this statement used the website of Genworth Financial, genworth.com, not that of GFAM, gfampcg.com, to solicit investors and market the Brinker investment maximization and simplification strategy. ¶¶ 30-31.

A corporation, as well as its subsidiaries and affiliates, may be found liable under section 10(b) and Rule 10b-5 for knowingly participating in another corporation's pattern of misrepresentations. *See SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 109-112 (2d Cir. 1998) (liability imposed on those who "participated in the fraudulent scheme" and "committed a manipulative act"); *In re Parmalat,* 375 F. Supp. 2d at 480-81, 485, 501, 509 (where investment bank for principal defendant participated in distributing misleading marketing materials, bank was liable under 10(b): "The Second Circuit thus appears to have indicated that a 'participant' in a fraud can be liable," because "Section 10(b) should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.") (internal citations omitted). Further, Section 10(b) is broad and flexible, and reaches those who "directly or indirectly ... use or employ ... any ... deceptive device or contrivance."

This is not a case, like those cited by Defendants, in which a shareholder or absentee parent corporation had no role in creating a misleading investment vehicle. *See The Limited Inc. v. McCrory Corp.,* 645 F. Supp. 1038, 1044 (S.D.N.Y. 1986) (involving attempt to hold a shareholder liable where there was no allegation that shareholders themselves "perpetrated a fraud," and distinguishing a case in which an accountant was held liable for participating in its client's fraud) (citing *Somerville v. Major Exploration, Inc.,* 576 F. Supp. 902, 911 (S.D.N.Y. 1983)). Defendants' other cases are inapposite, as they involve holding corporations liable under contracts rather under Section 10(b). *See Thomas-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 777-78 (2d Cir. 1995) (addressing whether nonsignatories were bound to an arbitration

35

clause); *Gunther v. Capital One, N.A.,* 2010 U.S. Dist. LEXIS 35465 at *2-3, 10-17 (E.D.N.Y. Apr. 8, 2010) (involving breach of contract and consumer protection claims relating to ATM fees); *Ascension Health v. AIG, Inc.,* 2009 U.S. Dist. LEXIS 64808 (S.D.N.Y. July 23, 2009) (liability under excess insurance policy). Instead, according to the securities filings of Genworth, it created and used GFAM and GFAC to generate investment assets and profits for the investment conglomerate, which it then accepted the revenue and profit from on its consolidated balance sheets. Additionally, Genworth was required to act and investigate its subsidiaries' misleading schemes and devices under the Sarbanes-Oxley Act of 2004, which required that when Genworth's CEO and other management signed its annual or periodic reports filed with the SEC, they certified that they had designed internal controls to ensure that material information relating to its subsidiaries was made known to them by others within the subsidiaries. 15 U.S.C. § 7241(a)(4) (2005).[26]

### H. Plaintiffs' Claim For Breach Of Fiduciary Duty Is Not Preempted

Defendants primarily rely on out-of-circuit case law which does not reflect the law of this Circuit. *See* MTD at 35-37. In the Second Circuit, courts use the "necessary component test," which provides that claims for "breach of contract, breach of the implied covenants of good faith

---

[26] *See* Genworth Annual Report Pursuant to Securities Exchange Act of 1934 on SEC Form 10-K for 2001, at 55 (filed Feb. 27, 2006). Genworth was incorporated in Delaware on October 23, 2003 in preparation for the corporate reorganization of certain insurance and related subsidiaries of General Electric Company ("GE") and an initial public offering of Genworth common stock, which was completed on May 28, 2004 ("IPO"). ("In connection with the IPO, Genworth acquired substantially all of the assets and liabilities of GEFAHI."); *id.* at 106 ("GE Asset Management ('GEAM') provides investment management services for significant portions of our U.S. and Bermudan investment portfolios pursuant to investment management and services agreements and investment guidelines approved by the boards of directors of our insurance subsidiaries. We have agreed to pay GEAM a management fee...."); *id.* at 114 ("[W]e continue to provide services to GEAM and GEFAHI related to this asset management business, including client introduction services, asset retention services and compliance support.... GEFAHI has agreed to pay us a fee ... determined based upon the level of third-party assets under management managed by GEAM over the four-year term.") *Id.*

and fair dealing, breach of fiduciary duty, or unjust enrichment" are not preempted because they do not "require[] misrepresentations or omissions as a necessary element, [so] none of them sounded in fraud, and thus none were preempted by SLUSA." *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 272 (S.D.N.Y. 2007). Under the necessary component test, only "claims that 'sound in fraud'" are preempted by SLUSA. *Id.* Courts have reasoned that SLUSA preemption does not result from allegations of fraud in other claims alleged in the complaint, because: "merely making allegations of fraud somewhere in the complaint" is not "sufficient to bring the case within the reach of SLUSA." *Id.* at 272-73. *See also Pension Committee of the University of Montreal Pension Plan*, 2010 U.S. Dist. LEXIS 4546 (SLUSA did not preempt claims under New York law based upon investment fund's failure to reconcile portfolio investments properly and wrong valuing of shares in portfolios).

In this case, Defendants' fiduciary breaches are based on Defendants' failure to properly monitor the Portfolio, investing in mutual funds for the sole purpose of generating fees, and by their failure to deal loyally and fairly with Plaintiffs. ¶ 53. Courts in this Circuit have held that a "claim of breach of fiduciary duty due to company's failure to prevent short-term trading in and out of mutual fund that allegedly harmed fund's long-term investors [is] not preempted by SLUSA because it did not involve allegations of misstatements or omissions by defendant." *LaSala,* 510 F. Supp. 2d at 272 (citing *Paru v. Mut. of Am. Life Ins. Co.*, 2006 WL 1292828 (S.D.N.Y. May 11, 2006)). By contrast, in *Dabit*, the gravamen of the plaintiff's breach of fiduciary duty claim was that Merrill Lynch was "disseminating misleading [analyst] research," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 75 (2006), which sounds in fraud. A breach of fiduciary duty claim predicated on self-dealing is not preempted under SLUSA because it is based on an investment firm's actions in violating its duty of loyalty to investors, rather than on a misrepresentation or fraudulent device in connection with the purchase or sale of securities. *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 551-52 (N.D. Cal. 2009).

Plaintiffs also have claims for the *non-purchase* of mutual funds recommended by Brinker but not purchased by Defendants in violation of Defendants' duty to exercise reasonable skill with Plaintiffs' assets.  The court addressed such non-purchase claims in the case of *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 2008 U.S. Dist. LEXIS 53923 (S.D.N.Y. June 27, 2008).  That case involved a motion to find a complaint preempted based upon the non-purchase of certain securities from plaintiffs based on defendants' actions.  Merrill Lynch argued that according to a case cited by Defendants here, *Dabit,* 547 U.S. 71, all claims relating to the "retention of securities" were preempted.  *In re Merrill Lynch Research Reports,* 2008 U.S. Dist. LEXIS 53923 at *17.  The court disagreed, holding that the complaint was not preempted to the extent that it alleged the absences of certain purchases or sales or securities after defendants' fraud was discovered.  *Id.* at *19-21.  Similarly here, Plaintiffs have adequately alleged that Defendants did *not* purchase certain small cap funds that Brinker recommended.  *See* ¶ 34.

Thus, Plaintiffs' fiduciary duty claims are distinct from the 10(b) claims and could have been pled separately.  Plaintiffs should not now be prejudiced for litigating efficiently.

## I.    Plaintiffs State A Claim For Control Person Liability

As set forth above, Plaintiffs have alleged primary violations of §10(b) by Genworth and GFAM.[27]  "To survive a motion to dismiss under 20(a), a plaintiff need only plead facts which 'support a reasonable inference that [defendants] had the ***potential power*** to influence and direct the activities of the primary violator.'" *In re Adelphia Comm'ns Corp. Sec. & Deriv. Litig.,* 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005) (rejecting argument that defendant could not be a control person because he was not a company officer) (citations omitted and emphasis added).  *See also*

_____

[27] "[T]here is no required state of mind for a defendant's culpable participation" under §20(a). *In re WorldCom, Inc. Sec. Litig.,* 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003).  The power and influence to cause the fraudulent conduct suffices for "culpability for the allegedly fraudulent statements." *In re Solucorp Indus., Ltd.,* 2000 U.S. Dist. LEXIS 16521 at *26 (S.D.N.Y. Nov. 15, 2000).  The Complaint here amply alleges Ahluwalia's power and influence. *See, e.g.,* ¶¶ 49-51.

*Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) ("control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof") (internal quotation marks omitted).[28]

Defendants do not – and, indeed cannot – challenge the fact that Ahluwalia is a "controlling person." As pled in the Complaint, witnesses stated that Defendant Ahluwalia led and directly participated in the dissemination of false and misleading statements to investors and the Class. ¶¶ 35, 40, 41. Moreover, the Complaint further alleges that Ahluwalia was directly involved in the decision making process of purchasing non-Brinker recommended or selected mutual funds instead of Brinker recommended mutual funds. *Id.* Additionally, the Complaint alleges that it was Defendant Ahluwalia's directive that Defendants purchase the non-Brinker recommended mutual funds in order to generate higher ASFs. As such, Defendant Ahluwalia is liable as controlling person under Section 20(a). *Id.*

---

[28] "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *Compudyne*, 453 F. Supp. 2d at 829. (citing *In re Oxford Health Plans Inc. Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999)).

## IV. **CONCLUSION**

For all the above reasons, Lead Plaintiffs respectfully request that the Defendants' Motion to Dismiss be denied in its entirety.[29]

Dated: July 26, 2010

WEISS & LURIE

By: _____
Joseph H. Weiss
James E. Tullman
David C. Katz
Michael Rogovin
551 Fifth Avenue
New York, New York 10176
(212) 682-3025
(212) 682-3010 (Fax)

Lenard Leeds
Jeffrey K. Brown
Rick Ostrove
LEEDS, MORELLI & BROWN, P.C.
One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 873-9550
(516) 747-5024 (Fax)

**Co-Lead Counsel for Plaintiffs**

---

[29] In the event Defendants' Motion to Dismiss is granted in whole or in part, Plaintiffs respectfully request leave to amend. *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 518 (S.D.N.Y. 2009) ("leave to amend should be granted liberally in cases alleging securities fraud").

40