UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MICHAEL J. GOODMAN and LINDA BROWN,
individually and on behalf of all others similarly
situated,

                        Plaintiffs,

        v.

GENWORTH FINANCIAL WEALTH
MANAGEMENT, INC., GENWORTH FINANCIAL,
INC. and GURINDER S. AHLUWALIA,

                        Defendants.

Civ. No. 09-5603(LDW)(ARL)

---

**REPLY MEMORANDUM IN FURTHER SUPPORT
OF MOTION TO DISMISS THE AMENDED COMPLAINT**

**SONNENSCHEIN NATH & ROSENTHAL LLP**
Reid L. Ashinoff
Sandra D. Hauser
Brendan E. Zahner

1221 Avenue of the Americas
New York, New York 10020-1089
Tel:  (212) 768-6700
Fax:  (212) 768-6800
rashinoff@sonnenschein.com
shauser@sonnenschein.com
bzahner@sonnenschein.com

*Counsel for Genworth Financial Wealth
Management, Inc., Genworth Financial, Inc. and
Gurinder S. Ahluwalia*

**TABLE OF CONTENTS**

**Page**

SUMMARY OF REPLY ..................................................................................................1

ARGUMENT ................................................................................................................3

    A.    The Plaintiffs Fail to State Their Own Claims And Meet the
           Pleading Standards of Rule 9(b), the PSLRA and *Tellabs* ..................................3

    B.    The Plaintiffs Ignore the Disclosures They Received, and Rely on
           Non-Contractual Documents They Apparently Never Saw..................................6

    C.    The Plaintiffs' Asset Allocation Allegations are Insufficient................................9

    D.    Plaintiffs Lack a "Cogent and Compelling" "Strong Inference"
           of Scienter ......................................................................................................10

    E.    Plaintiffs Failed to Adequately Allege Loss Causation..........................................16

    F.    SLUSA Precludes the Plaintiffs From Bringing Their State Law
           Claims as Part of a Class Action........................................................................19

    G.    Plaintiffs Fail to State a Claim Against Defendant
           Genworth Financial, Inc...................................................................................21

CONCLUSION..............................................................................................................23

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*In re AIG Advisor Group Sec. Litig.,*
    309 Fed. Appx. 495 (2d Cir. 2009)....................................................................12

*In re Bayou Hedge Fund Litig.,*
    534 F. Supp. 2d 405 (S.D.N.Y. 2007)...............................................................14

*Abu Dhabi Commercial Bank v. Morgan Stanley Insurance Co. Inc.*
    651 F. Supp. 2d 155 (S.D.N.Y. 2009).................................................................5

*Barr v. McGraw-Hill, Inc.*,
    710 F. Supp. 95 (S.D.N.Y. 1989).......................................................................5

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)..........................................................................................22

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009).......................................................................21

*City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan Trust Inc*,
    --- F.Supp.2d ----, 2010 WL 1371417 (E.D.N.Y. April 10, 2010) ......................4, 5

*Cummings v. Paramount Partners, LP,*
    2010 U.S. Dist. LEXIS 51579 (D. Minn. Mar. 1, 2010)......................................18

*Freudenberg v. E*Trade Financial Corp.,*
    2010 U.S. Dist. LEXIS 46053 (S.D.N.Y. May 11, 2010) ....................................17

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000)................................................................................5

*In re GeoPharma, Inc. Sec. Litig.,*
    411 F. Supp. 2d 434 (S.D.N.Y. 2006)...............................................................14

*Gunther v. Capital One, N.A.*,
    --F. Supp. 2d--, 2010 WL 1404122 (E.D.N.Y. April 8, 2010) .........................21, 22

*In re Health Management Systems, Inc. Sec. Litig.*,
    1998 WL 283286 (S.D.N.Y. June 1, 1998) .........................................................5

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d. 522 (S.D.N.Y. 2008)..........................................................12, 18

*Kamholtz v. Yates County*,
    350 Fed. Appx. 589 (2d Cir. 2009) ...........................................................................14

*Lasala v. Bank of Cyprus*,
    510 F. Supp. 2d 246 (S.D.N.Y. 2007)..................................................................20, 21

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)....................................................................................17

*Levitin v. Painwebber Inc.*,
    159 F.3d 698 (2d Cir. 1998) ...................................................................................14

*Medis Investor Group v. Medis Technologies, Ltd.*,
    586 F. Supp. 2d 136 (S.D.N.Y. 2008).....................................................................14

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    No. 02-MDL-1484, 2008 U.S. Dist. LEXIS 53923 (S.D.N.Y. June 27, 2008) ......21

*In re Merrill Lynch*,
    434 F. Supp 2d 233 (S.D.N.Y. 2006)...........................................................12, 16, 18

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
    2006 WL 1008138 (S.D.N.Y. April 18, 2006) .............................................12, 16, 18

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).................................................................................9, 15

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
    --F.3d--, 2010 WL 520896 (2d Cir. Feb. 16, 2010) .................................................18

*In re PXRE Group, Ltd., Sec. Litig.*
    600 F. Supp. 2d 510, 524 (S.D.N.Y. 2009)...............................................................5

*Paru v. Mutual of Am. Life Ins. Co.*,
    No. 04-civ-6907, 2006 WL 1292828 (S.D.N.Y. May 1, 2006) ...............................21

*Romano v. Kazacos*,
    08-6187-cv, 2010 WL 2574143 (2d Cir., June 29, 2010)...............................2, 19, 20

*Rombach v. Chang*,
    355 F. 3d 164 (2d Cir. 2004).................................................................................3, 5

*San Leandro Emergency Medical Group Profit Sharing v. Philip Morris*,
    75 F. 3d 81 (2d Cir. 1996)....................................................................................3, 5

*In re Scholastic*,
    252 F.3d 63 (2d Cir. 2001)........................................................................................3

*Shields v. Citytrust Bancorp.Inc.*,
    25 F.3d 1124 (2d Cir. 1994)....................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................... passim

**STATUTES**

15 U.S.C. §78u-4(b)(1)-(2) ........................................................................................... 4

17 C.F.R. § 240.10b-5 ............................................................................................ 1, 3, 21

Fed. R. Civ. P. 8(a) ...................................................................................................... 4

Fed. R. Civ. P. 9(b) ......................................................................................... 1, 3, 4, 5, 17

Defendants, by and through their undersigned counsel, hereby file their Reply Memorandum in Further Support of their Motion to Dismiss the Amended Complaint.

## SUMMARY OF REPLY

Plaintiffs' Opposition to Defendants' Motion to Dismiss, although strident, distorts the very facts they have pled, and blatantly misconstrues applicable law on critical aspects of their claims. Most fundamentally, Plaintiffs ignore the plain language of their contract documents with Genworth, and pretend that the words say something that they simply do not. Specifically, Plaintiffs allege that Genworth falsely represented in their contract documents that Mr. Brinker, not Genworth, would select the mutual funds for client accounts. Nearly all of Plaintiffs' arguments, on every element of their claims, focus on the assertion regarding fund selection. But the only documents that Plaintiffs plead they actually received at the time they invested with Genworth contradict this claim. Plaintiffs cannot avoid that fact by underlining half-sentences in their brief, or citing to other documents that not one of them alleges they ever saw.

Unable to support any of the four Plaintiffs' claims with their own specific transaction facts, Plaintiffs resort to generalized assertions and argue – badly misciting the PSLRA and the caselaw – that "there is absolutely no requirement at this stage that Plaintiffs plead the evidence for each particular client for each particular claim." (Op. Br. 20) Plaintiffs are wrong. Under the PSLRA and Rule 9(b), to state a prima facie claim under Rule 10b-5, a plaintiff must plead facts demonstrating that the defendant made a false statement or omitted a material fact with intention to deceive that plaintiff (scienter), in connection with that plaintiff's securities purchase, and further that plaintiff relied on defendant's statement, thus causing plaintiff injury. The PSLRA made clear, as have numerous Second Circuit decisions, that a plaintiff must state the "who, what, when, where, and how" of his or her case. No Plaintiff here has done so.

Plaintiffs also fail to support their pleading of scienter. *Tellabs* makes clear that Plaintiffs

must plead specific "facts that give rise to a . . . cogent and compelling" inference of intent to deceive.  551 U.S. 308, 321-24 (2007).  But Plaintiffs' principal theory of scienter is neither consistent with the documents cited in the Complaint, nor cogent and compelling.  It is implausible and makes no sense.  Genworth disclosed to each Plaintiff at the point of sale that mutual funds it selects both (i) comported with Mr. Brinker's asset allocation strategies, and (ii) paid ASF.  Thereafter, each Plaintiff received a quarterly report disclosing all his/her mutual fund holdings, making any deviation from Mr. Brinker's *MarkeTimer* fund selections readily apparent, if that was an issue for any Plaintiff.  There was nothing hidden here.  Moreover, the management fees that Genworth received for growing its assets under management far outweighed any alleged ASF.  It would make zero sense, and benefit no one at Genworth, for Genworth to stunt the growth of its assets under management by choosing inferior mutual funds that did not comport with Mr. Brinker's asset allocation recommendations, simply to collect immaterial ASF.  Significantly, the Complaint nowhere alleges that the mutual funds referred to in the Complaint did not meet Brinker's asset allocation recommendations at the time they were selected, and advances no facts beyond a vague, hindsight assertion that some unstated Genworth portfolio or aggregation of portfolios "underperformed" and  "veered as much as 20% from the asset allocation being recommended by Brinker."  (AC ¶¶ 3, 34)

Plaintiffs also fail to plead recognizable loss causation.  Plaintiffs do not plead any "bargain" that was not met, and have not put forth (as Second Circuit law requires) any plausible theory that the "underperform[ance]" of their accounts was foreseeable, or that Genworth's conduct proximately caused their accounts to perform worse than Brinker's model.

And Plaintiffs' claims for breach of fiduciary duty cannot survive SLUSA's bar, under the clear language of that statute and the Second Circuit's decision in *Romano v. Kazacos*, which

emphasizes the deliberately broad parameters of SLUSA and entirely undermines Plaintiffs'

notion that a more permissive standard applies here as opposed to other federal circuits.

## ARGUMENT

### A.     The Plaintiffs Fail to State Their Own Claims And Meet the Pleading
### Standards of Rule 9(b), the PSLRA and *Tellabs*

It is black letter law that "[f]or a plaintiff to state a viable cause of action for securities

fraud under . . . Rule 10b-5 . . . the complaint must allege that in connection with the purchase

or sale of securities, defendant, acting with scienter, either made a false material representation

or omitted to disclose material information so that plaintiff -- acting in reliance either on

defendant's false representation or its failure to disclose material information -- suffered injury

and damages." *See In re Scholastic*, 252 F.3d  63, 69 (2d Cir. 2001); s*ee also San Leandro

Emergency Med. Plan v. Philip Morris*, 75 F.3d 801, 808 ("[A] plaintiff must plead that the

defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's

reliance on defendant's action caused plaintiff injury."); *Rombach v. Chang*, 355 F. 3d 164, 169

n.4 (2d Cir. 2004) (same).

Plaintiffs cite this caselaw but erroneously disclaim any obligation to plead facts for

any named Plaintiff, and instead rely solely on amalgamated "class" pleading.  In fact,

Plaintiffs *concede* that they have not pled specific facts supporting all the elements of any of

the named Plaintiff's claims, and instead boldly pronounce that "there is absolutely no

requirement at this stage that plaintiffs plead the evidence for each particular client for each

particular claim." (Op. Br. 20)  They also pronounce that the PSLRA applies a heightened

pleading standard "only to the element of scienter." (Op. Br. 11)  They are clearly wrong,

under the very statutes and cases they invoke.

The Supreme Court in *Tellabs* confirmed that, "[t]he PSLRA Act requires <u>plaintiffs to state

with particularity</u> both the <u>facts</u> constituting the alleged violation, and the <u>facts</u> evidencing

3

scienter," *Tellabs*, 551 U.S. at 313 (emphasis added).[1]  That the PSLRA's heightened pleading

standard is applicable to all elements is clear by the statute's own terms, which identify the

standards for a securities fraud-based claim, and separately describe the additional burdens a

plaintiff faces as to the element of scienter.  The statute reads:

> **(b) Requirements for securities fraud actions**
>
> (1) Misleading statements and omissions
> In any private action arising under this chapter in which the plaintiff alleges
> that the defendant—
>> **(A)** made an untrue statement of a material fact; or
>> **(B)** omitted to state a material fact necessary in order to make the
>> statements made, in the light of the circumstances in which they were
>> made, not misleading;
> the complaint <u>shall specify</u> each statement alleged to have been misleading,
> the reason or reasons why the statement is misleading, and, if an allegation
> regarding the statement or omission is made on information and belief, the
> complaint <u>shall state with particularity all</u> facts on which that belief is formed.
>
> (2) Required state of mind
> In any private action arising under this chapter in which the plaintiff may
> recover money damages only on proof that the defendant acted with a particular
> state of mind, the complaint shall, with respect to each act or omission alleged
> to violate this chapter, <u>state with particularity facts</u> giving rise to a strong
> inference that the defendant acted with the required state of mind.

15 U.S.C. §78u-4(b)(1)-(2) (emphasis added).

Thus, these heightened pleading standards do not apply only to scienter.  Moreover, it is

plain fiction to argue that the law requires only that "the Complaint" contain generalized

allegations, without requiring that a named plaintiff's claim be stated with particularity.  This

Court and numerous others in this Circuit have so recognized.  *See City of Ann Arbor*

*Employees' Retirement System v. Citigroup Mortgage Loan Trust Inc*, --- F.Supp.2d ----, 2010

WL 1371417 (E.D.N.Y., April 10, 2010) (regarding claims under Sections 11, 12(a) (2) and 15

---

[1]  The Supreme Court explained that even "[p]rior to the enactment of the PSLRA, the
sufficiency of a complaint for securities fraud was governed not by Rule 8, but by the heightened
pleading standard set forth in Rule 9(b)." *Tellabs* 551 U.S. at 319.  Plaintiffs assertions that their
pleading should be reviewed under Rule 8(a) is also wrong. (*See* Op. Br. 11)

of the Securities Act of 1933, requiring that Plaintiffs re-plead their complaint specifically and individually).[2]  *See generally Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir. 2000); *In re Health Management Systems, Inc. Securities Lit.*, 1998 WL 283286 at *2 (S.D.N.Y. 1998) (quoting *San Leandro*, *supra*, 75 F.3d at 808 (2d Cir. 1996) ("*a plaintiff* must plead … with a heightened degree of specificity.").

In addition, under Rule 9(b), which also applies to all fraud claims including securities fraud (*see Tellabs*, 551 U.S. at 319), a complaint is deficient if "it fails . . . to specify the material circumstances of <u>each plaintiff's</u> claim."  *Barr v. McGraw-Hill, Inc.*, 710 F.Supp. 95, 97 (S.D.N.Y. 1989) (emphasis added).  "[T]he plaintiff must" specify the fraudulent statement(s) made to him/her, identify the speaker, state where and when the statements were made, and why they were fraudulent.  *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 524 (S.D.N.Y. 2009) (also cited by Plaintiffs) (quoting *Rombach*, *supra*).  Plaintiffs' objection that Defendants are asking for an "exhaustive" list of evidentiary facts is a strawman.  Genworth is entitled to be apprised by each Plaintiff's pleading specifically what, how, when, where and by whom he/she was told misleading statements "in connection with" his/her investment decisions, how he/she relied on those statements, what benefit he/she was seeking, and how the alleged misrepresentation hurt him/her.  *See Ganino*, *supra*; *Rombach*, *supra*.

---

[2]  Recognizing that the pleading requirements must be satisfied by actual Plaintiffs and not just a lawyer's Complaint, this Court required: "Plaintiffs shall specify the tranches in which they invested. They shall also plead the false statements and/or omissions upon which they rely. They shall plead how those statements and/or amended pleading (which will be the second such pleading) shall plead only the causes of action with respect to the Trusts actually purchased by Plaintiffs. With respect to those Trusts, Plaintiffs shall specify the tranches in which they invested. They shall also plead the false statements and/or omissions upon which they rely. They shall plead how those statements and/or omissions are tied to the loans in which they invested, and the basis for their damages claim. In particular, Plaintiffs shall state whether their damages claims arise from the non-payment of amounts due under the Certificates or the inability to sell their interests in those Certificates in a secondary market." *City of Ann Arbor*, at 2010 WL 1371417 at *10.

Plaintiffs' sweeping assertions on behalf of a putative, sprawling class, relating to thousands of individual investment accounts, created over a period of many years, legally do not -- cannot -- substitute for the requirement that each Plaintiff plead the specific facts constituting the elements of his/her claim for relief with particularity.  A Complaint that quotes marketing materials that <u>no Plaintiff even claims to have seen</u>, that long post-date any named Plaintiff's investment decisions with Genworth, and that are contradicted by contract documents Plaintiffs admit they signed, is insufficient as a matter of law.[3]  Here, no Plaintiff pleads the specific facts regarding his/her alleged fraudulent securities transaction adequately.

**B.     The Plaintiffs Ignore the Disclosures They Received, and Rely on Non-
        Contractual Documents They Apparently Never Saw**

Plaintiffs repeatedly conflate the contractual documents that they admit having received, agreed to, and executed "in connection with" their investment with Genworth with other documents and material that they <u>never</u> allege to have seen, let alone relied upon, in their purchase or sale of a security.  The document that Plaintiffs admit receiving, the Account Application (AC ¶ 23), clearly states that Mr. Brinker recommends asset allocations and that Genworth will implement those asset allocations by selecting mutual funds:

**The BJ Group Service**

**In this advisory service, client accounts are invested primarily in mutual funds that are selected by GFAM**. GFAM may also purchase other investments for client accounts, including, without limitation, closed-end investment companies, exchange-traded funds ("ETFs"), U.S. Treasury bonds, notes and bills, and bank notes.

The BJ Group Service offers clients **tactical asset allocation** by implementing recommendations from Robert ("Bob") J. Brinker, author of the Marketimer newsletter. Mr. Brinker analyzes economic trends and financial markets and **makes asset allocation recommendations** to GFAM based on that analysis. **GFAM implements Mr. Brinker's recommendations by selecting mutual**

---

[3]  The court should not accept the truth of allegations that are contradicted by documents cited and relied on in the Complaint.  *See* MTD 19.

**funds for client accounts** . . . (Exh. 1 at Part B, p. 1)[4] (Emphasis added)

Although Plaintiffs cite this provision several times (as well as similar provisions in documents they do not claim to have received), they apparently read only half of what is stated, arguing it is a "crystal clear" representation that Mr. Brinker manages or dictates mutual fund selection. (Op. Br. 13)   But that is not what the words say.  To the contrary, Genworth unambiguously spells out the investment management services[5] that Mr. Brinker provides (asset allocation recommendations) and Genworth's role (implementing that asset allocation recommendation by selecting mutual funds).  While the Complaint repeatedly conclusorily alleges that Genworth misrepresented that Mr. Brinker selected mutual funds for client accounts, nothing in the Complaint supports that statement – and the contract documents undermine it.  To the extent any Plaintiff was told that when he/she invested with Genworth, the who, what, when, and where of such alleged misrepresentation remains unpled.

Plaintiffs quote a hodgepodge of other material, including what they refer to as "a 2004 Genworth report," "*a recent Introductory Brochure*," "letters to potential clients," the "'BJ Services Overview,' dated *August 2009*" and Genworth's *current* website.  (AC ¶¶ 26, 28, 29, 30, 31)   While these materials do not support their claims, there is another problem: not a single Plaintiff claims that he/she ever saw these documents in connection with his/her investment decision.  None of Mr. Goodman, Ms. Yassick, Mr. Yoelin or Mr. Wasser claims that these documents even existed, or that they received these documents at the time of sale, that they read them and considered them material to their investment decision, or that they relied on them.  The Plaintiffs have not stated a securities law claim based upon the disclosures they admit receiving, and may not do so using material they did

---

[4]  Exhibits are to the Transmittal Declaration of Jeffrey Joseph dated June 24, 2010.

[5]  The Plaintiffs desperately stretch the truth in claiming the Defendants paid Mr. Brinker only for leads (Op. Br. 2, n.2); Genworth's Disclosure Brochures clearly states that the advisory strategies of PCG's BJ Group Services were developed using Mr. Brinker's asset allocation recommendations.  (Exhs. 2-3 at 5).  The Plaintiffs must wrongly assume that this advice is provided for free, and wrongly believe that asset allocation recommendations do not constitute investment management services.

not receive.

The Plaintiffs also treat their pleading like a multiple choice exam, alleging that Defendants "routinely represented to . . . clients that <u>the Portfolio was being managed by Brinker, or</u> at a minimum, GFAM was going to implement Brinker's recommendations . . ."  (AC ¶ 22) (emphasis added) (*See, also,* Op. Br. 1, 22)  Defendants and the Court should not be required to guess what the alleged misrepresentation was.  Unsurprisingly, no Plaintiff alleges that this "Brinker will manage the Portfolio" misrepresentation was made to him/her, if so when it was made, by whom, etc.  No documents say this.  The Complaint provides no factual specifics for this generalized allegation.

Nonetheless, in response to this "either/or" misrepresentation claim, Defendants pointed out that full discretionary authority to manage client assets was given to Genworth, not Mr. Brinker. Similarly, the Disclosure Brochures list each Executive Officer and the Investment Management Staff of Genworth, including extensive detail as required by the SEC. (Exh. 2 at 49-53, Exh. 3 at 52-54).  Mr. Brinker is not listed as either an officer or a member of Genworth's investment management staff.  (Defendants' Opening Memorandum of Law "MTD" 11-12)  This is not to say, as Plaintiffs disingenuously argue at length, that Genworth could or did ignore Mr. Brinker's asset allocation recommendations (Op. Br. 16-19).  Rather, Genworth's point is that the Plaintiffs were told exactly who would be managing their accounts and picking their mutual funds, and it was Genworth, not Mr. Brinker.

Finally, Plaintiffs assert that they have demonstrated fraud through their allegation that Genworth maintained "secret" portfolios designed to mimic Mr. Brinker's *MarkeTimer* model portfolios (Op. Br. 2), and that these "Brinker Basic" portfolios "allowed Defendants to operate under a cloak of darkness" and provided an additional opportunity to "commit acts of fraud against Plaintiffs . . ."  (Op. Br. 28)  -- though Plaintiffs do not explain how.  Again, there are no allegations that material misrepresentations were made, relied upon and caused loss to any of these Plaintiffs, or

anyone else, related to the Brinker Basic Portfolios.  Moreover, from the Complaint, the Court cannot even determine whether any of these Plaintiffs invested in these supposedly "secret" portfolios, or when, thus belying the generalized "secret" portfolio assertions.

### C.     The Plaintiffs' Asset Allocation Allegations are Insufficient

The Plaintiffs' allegations that Genworth did not follow Mr. Brinker's asset allocation recommendations are also wholly insufficient.  Although the Plaintiffs refer throughout their Complaint to "the Portfolio," even the Account Applications make clear that Genworth offered clients multiple different investment objectives, containing very different allocations of asset classes. (Exh. 2 at 5-6; Exh. 3 at 5-6)  Pretending that the Plaintiffs were all invested in one portfolio is no doubt helpful to Plaintiffs for a variety of reasons, but it is false, again contradicted by the contractual documents relied upon and referenced by the Plaintiffs' Complaint.  Every single reference in the Complaint to "the Portfolio" is hopelessly generalized to the point of being literally meaningless.  At a minimum, each Plaintiff needs to plead with specificity which investment objective he/she followed, and which mutual funds within that objective did not match a specific asset allocation recommendation by Mr. Brinker.

The allegation that "Defendants veered as much as 20% from the asset allocation being recommended by Brinker" (AC ¶ 34) fails to include the time period or investment objective being complained of, which asset recommendation by Mr. Brinker is being compared, or what mutual funds supposedly do not meet the asset class at issue.  The same is true of the allegations that some unknown large cap allocation "was roughly double" Brinker's or that the allocation to small cap funds was "significantly underweighted."  (*Id.*)  The Plaintiffs claim that they have pled their case with "exacting detail," but nothing could be further from the truth.  All they have pled is hindsight second guessing of performance, which cannot sustain a fraud pleading in this Circuit.  *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).

Moreover, Plaintiffs' contention that the facts are somehow "peculiarly within the possession and control of the defendant," (Op. Br. 11 n.5) is ironic, given that the Plaintiffs claim that they did not receive the benefit of a bargain they thought they had but do not plead.  For example, the Complaint lists eighteen different mutual funds over seven years (without claiming any Plaintiff bought any of these funds) that supposedly were not recommended by Mr. Brinker. (AC ¶ 33)  But the claim that Mr. Brinker did not include these funds in his hypothetical *MarkeTimer* portfolios does not mean that the funds did not fit his asset allocation recommendations.  This is not pled at all.  Finally, Plaintiffs clearly have a list of funds with which they take issue.  To sustain a securities fraud claim based on asset allocation, they need to at least give notice which of these funds (if any) did not match his/her own asset allocation requirements when the funds were chosen.

**D.    Plaintiffs Lack a "Cogent and Compelling" "Strong Inference" of Scienter**

As discussed above, no Plaintiff has adequately alleged that he or she saw or heard that Mr. Brinker would manage their account or that Mr. Brinker would choose or even recommend mutual funds for their account.  All that the Plaintiffs actually plead (that is not contradicted by the contemporaneous documents delivered to them) is that: (1) many of the mutual funds selected by Genworth were not the same mutual funds used by Mr. Brinker in his hypothetical *MarkeTimer* mutual fund portfolios, and (2) some unspecified portfolio or aggregation of Genworth portfolios reflected a different asset allocation and performance than another unspecified hypothetical portfolio or aggregation of hypothetical portfolios in Mr. Brinker's *MarkeTimer* newsletter. (AC ¶¶ 33-36)[6]

From here, Plaintiffs make an implausible, illogical, and non-compelling leap.  They

---

[6] However, each PCG client invested in one or more different specific portfolios of mutual funds, which are not identified anywhere in the Complaint – not in all of the portfolios or all of  the funds in all of the various PCG portfolios.  So, this aggregated, non-specific pleading fails to plead the claim of any Plaintiff with the requisite specificity.

claim that the reason for this alleged performance disparity is that Genworth intended from inception to choose mutual funds that did not meet Mr. Brinker's asset allocation recommendations.  They then make the further leap of inferring that Genworth intended to mislead all of the Plaintiffs by falsely claiming that it would in fact follow Mr. Brinker's asset allocation recommendations.  Why?  According to the Complaint, so that Genworth could purchase mutual funds paying minimal fees, literally a fraction of 1%, to a Genworth affiliate.

Here again, however, there is <u>no</u> factual allegation in the Complaint that any of the various mutual funds listed in the Complaint (AC ¶ 33) – whether they paid minimal ASF or not – were not intended to satisfy the represented asset class when they were chosen by Genworth. This is highly significant.  All of the "facts" were fed to Plaintiffs' counsel and regurgitated into the Complaint by "former high level employees," albeit former employees who have now been found by Federal District Judge Vanessa Bryant to have "falsely testified before [that] Court." (MTD 33.)  Yet, even with these ill-motivated sources, there is <u>no</u> allegation in the Complaint that the funds listed – even though they allegedly paid minimal ASF, and even though they may not have been the same funds as in Mr. Brinker's hypothetical *MarkeTimer* portfolios – did not in fact meet Mr. Brinker's asset allocation recommendations at the time Genworth selected them.

In *Tellabs*, the Supreme Court directed district courts that they "must take into account plausible opposing inferences", and "must consider plausible, nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. 308, 323-324.  Moreover, plaintiff's inferences of scienter must be "strong", not merely plausible.  They must be "cogent and compelling." *Id*. at 324.

Here Genworth had over 9,000 (!) mutual funds to choose from (AC ¶38), many of which in fact paid ASF.  Having disclosed at the point of sale that Genworth may choose mutual funds for client accounts that pay ASF, what possible motive could Genworth or any of its employees have had not to choose mutual funds that <u>also</u> met Mr. Brinker's relevant asset allocation

11

recommendation?  Plaintiff's brief on this point (Op. Br. 21-30) conspicuously and completely fails to respond to this glaring flaw in their scienter theory.  It is also built on insufficiently pled assertions, incorrect facts, and inapplicable case law.

First, Plaintiffs assert that Defendants "knew facts or had access to information suggesting that their public statements were not accurate."  (Op. Br. 22)  But as discussed above, Plaintiffs plead no such inaccurate statements made to them at the time they made their decision to invest with Genworth.  Instead, Genworth's clear written disclosure that it would be selecting mutual funds that pay ASF "disclosed the existence of the very conflict of interest at the heart of plaintiffs' complaint, barring any claim based thereon." *In re AIG Advisor Group Securities Litigation*, 309 Fed. Appx. 495, 498 (2d Cir. 2009) (affirming dismissal of a 10(b) complaint for failure to plead actionable misrepresentations in the face of written disclosures.)  Moreover, as set forth in Genworth's opening brief (MTD 23-24), courts have repeatedly dismissed similar 10(b) claims based on advisors failing to disclose that they were steering clients into inappropriate funds to obtain minimal (100 basis point or less) fees. *See Hoffman v. UBS-AG*, 591 F. Supp 2d. 522 (S.D.N.Y. 2008); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138 (S.D.N.Y. 2006); *In re Merrill Lynch Inv. Mgmt. Funds. Sec. Litig.*, 434 F. Supp 2d 233, 236 (S.D.N.Y. 2006).

Second, Plaintiffs' argument that pursuing ASF "provided Defendants with motive for committing fraud" (Op. Br. 26 n. 21) makes no sense, and is wrong as a legal matter.  Plaintiffs acknowledge that Genworth received management fees ranging from 0.85% - 2.00% on assets under management, but then make the incorrect and illogical argument that Genworth improperly picked mutual funds paying 0.23%-0.25% of ASF because "Defendants do not generate revenue based on the performance of the Portfolio."  (Op. Br. 25)  To the contrary, Genworth earns management fees on every incremental dollar of value in a client's account.

There is simply no logic or plausibility to Plaintiffs' scienter argument that Genworth had any motive to sacrifice a client's account performance and its own additional management fees (or loss of the client altogether) by picking improper, inappropriate or lower quality mutual funds solely because it was chasing 0.25% in ASF. Genworth's clearest economic incentive was to maintain its clients and grow the value of their accounts, thus maximizing Genworth's far larger management fees.[7]

Moreover, the facts and law in each of the cases cited by Plaintiffs (Op. Br. 26, n.21) discussing a defendant's "motive" do not apply here. In each of those cases the court found a "concrete and personal benefit", a "unique" incentive for the named defendant to have pursued the alleged fraudulent strategy (*e.g.* "managers of a struggling privately owned investment fund in which they possessed a personal financial stake.") The Complaint fails to identify any individual at Genworth who had a personal motive to sacrifice incremental management fees to obtain far more modest ASF. For example, the factual situation here is the exact opposite of the *Global Crossings* case cited by the Plaintiffs. There, the claim was that the defendant auditing company sought to increase its consulting business, "which generated much higher fees than the firm's auditing business." *Id.* Here, the claim is that Genworth intentionally drove clients into poorly performing funds, sacrificing their higher management fee in return for far lower ASF.

Third, Plaintiffs nowhere deny -- they cannot -- that they all received quarterly statements

---

[7] It is also difficult to understand how the "exclusivity" allegation could be material to the Plaintiffs, *i.e.* whether Mr. Brinker gave asset allocation recommendations only to Genworth or also to another investment advisor. Even assuming the Plaintiffs are correct and the Brinker-Genworth relationship was never exclusive (in fact they are incontrovertibly wrong), it is even harder to comprehend how the Plaintiffs claim to have been harmed by Genworth saying its relationship with Mr. Brinker was exclusive. The Complaint sheds no light on why this would be material and how it harmed the Plaintiffs. No Plaintiff made their decision to invest with Genworth after August 18, 2009, which was, according to the Complaint, the first time there was another avenue to access Mr. Brinker's recommendations. (AC ¶ 42)

from Genworth showing the mutual funds they owned and their account values.[8]  They wrongly advise the Court that simply picking the mutual funds is sufficient "opportunity," or the means, for Genworth to have committed fraud.  But this is not what "opportunity" means in securities fraud claims.  The Second Circuit has made clear that "Opportunity would entail the means <u>and likely prospect of achieving</u> concrete benefits by the means alleged." *See e.g. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (emphasis added).  "It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."  *Id.*  Here, the regular receipt of quarterly statements identifying the mutual funds held by each Plaintiff would have alerted them that some of these funds were not in Mr. Brinker's hypothetical *MarkeTimer* portfolios, rendering any deceptive plan by Genworth short lived, doomed to failure and implausible.  The Second Circuit has further underscored that the overall (lack of) plausibility of the alleged fraudulent scheme is to be considered when evaluating scienter.  *Medis Investor Group v. Medis Technologies, Ltd.,* 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008), *aff'd* 328 F. App. 754 (2d Cir. 2009).  *See also in re Bayou Hedge Fund Litig.,* 534 F. Supp. 2d 405, 415-18 (S.D.N.Y. 2007); *In re GeoPharma, Inc. Sec. Litig.,* 411 F. Supp. 2d 434, 443-46 & n.83 (S.D.N.Y. 2006) (requiring inquiry as to whether an alleged  scheme "has any chance of achieving its putative ends," noting that "[c]ourts often refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations.")

---

[8] Amazingly, Plaintiffs ask the Court to ignore their quarterly Genworth statements detailing their mutual fund holdings, because they did not plead that fact.  However, Plaintiffs allege that Genworth improperly selected the "wrong" mutual funds for them, clearly possessed their statements concerning their mutual fund holdings in framing their Complaint.  The statements are "integral to plaintiffs' complaint", and the existence of these statements is knowledge available to the Court on this motion.  *Kamholtz v. Yates County*, 350 Fed. Appx. 589, 592 (2d Cir. 2009) (citing *Cortec Industries Inc. v. Sum Holdings L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)); *Levitin v. Painwebber Inc.*, 159 F.3d 698, 703 n.4 (2d Cir. 1998).  Moreover, in weighing opposing inferences concerning scienter, the regular provision of these statements to Plaintiffs is an essential component of the Court's assessment of the "plausibility" of the alleged scheme to defraud.

14

Plaintiffs' citation to *Abu Dhabi Commercial Bank v. Morgan Stanley Insurance Co. Inc.*
(Op. Br. 27) only underscores Genworth's point.  In *Abu Dhabi*, the Southern District of New
York found that plaintiff sufficiently pled "opportunity" to promulgate false and misleading
credit ratings to potential investors precisely:

> [B]ecause the Rating Agencies were responsible for determining and issuing their
> ratings and devised the models that produced the allegedly unreasonably high
> ratings, the Rating Agencies had the opportunity to assign misleading ratings."

*Abu Dhabi*, 651 F. Supp. 2d 155, 179 (S.D.N.Y. 2009).  In contrast, here Genworth was
allegedly selecting mutual funds whose information was publicly available and which were not
the funds in Mr. Brinker's *MarkeTimer* newsletter, and simultaneously disclosing all of the
mutual funds selected to each client regularly.  Presumably Genworth would have chosen not to
show every mutual fund in client accounts if it was running a fraudulent scheme based on
investing in the wrong mutual funds.  Genworth's transparency and lack of opportunity to hide
the facts from Plaintiffs strongly undercut any inference of scienter.

Plaintiffs are left with the impermissible "hindsight" allegation that Genworth's "Growth
Portfolio underperformed the funds actually being recommended by Brinker" in his hypothetical
*MarkeTimer* portfolio (AC ¶¶ 35, 36), or performed differently, allegedly in the aggregate, over
certain periods of time (AC ¶ 34)  This is insufficient pleading to allege scienter in this Circuit.
*Novak v. Kasaks*, 216 F. 3d 300, 309 (2d Cir. 2000).  In addition, no Plaintiff pleads whether he
was invested in this "Growth Portfolio" or at what point in time.  No Plaintiff invested his/her
funds in the aggregate as the Complaint's (AC ¶ 36) numbers are apparently presented.

Other non-culpable, more plausible explanations for Plaintiffs' alleged performance
disparities include the facts that the percentages and alleged performance of Mr. Brinker's
hypothetical newsletter portfolios: (i) never varied over time, unlike a real invested portfolio, (ii)
did not reflect the investment impact of the cash reserve any real portfolio was required to

maintain, (iii) did not reflect market timing investment recommendations Mr. Brinker made to Genworth but did <u>not</u> reflect in his own hypothetical newsletter portfolios, and (iv) did not reflect the investment impact (in one year or cumulatively over the years) of paying up to 2% of the invested funds as management fees.  All of these real world explanations of why Plaintiff's hindsight performance comparisons do not match up are more plausible and cogent than Plaintiffs' claim, that Genworth intended from inception to lie to its investors and decided not to try to choose funds that comported with Mr. Brinker's asset allocation recommendations.

### E.      Plaintiffs Failed to Adequately Allege Loss Causation

Plaintiffs respond to Defendants' argument that they failed to plead loss causation by urging that the pleading standard is low, that their theory must only be "plausible," and that, though they admittedly plead <u>no</u> monetary loss or loss in account value, "Plaintiffs lost millions of dollars due to the fact that the Portfolio grossly underperformed the investment strategy that was promised them by Defendants."  (Op. Br. 31)  They therefore claim that they have pled a sufficient "benefit of the bargain" loss, because Plaintiffs purportedly would have made more money if they had been invested only in the mutual funds listed in *MarkeTimer*.

Plaintiffs are wrong, for a host of reasons.  First, as stated above, Plaintiffs have failed to allege what investment strategies or portfolios they each were invested in, and when; failed to plead their account returns (let alone what they believe those returns should have been); and failed to plead any "false promise" by Genworth to purchase only mutual funds for their accounts that were also contained in a hypothetical newsletter model published by Mr. Brinker. Plaintiffs thus fail to plead any "bargain," or any facts indicating that they did not achieve a promised benefit.  The flimsiness in Plaintiffs' pleadings regarding what exactly they were was promised reduces their assertions regarding what they "should have made" in different investments to the realm of the hypothetical.  *See In re Morgan Stanley*, *supra*; *In re Merrill*

*Lynch, supra.*

Even if Plaintiffs could articulate an actionable "loss," they fail to demonstrate causation under this Circuit's standard. The Second Circuit describes loss causation in terms of the tort-law concept of proximate cause, *i.e.,* "that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission," *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (quotations omitted).  The loss must both be foreseeable "*and* caused by the materialization of the concealed risk."  *Id.* at 173 (emphasis in original)

Here, Plaintiffs have not pled that their losses were either foreseeable by Genworth, or that any alleged misstatements were the reason that their accounts earned less money than they otherwise might have.  There is no allegation that Genworth purposefully chose funds that would perform *worse* than funds that Mr. Brinker slotted into his newsletter model.  Nor would any such assertion be plausible[9] (*see* discussion of scienter).

It is unremarkable that courts in some circumstances have recognized loss causation when a defendant "violates [its] own stated investment strategy." (Op. Br. 32)  But Plaintiffs' cases on this point fail to help them because, unlike here, they address situations where: (1) the high-risk nature of an investment was alleged to have been entirely concealed, and (2) the loss to plaintiff was foreseeable and directly linked to the concealed risk and subject matter of the alleged fraud.  In *Freudenberg v. E-Trade*, for example, the court accepted plaintiffs' assertion of loss causation where they alleged that extensive purchases of sub-prime loans did not meet the defendant's stated "extremely conservative credit standards," and that loss of the value of their investment was entirely foreseeable because "SEC investigations and rating agency downgrades were within the concealed 'zone of risk'" of purchasing risky sub-prime loan pools.  2010 U.S.

_____

[9]  Plaintiffs correctly note that they need not detail their losses with particularity under 9(b), although this does not eliminate the need to detail the <u>facts</u> that give rise to loss.  Moreover, Plaintiffs do not specifically address loss causation for their assertions regarding asset allocation or exclusivity, and disclaim the allegation that ASF was concealed.

17

Dist. LEXIS 46053 at *6, *88 (S.D.N.Y. 2010).  Likewise in *Cummings v. Paramount*, plaintiffs alleged that the defendant hedge fund had promised investors a "conservative" and "foolproof" investment strategy of investing in the stock market, but instead invested plaintiffs' funds in unregistered securities and highly risky limited partnership interests.  2010 U.S. Dist. LEXIS 51579 at *15 (D. Minn. 2010).  The court ruled that "the loss Plaintiffs have alleged they suffered – that their entire limited-partnership investments in the hedge fund are no longer of any value – was the foreseeable result of [] concealment" by defendants of the very nature and risk level of the enterprise.[10]  *Id.* at *55.  This case presents no such scenario.

Finally, the Second Circuit's decision in *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86 (2d Cir. Feb. 16, 2010), is not helpful to Plaintiffs. As an initial matter, the *Operating Local* plaintiffs alleged, unlike here, that the defendants had manipulated to conceal an entire stream of income that was both material and was required to be disclosed.  Here Plaintiffs disclaim any assertion of "secret[ed]" fees, acknowledging that all fees were disclosed, repeatedly.  (Op. Br. 14-15)  Moreover, unlike the fees in *Operating Local*, the impact of ASF on any individual's account is negligible.  Plaintiffs claim at most that a fee of 0.25% was targeted for roughly half the mutual funds in Genworth's portfolio, *i.e.* those that did not coincide with Brinker's picks.  Whereas the court in *Operating Local* determined that the pled losses "were real ones because the deductions used to fund the transfer agent "fees" diminished for Local 649 (and other shareholders) money under management and, as a result, negatively and predictably impacted returns," the same cannot be said here where the fee amounts were *de minimis* and in amounts found by numerous courts to be immaterial as a matter of law.  *See Hoffman*, *supra*; *In re Morgan Stanley*, *supra*; *In re Merrill Lynch*, *supra*.

---

[10] *In re Dynex* is even less on point (attacking representations about bonds collateralized by mobile home loans, and finding loss causation where the bonds' price dropped after adverse disclosures.)

18

**F.      SLUSA Precludes the Plaintiffs From Bringing Their State Law Claims as Part of a Class Action**

The Plaintiffs are also incorrect in claiming they can bring their state law claims as part of this class action.  The text of SLUSA and the Supreme Court's decision in *Dabit* foreclose bringing these claims as part of a class action based upon misrepresentations or omissions of material fact in connection with the purchase or sale of a covered security.  Plaintiffs' argument that the Defendants rely on "out-of-circuit case law" in citing directly on point decisions from two federal Circuits, is unpersuasive.  (Op. Br. 36)

In all events, a recent decision by the Second Circuit is fatal to Plaintiffs' argument that New York district courts would apply a "different test."  *See Romano v. Kazacos*, 08-6187-cv, 2010 WL 2574143 (2d Cir., June 29, 2010).  The *Romano* plaintiffs brought a putative class action in a New York state court alleging that as a result of poor retirement advice, they suffered dramatic losses in the value of their retirement accounts.  *Id*. at *2.  The plaintiffs brought purely state law claims, including common law claims of negligence, breach of fiduciary duty, negligent misrepresentation, breach of contract, and violations of Section 349 of New York's General Business Law.  *Id*.  The plaintiffs took special care to avoid pleading claims that might bring them within SLUSA, specifically averring that:

> they do not bring claims for violation of state or federal securities laws and that their amended complaints contain no allegations relating to defendants' investment of appellants' retirement funds. Rather, appellants contend that they assert only "garden variety" state negligence and breach of fiduciary duty claims that "do not relate to the value of any given security" and exclusively concern matters such as financial and retirement planning and tax advice, all of which are divorceable from appellants' ultimate purchase of securities.

*Id*. at *7.  The *Romano* plaintiffs also argued that they did not "seek any damages which relate to the performance of any investments they may have made," and that their eventual purchase of securities, eighteen months after the advice they complained of, was too remote to trigger SLUSA preclusion. *Id*.  at *7-8.

19

Despite the disclaimer of any securities claim, and the eighteen month lag, the Second Circuit held that the misconduct and harm rested on and arose from securities transactions, and that SLUSA applied (both as a basis for removal, and as a bar), and affirmed the District Court's decision dismissing the class claims.  *Id*. at *9.

The *Romano* decision comports with other federal Circuit decisions and compels dismissal of the fiduciary claims here.  The Complaint, including the state law fiduciary duty claim, is squarely founded upon the allegation that misrepresentations or omissions were made in connection with the sale of mutual funds.  The Plaintiffs hardly put up much of a fight, admitting that, among other things, their breach of fiduciary duty claim is based on Genworth "investing in mutual funds for the sole purpose of generating fees . . ."  (Op. Br. 37)  The factual allegations supporting the fiduciary duty claim are the exact same facts used to support the securities fraud claims, plus a few conclusory allegations of failure to use due care.[11]  Even the supposed failings recited in Count III repeatedly emphasize the purchase and sale of securities.  See AC ¶ 53(b), (c), (d).  Moreover, the Plaintiffs explicitly claim that the allegations in their fiduciary duty count involve  "fraudulent acts," leaving no doubt that the fiduciary duty claim is based on alleged misrepresentations in connection with the purchase or sale of covered securities.  (AC ¶ 54)

The cases cited by Plaintiffs, all of which pre-date *Romano*, lend no support to their argument that <u>their</u> fiduciary duty claims are not precluded by SLUSA.  For example, in *Lasala v. Bank of Cyprus*, the Court stated in *dicta* that a plaintiffs' claim that a bank aided and abetted a breach of fiduciary duty was not precluded by SLUSA, because the fraud at issue "was a fraud perpetrated on the Company itself, not a securities fraud."  510 F. Supp. 2d 246 (S.D.N.Y. 2007).  So this *dicta* stands for the unremarkable proposition that ordinary claims of fraud not involving

---

[11]  Even if the "necessary component" test is applied, if all of the allegations concerning misrepresentations in connection with the purchase and sale of securities were deleted from the Complaint, there would be no factual allegations supporting a supposed fiduciary duty claim.

securities are not precluded by SLUSA.[12]  *Paru v. Mutual of Am. Life Ins. Co.* is also inapposite because the fiduciary duty claims were based upon the failure to prevent market timing, and made no "explicit allegation of a misstatement or omission."   2006 WL 1292828 at *3 (S.D.N.Y. 2006).   Similarly, *In re Charles Schwab Corp. Sec. Litig.* did not involve any "untrue statements or omissions . . . related to the purchase or sale of . . . securities." 257 F.R.D. 534, 551 (N.D. Cal. 2009).[13]

## G.   Plaintiffs Fail to State a Claim Against Defendant Genworth Financial, Inc.

Plaintiffs' claims against GFI must also be dismissed because they plead no actions or omissions by Genworth Financial, Inc. ("GFI"), let alone pleading wrongdoing with specificity. In fact, the only paragraph of the Complaint that references GFI by name simply states that Genworth is a wholly-owned subsidiary of GFI.[14]  (AC ¶ 11)  But simply adding the parent's name to the caption does not make a parent company liable for the actions of a subsidiary.

While Plaintiffs make blanket allegations against the "Defendants" (without defining that term), they fail to articulate any role played by GFI (or, for that matter, Gurinder Ahluwalia[15]) in the alleged fraud by Genworth.  They cannot avoid pleading a claim against a parent company by simply using the general term "defendants."  *Gunther v. Capital One, N.A.*, --F. Supp. 2d--, 2010 WL 1404122 at *12 (E.D.N.Y. Apr. 8, 2010) ("Except for the plaintiff's use of the term 'Defendants' in plural and his allegation that Capital One Financial controls Capital One Bank, Capital One Financial is left almost entirely out of the story.").

---

[12]  *Lasala* even clearly states that "nothing in [its] holding is intended to suggest that SLUSA could not preempt a claim for aiding and abetting a breach of fiduciary duty, so long as the defendant's conduct is alleged to be in furtherance of a securities fraud."  *Id.* at 276 n.5.
[13]  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02-MDL-1484, 2008 U.S. Dist. LEXIS 53923 (S.D.N.Y. June 27, 2008) does not help Plaintiffs since that claim did not rely on any security purchase but rather was based on the absence of such transactions.
[14]  Defendants only assume that GFI is the direct corporate parent of GFAM as they must for purposes of this motion.
[15]  As noted in Defendants' motion, the "control person" claim against Mr. Ahluwalia fails because no primary violation of Rule 10b-5 is stated.

In their brief, Plaintiffs – for the first time – make the conclusory and unsupported claim that "[GFI] (along with GFAM) clearly authorized all of the misleading marketing materials distributed to Plaintiffs and the Class."  (Op. Br. 34)  Plaintiffs glibly make this novel claim as if it is obvious that shareholders always approve and are personally liable for every corporate action.  That is not the law, and contrary to Plaintiff's brief there is not even such an allegation in the Complaint.   Plaintiffs also claim for the first time that GFI is responsible for the liabilities of its subsidiaries by virtue of its SEC filings or the Sarbanes-Oxley Act.  (Op. Br. 36)  SEC filings or the Sarbanes-Oxley Act do not negate the longstanding rule of corporate separateness, and these new allegations should be disregarded.  *See, e.g.*, *LaFlamme v. Societe Air France*, -- F. Supp. 2d--, 2010 WL 1292262, at *8, n.18 (E.D.N.Y., Apr. 5, 2010) ("[I]t is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss.").

Plaintiffs also maintain that a corporation may be liable under Section 10(b) for "knowingly participating" in another corporation's violation of the Act.[16]  (Op. Br. 35)  Even if true, Plaintiffs must allege specific wrongdoing by each named Defendant.  The authority cited by Plaintiffs does not suggest that parent corporations are somehow *de facto* participants in the alleged Section 10(b) violations of their subsidiaries.  In short, it is a fundamental principle of corporate law that a parent corporation is not liable for the torts of its subsidiaries unless substantial hurdles are overcome.  *Gunther*, *supra*.  Here there is not even an allegation of wrongdoing against GFI, so all claims against Defendant GFI should be dismissed.

---

[16] Plaintiffs' statement of the law is misleading.  The Supreme Court has unequivocally stated that a private litigant may not bring a claim for aiding and abetting a violation of Section 10(b). *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

**CONCLUSION**

For all of the foregoing reasons, and those set forth in Defendants' Motion to Dismiss (MTD), Defendants respectfully request that the Amended Complaint be dismissed in its entirety.

Dated: August 5, 2010

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

By:    s/ Reid L. Ashinoff
      Reid L. Ashinoff
      Sandra D. Hauser
      Brendan E. Zahner

      1221 Avenue of the Americas
      New York, New York 10020-1089
      Tel: (212) 768-6700
      Fax: (212) 768-6800
      rashinoff@sonnenschein.com
      shauser@sonnenschein.com
      bzahner@sonnenschein.com

*Counsel for Genworth Financial Wealth Management, Inc., Genworth Financial, Inc. and Gurinder S. Ahluwalia*

23