UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MICHAEL J. GOODMAN, et al.,

                        Plaintiffs,                      **MEMORANDUM AND ORDER**
                                                                     CV 09-5603 (LDW) (GRB)

      -against-

GENWORTH FINANCIAL WEALTH
MANAGEMENT, et al.,

                        Defendant.
-----------------------------------------------------------X
**BROWN, Magistrate Judge:**

      Before the Court are issues arising from the depositions of three non-party witnesses, Timothy McMullan, James Cook and Timothy McFadden (the "TJT witnesses") and the objections by defendants (collectively "Genworth") to certain questions based upon an injunction issued by the United States District Court for the District of Connecticut in a parallel litigation brought by Genworth against the TJT witnesses. *See* Memorandum of Decision and Order in *Genworth v. McMullan, et al.*, 09-CV-1521 (D. Ct. June 10, 2010) (the "Injunction").[1] In an application dated December 19, 2011, plaintiffs seek a ruling that the Injunction does not prevent the TJT witnesses from testifying in depositions in this case. *See* Docket Entry ("DE") [83]. Genworth disputes this, arguing that (1) the injunction prohibits the TJT witnesses from testifying at deposition, and (2) prior decisions in this matter bar further consideration of this issue and (3) this Court lacks the authority to determine otherwise. *See* DE [85].

      For the reasons set forth herein, I find, *inter alia*, that the Injunction, by its terms, does not bar deposition testimony in this matter. Therefore, plaintiffs' motion [83] is granted in part, defendants' objections are overruled, and the depositions should be continued so as to allow the

---

[1]Throughout this Order, I will refer to this and other rulings rendered by judges in the District of Connecticut as being made by the "Connecticut court."

witnesses to answer plaintiffs' questions, reasonable follow-up questions, and provide a reasonable opportunity for inquiry by defendants. Furthermore, for the reasons contained herein, the depositions will not commence for 30 days to allow Genworth, as appropriate, to identify specific questions to which it contends the Injunction should apply and/or to appeal this Order to the district judge.

## BACKGROUND

*Allegations in the Complaint*

The complaint was originally filed on December 22, 2009 as a potential class action by clients of defendant Genworth who invested in that firm's BJ Group Services Portfolios (the "Portfolio") during the time period from December 22, 2003 to December 22, 2009. Compl. ¶1, DE [1]. An Amended Complaint filed on May 24, 2010 is substantially identical, but includes additional factual allegations including references to information obtained in the "parallel action" in Connecticut. See Am. Compl. ¶¶ 40-42, DE [16].

The Amended Complaint purports to state a cause of action for violations of Section 10(b) and of the Exchange Act and Rule 10 b-5 of the SEC. Plaintiffs allege that defendants perpetrated a fraudulent scheme in which they recklessly and/or intentionally misled investors regarding the Portfolio "and its 'exclusive' management agreement with Robert 'Bob' Brinker." Am. Compl. ¶1. Plaintiffs claim that defendants mislead investors by representing that they were implementing investment recommendations and strategies from Brinker, the author of the *Marketimer* newsletter and the host of a national radio show called *Moneytalk*. Id. ¶¶ 2, 28. According to plaintiffs, defendants aggressively marketed their product by reference to their relationship with Brinker. For example, the "Account Application" sent to prospective clients "expressly identifies the Portfolio as the 'BJ Group (Brinker) Services' portfolios." Id. ¶23.

2

Plaintiffs assert that in practice, however, fewer than 50% of the Funds purchased for the Portfolio were selected or recommended by Brinker, *id.* ¶32, and that the non-Brinker selected Funds underperformed the Funds recommended by Brinker. *Id.* ¶35. It is further alleged that the non-Brinker selected Funds were chosen because those Funds paid extra administrative and service fees to defendants. *Id.* ¶¶33, 37. Plaintiffs conclude that the putative class has "suffered millions of dollars in damages as a result of Defendants' blatant misrepresentations regarding the Portfolio, as well as Defendants' scheme to purchase Funds that generated higher fees for the Defendants." *Id.* ¶43.

***Procedural History***

This matter has a multifaceted procedural history, involving litigation both before this Court and the Connecticut court. The Connecticut litigation was filed by Genworth against the TJT witnesses on or about September 25, 2009. That case, in sum and substance, alleges that the TJT witnesses, former Genworth employees, misappropriated proprietary information from Genworth in order to assist with their efforts to establish a competing company and lure Genworth clients to that enterprise. In the Connecticut litigation, Genworth further alleges that as part of their effort to discredit Genworth and attract its clients, the TJT witnesses used confidential client information and disseminated proprietary (and in some cases inaccurate) information to those clients. Further, it alleges that the TJT witnesses leaked confidential information to class counsel in this action.[2] *See* Injunction at 2-5. On February 25, 2010,

---

[2] We note that Leeds, Morelli & Brown ("LMB"), which has been appointed as co-lead counsel in this action, and Federic David Ostrove, Esq., one of its attorneys appearing in this matter, are defendants in an action in the Southern District of New York which is discussed in a recent Second Circuit opinion. *Johnson v. Nextel Commc'ns Inc.,* 660 F.3d 131 (2d Cir. 2011). The allegations in that case involve, among other things, claims that, while representing 587 individuals on claims against Nextel, LMB secretly entered an agreement with Nextel that provided that "LMB was to be paid $2 million if it persuaded the claimants to: (i) drop all pending lawsuits and administrative complaints against Nextel

Genworth filed a motion in the Connecticut litigation seeking preliminary relief designed to prevent further dissemination of its confidential data.

*The Injunction*

On June 10, 2011, the Connecticut court issued the Injunction, based on Genworth's motion for a preliminary restraining order to prevent the TJT witnesses "from unlawfully using confidential, proprietary and trade secret-protected Genworth information . . ." in a manner that would cause "irreparable harm to [Genworth's] business and reputation." Injunction at 2. Following a preliminary hearing, the Connecticut court found that the TJT defendants had engaged in inappropriate conduct, including improperly copying Genworth's confidential information, contacting Genworth clients with disparaging information, failing to comply with discovery demands in the Connecticut action, and disclosing confidential information to class action counsel herein. *Id.* at 4-6, 10-15. The district court also found that there was evidence that confidential information "pervades the class action complaint." *Id.* at 15. The district court described these efforts as an "unabashed attempt to destroy Genworth's goodwill and customer relations," *id.* at 16-17, and as such, ruled that Genworth had satisfied its burden to demonstrate irreparable harm, because of the "threatened loss of goodwill and customers" posed by such actions, *id.* at 16.

After a careful and detailed analysis, the Connecticut court imposed a number of

---

within two weeks (excluding already filed worker's compensation claims); and (ii) sign within ten weeks individual agreements in which each claimant agreed to be bound by [a settlement agreement]." *Id.* at 135. These serious allegations remain unproven at present. In any event, there are several factors which would mitigate the impact, if any, of the allegations on the instant proceedings, including: (1) LMB is co-lead counsel for plaintiffs with Weiss & Lurie, a second, independent law firm, and (2) plaintiffs have not yet made a motion under Rule 23 for class certification, which would involve further review of the adequacy of counsel for a potential class. Thus, I am not recommending any action to the district judge on this issue – which the parties have not raised – at this time.

restrictions on the TJT witnesses designed to prevent further dissemination of Genworth's proprietary data, including, as most relevant herein, the following:

> The Defendants shall not use any of Genworth's proprietary information for their own advantage or on the behalf, or for the benefit of, a third party, including without limitation to providing context for the pending class action proceeding.

*Id*. at 20.

Following issuance of the Injunction, plaintiffs sought the depositions of the TJT witnesses, which led to motion practice in both this Court and the Connecticut court. In this Court, plaintiffs moved to compel testimony by the TJT witnesses. Magistrate Judge Arlene Lindsay issued an order dated June 6, 2011, which granted that motion, stating:

> Before the court is the plaintiffs' request for an order compelling non-party witnesses Timothy McMullan, James Cook and Timothy McFadden to appear for depositions and the defendants' opposition to that motion. Upon review of the papers, the court grants the plaintiffs' application. The non-parties are directed to appear at a mutually convenient time. At the depositions, the non-parties may be instructed not to answer questions that would violate that injunction issued by the Connecticut court. The parties may seek further judicial intervention only upon completion of the depositions.

DE [35]. With respect to this procedure, Magistrate Lindsay later advised the parties:

> until there is a record against which the Court can make a ruling, it's really impossible to make any rulings with respect to what the witnesses -- what you're looking for, whether or not it is, in fact, governed by the injunction and what the witnesses can answer. I can't do that in a vacuum . . .

Tr. of 11/4/11 Proceedings at 7-8, DE [71]. Shortly after this proceeding, the matter was re-assigned to the undersigned.

On June 15, 2011, in response to a motion for clarification of the Injunction and protective orders by the TJT witnesses in the Connecticut action, Magistrate Judge Thomas P.

5

Smith entered the following recommended ruling that states, in relevant part, as follows:

> Defendants' motion for "clarification" or "modification" of Judge Bryant's injunction should be DENIED. That injunction is clear and unambiguous. The order does not create a "dilemma" or a problem for persons, parties, or witnesses in the E.D.N.Y. class action, during discovery therein. Nor does Judge Bryant's injunction require "modification" that would allow exposure of protected, allegedly purloined, information that Judge Bryant found was entitled to protection. Judge Bryant's findings are well supported in the record and her order is narrowly and thoughtfully drafted . . . . Judge Arlene Lindsey of the E.D.N.Y. has fashioned a wholly fair and adequate methodology for the conduct of depositions wherein plaintiff may object to questions that would require a deponent's answer to reveal information that Judge Bryant has found to be legally entitled to protection. Judge Bryant's injunction was based on intimate familiarity with the facts and careful assessments of credibility. It should not be undermined by such an obvious attempted "end run."

Report & Recommendation of 6/15/11, 09-cv-1521 (PCD), DE [190]. Magistrate Smith's recommendation was adopted by the district court. Elec. Order of 8/31/11, 09-cv-1521 (PCD).

The depositions were conducted on November 10-17, 2011. Invoking the injunction, counsel for Genworth objected and counsel for the TJT witnesses instructed the witnesses not to answer the lion's share of the questions. Early on, counsel for Genworth made clear his position that questions "calling for knowledge that the witness could only have gained as an employee of Genworth [would] invade the province of the injunction." McFadden 16.[3] As a result, little, if any, testimony was elicited on any relevant subject.

At the depositions, counsel for Genworth invoked the injunction in a broad, sweeping manner. By way of example, counsel objected to questions seeking to have the witnesses testify

---

[3] The citations to "McFadden," "Cook," and "McMullen" are to page numbers of the deposition transcripts, which were filed under seal.

whether:

a) the witnesses had *seen* publicly available materials published by Genworth (McFadden 53; Cook 34);

b) a witness had ever seen a Genworth account application. (McFadden 51);

c) Genworth had an investment management department (Cook 77);

d) Portions of Genworth's website required a log-in before being accessed (Cook 87)

e) Genworth account executives spoke with clients (Cook 116)

f) Other employees had left Genworth and the circumstances of their departure (Cook 168)

g) McMullen ran the private client group for Genworth and was in charge of the BJ Group Services (McMullen 4)

h) McMullen knew certain individuals who worked at Genworth and what their titles were at Genworth, or whether he knew Bob Brinker (McMullen 8-12, 16)

Remarkably, one of the TJT witnesses was prohibited – again ostensibly based upon the Injunction – from testifying about his own title at Genworth, while another was prevented from identifying his supervisor or the chief investment officer during the time he worked at Genworth. (Cook 103; McMullen 113). Counsel also claimed that the following question "invaded the province of the injunction," even when phrased as a yes or no query:

> "Are you award of instances when Genworth employed **deceptive** marketing materials for the BJ Group Services during the class period?"

(McMullen 14; Cook 18; *cf.* McFadden 17) (emphasis added).

This application followed. Concurrently, in the Connecticut court, counsel for Genworth

filed a "Motion to Enforce This Court's June 10, 2010 Injunction with Respect to the Depositions of the TJT Defendants; and to Enjoin the *Goodman* Case Plaintiffs' counsel from Seeking relief from the Injunction in any other Court," even though the plaintiffs are not parties to the Connecticut litigation. That motion is pending.

## DISCUSSION

*The Authority to Review the Instant Application*

We first consider the position vigorously urged by Genworth that this Court lacks the authority to consider this application, arguing that prior court orders foreclose further consideration of the issue or, in the alternative, that this Court may not interpret the Injunction. For the reasons that follow, these arguments are unpersuasive.

Defendants first cite the order of Magistrate Judge Lindsay, suggesting that "Judge Lindsay . . . ruled that the injunction applies to the subpoenaed testimony in this case." I disagree. The order entered by Judge Lindsay, reproduced in its entirety above, established a reasoned procedure to proceed with the deposition and clearly define the issues. The procedure she set forth expressly provided for further judicial review after the issues were more squarely defined. As demonstrated, the procedure she put in place successfully crystalized the issues to permit reasoned review.

Defendants similarly argue that Magistrate Judge Smith's recommendation, later adopted by Judge Dorsey, precludes further determination of how and whether the injunction should apply to deposition testimony of the TJT witnesses in this case. Defendants' argument ignores the fact that plaintiffs are not parties to the Connecticut litigation; a fact that would undermine the suggestion that the decision has a preclusive effect on these proceedings. More to the point,

8

though, Magistrate Judge Smith's order (1) expressly denies the request for modification of the injunction, leaving the question of its interpretation open and (2) endorses the procedure put in place by Magistrate Judge Lindsay, which, as mentioned, provides for further review. To the extent that, in what amounts to *dicta,* Magistrate Judge Smith suggests that the Injunction is applicable to depositions in this case, it is hard to imagine that Judge Smith could have envisioned how far defendants would attempt to stretch the parameters of the Injunction.

The Connecticut court determined, after a preliminary hearing, that the TJT witnesses engaged in improper conduct, and found issues with their credibility. Nothing in this opinion should be read as condoning such conduct by these witnesses. At the same time, the determination that these witnesses lack credibility cannot form a basis, as has been suggested by counsel here, for preclusion of their testimony. After all, the Federal Rules of Evidence contemplate that convicted perjurers may testify -- *see* F.R.E. 609(a)(2) (providing for impeachment using evidence of convictions for crimes of dishonesty) – thus a credibility determination in a preliminary injunction hearing could not possibly preclude trial testimony by a witness. Issues of credibility go to the weight, not admissibility or discoverability of testimony. *See Washington v. Texas*, 388 U.S. 14 (1967) ("the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury").

We have reviewed defendants' arguments suggesting that the issuing court, rather than this Court, should interpret the Injunction, and find them unpersuasive. By way of example, if another court ordered a party not to conduct activities at night, this Court would be in a position

9

to decide that that injunction, by its terms, did not prevent conducting activities by day. And, unfortunately for defendants' argument, the application of the Injunction to this case is as clear as the difference between night and day.

***By its Express Terms, the Injunction does not Foreclose Deposition Testimony in this Matter***

Rule 65(d)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required." The reasons underlying such specificity are well-established and well-founded. As the Supreme Court has observed:

> As we have emphasized in the past, the specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)(citations omitted). In issuing the Injunction, the Connecticut court was mindful of its obligation to provide relief that was "narrowly drawn to protect Genworth's trade secret information from further disclosure or use." Injunction at 17.

In light of these authorities, by its express terms, the Injunction is simply inapplicable to deposition testimony of the TJT witnesses in this case. The Connecticut court's prohibition against "*providing context* for the pending class action proceeding" cannot reasonably be read to proscribe sworn deposition testimony, taken pursuant to a subpoena and under the shield of a

protective order. Rather, this prohibition was clearly directed at the informal communications between plaintiffs' counsel and the TJT witnesses that is detailed in the findings contained in the Injunction. Indeed, in the body of the Injunction, Judge Bryant expressly observed that "counsel for the plaintiffs in the class action will likely be entitled to, and will like receive information regarding Genworth . . . through the process of discovery." Injunction at 18.

Other, more general restrictions on the TJT witnesses contained in the Injunction regarding disclosure of Genworth information are equally inapplicable to the question of deposition testimony. The express purpose of the Injunction is to "protect Genworth's trade secret information from further disclosure or use." Injunction at 17 (internal quotations omitted). As counsel for Genworth has already acknowledged, there is a confidentiality order in place, transcripts are sealed and the material has been designated as "Attorney's Eyes Only." Tr. of 12/14/11 Proceedings at 60, DE [84]. Clearly, deposition testimony by the TJT witnesses, under the protection of a confidentiality order, with sealed, attorney's-eyes only transcripts, cannot reasonably be expected to constitute or lead to "further disclosure or use" of Genworth's confidential information. Rather, the only "use" to which such testimony would be put is to allow the trier of fact in this case to make a determination concerning the truth or falsity of the allegations, a use that is fully consistent with protecting trade secrets. *See Restatement (3d) of Unfair Competition*, § 40, Comment c ("the disclosure of another's trade secret for purposes other than commercial exploitation may implicate the interest in freedom of expression or advance another significant public interest. A witness who is compelled by law to disclose another's trade secret during the course of a judicial proceeding, for example, is not subject to liability.") Thus, there is nothing in the Injunction that prohibits deposition testimony in this

11

case.[4]

### *Genworth's Blanket Invocation of the Injunction*

Given Genworth's spirited protestations that the allegations are false, one would expect Genworth to welcome the opportunity to examine the TJT witnesses under oath. As Justice White has observed:

> It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings should be given every encouragement to make a full disclosure of all pertinent information within their knowledge . . . A [lawyer] faced with a decision whether or not to call a witness whom he believes, but whose credibility he knows will be in doubt and whose testimony may be disbelieved by the jury, should be given every incentive to submit that witness' testimony to the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.

*Imbler v. Pachtman*, 424 U.S. 409, 439-40 (1976) (White, J. concurring). However, counsel for Genworth has pursued a different tack.

In establishing a procedure for the depositions, defining the issue, Magistrate Judge

---

[4] Citing *Baker v. General Motors*, 522 U.S. 222 (1998), counsel for plaintiffs raise the interesting question of whether the Connecticut Court has the authority issue an order foreclosing the TJT witnesses from testifying pursuant to a subpoena in this judicial district. Defendants correctly note that *Baker* is a construction of the Full Faith and Credit Clause, and is thus inapplicable to the issue of the division of authority among district courts, though the language of *Baker* may be instructive in this matter. Based on the clear language of the Injunction, I find there is no need to resolve this issue on this motion. However, the fact that there may be an issue regarding whether the Connecticut court could issue such an order further tends to support the finding that it did not do so.

Lindsay specifically cautioned Genworth's counsel about the dangers of overbroad invocation of the Injunction:

> I need to see your questions, specifically your questions and then I can rule on the good faith, if I feel it's appropriate, on the good faith of the refusal to answer or the assertion of -- on the defendant's side that there shouldn't be any answer because it's governed by the injunction. I mean it seems to me that **if the defendants take the position that they can't answer any questions, right away I am going to know there's a problem here, that that isn't what was contemplated by the injunction in the District Court of Connecticut.** So that's going to make my job a little easier, I think, if they don't parse it out. On the other hand, they may be more selective and more targeted in their assertions of privilege -- I'm calling it privilege but it's not specifically privileged, their assertions of -- that this is governed by the injunction and in which case, to the extent I am able, I will make some rulings.

Tr. of 11/4/11 Proceedings at 7-8 (emphasis added). Notwithstanding these cautions, counsel for Genworth attempted to use the Injunction as a complete barrier to reasoned discovery, and to convert Judge Bryant's Injunction into a testimonial gag order, designed to prevent the TJT witnesses from testifying. As demonstrated above, the Injunction was invoked in response to questions seeking information that was, in some instances, available publicly, and in most, if not all, instances had nothing to do with an effort to protect legitimate trade secrets.

Perhaps most egregious is the defendants' invocation of the injunction in response to questions about whether Genworth used deceptive marketing materials – an issue at the very core of the instant case. Deceptive, illegal or fraudulent activity simply cannot qualify for protection as a trade secret. *See* Restatement (3d) of Unfair Competition, § 40, comment c (recognizing privilege to disclose another's trade secret "in connection with the disclosure of information that is relevant to public health or safety, or to the commission of a crime or tort, or

13

to other matters of substantial public concern*"), cited with approval by Bartnicki v. Vopper*, 532 U.S. 514 (2001); *cf. Lachman v. Sperry-Sun Well Surveying Co.,* 457 F.2d 850 10th Cir. 1972) (voiding agreement requiring nondisclosure as void on public policy ground where such non-disclosure would constitute tortious conduct toward a third party).  Genworth's invocation of the injunction in response to questions about allegedly deceptive practices flies in the face of law, policy, and common sense.

Arguably, Genworth's blanket invocation of the Injunction, particularly after the cautions issued by Magistrate Judge Lindsay, could be construed as a waiver of its protections.  More to the point, however, this robotic invocation ignores the context in which these questions are being asked.  The TJT witnesses, former employees of Genworth, are now arguably competitors, who possess certain knowledge that may be regarded as trade secrets and confidential information.  These competitors are now being asked, in the context of a sealed, attorney-eyes only deposition to testify to the information they can recall on certain subjects.  Genworth has not, and simply cannot demonstrate that the reiteration of information known to these witnesses under such safeguards, presents a commercial threat to its proprietary information.   This case differs substantially from the situation in *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010), in which the Second Circuit upheld restrictions on an attorney's dissemination of discovery materials covered by protective order to a reporter for publication in *The New York Times*.  By contrast, in the instant case, the information – already known by the TJT witnesses – will be recorded in a sealed transcript.

Even though Genworth failed to selectively identify specific questions to which it believes the Injunction should apply, it will be given one more chance to do so.

14

## CONCLUSION

Based on the foregoing, it is hereby ORDERED that:

1. The parties shall reconvene the depositions of the TJT witnesses, who are already subject to subpoenas herein. At those depositions, the TJT witnesses are directed to respond to all questions previously posed but not answered on the basis of the Injunction as well as reasonable follow-up questions. Defendants will be given the opportunity for reasonable inquiry of the witnesses;

2. In order to allow for review of this Order but, at the same time, in order to keep this matter moving forward toward trial, the depositions will be commenced no sooner than 30 days, but no later than 45 days, from the date of this Order;

3. If Genworth wishes to press its objection based on the Injunction to specific, targeted questions, it may submit those questions, along with a brief justification, to this Court within five days of the date of this Order. Plaintiff may respond within five days from the date of defendants' submission;

4. Defendants are directed that any appeal of this Order is properly addressed to Judge Wexler;[5] and

---

[5] Defendants' request that the Injunction's "rulings concerning both the bias and the lack of integrity of the TJT Defendants be treated as admissible evidence in all future proceedings in this case," made without citation to support or authority (which likely does not exist), is denied without prejudice to its renewal at trial before Judge Wexler.

5. Counsel for plaintiffs shall forthwith serve a copy of this order on counsel for the TJT witnesses.

Dated: Central Islip, New York　　　　　　　　**SO ORDERED**
　　　　January 24, 2012

　　　　　　　　　　　　　　　　　　　　　　　 /s/ Gary R. Brown
　　　　　　　　　　　　　　　　　　　　　　　GARY R. BROWN
　　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge