# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

Nº 09-CV-5603 (JFB) (GRB)

———————————————

## MICHAEL J. GOODMAN, ET AL.,
### INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

## GENWORTH FINANCIAL WEALTH MANAGEMENT, INC., ET AL.,

Defendants.

———————————

**MEMORANDUM AND ORDER**
April 15, 2014

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Michael J. Goodman, Clarice Yassick, Steven Yoelin, Martin Wasser, and Edward Schiller (collectively, "plaintiffs") commenced this securities fraud class action against defendants Genworth Financial Wealth Management, Inc. ("GFWM"), Genworth Financial, Inc. ("Genworth Financial"), and Gurinder S. Ahluwalia ("Ahluwalia") (collectively, "defendants") on December 22, 2009. Plaintiffs allege that defendants violated Sections 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and breached their fiduciary duties to plaintiffs. In addition, plaintiffs seek to hold Ahluwalia, who is the President and Chief Executive Officer of GFWM, liable as a controlling person under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.

§ 78t(a). The crux of plaintiffs' claims is that defendants misrepresented the role that Robert Brinker ("Brinker")—an individual renowned for his expertise in the investment field—played in the management of GFWM's BJ Group Services portfolios. According to plaintiffs, they and other members of the putative class relied upon that misrepresentation in deciding to invest with defendants. They claim to have lost millions of dollars as a result.

Before the Court is plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23. Plaintiffs seek to certify a class of over 2,000 individuals who invested in GFWM's BJ Group Services portfolios during the period from December 22, 2003 to December 22, 2009 (the "Class Period"). Defendants argue that plaintiffs have failed to satisfy the requirements of Rule 23(a) and Rule 23(b)(3). For the following reasons, based on plaintiffs'

allegations and the record before this Court, the Court agrees with defendants and denies plaintiffs' motion for class certification. In particular, the Court determines that plaintiffs have failed to prove by a preponderance of the evidence that common questions of law or fact predominate, as Rule 23(b)(3) requires, because they have not demonstrated that the reliance element of their securities fraud claims is susceptible to a common method of proof for all class members. Specifically, plaintiffs are not entitled to either of the two well-established presumptions of reliance, which obviate the need for an individual assessment of each class member's reliance at trial. First, the Court does not apply the fraud-on-the-market presumption of reliance to plaintiffs' claims because plaintiffs identify no efficient market or market price for the particular securities in which the putative class invested. In fact, plaintiffs concede the inapplicability of the fraud-on-the-market presumption. Second, the presumption of reliance for cases primarily concerning a failure to disclose, as set forth by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, cannot apply here. *See* 406 U.S. 128, 153–54 (1972). Plaintiffs' own amended complaint demonstrates that this case primarily concerns misrepresentations, not omissions. Nonetheless, plaintiffs attempt to invoke the *Affiliated Ute* presumption of reliance by recasting defendants' alleged misrepresentations as omissions. However, the alleged omissions are merely the inverse of the alleged misrepresentations concerning Brinker's role in managing the BJ Group Services portfolios. Essentially, plaintiffs claim that defendants promised them an investment approach guided by Brinker's investment philosophy, but defendants failed to disclose that they did not actually follow Brinker's approach. That is not enough to trigger the *Affiliated Ute* presumption of

reliance. To the extent any of the omissions identified by plaintiffs amount to more than the inverse of an alleged misrepresentation, the Court still concludes that this case *primarily* concerns representations, not omissions. Finally, having failed to establish a presumption of reliance in the instant case, plaintiffs contend that they can prove class-wide reliance circumstantially. In particular, plaintiffs argue that a jury could reasonably infer class-wide reliance from the facts that defendants made the same representations to all class members, and that all class members invested with defendants. The Second Circuit has approved the use of circumstantial evidence to prove class-wide reliance in fraud cases (but never in a securities fraud case), but only where the inference of reliance is practically inescapable. In this case, however, the evidence that defendants made uniform representations, and that all class members invested with defendants, does not compel the conclusion that all class members must have relied upon defendants' representations. Accordingly, if this case went to trial, each class member's reliance would have to be proven individually. That is reason enough to conclude that class certification under Rule 23(b)(3) is unwarranted in this case.

I. BACKGROUND

A. Facts

1. An Overview of Genworth

Genworth Financial is an international financial services organization that offers consumer-focused products including, *inter alia*, investment services. (Am. Compl. ¶ 10.) GFWM is a registered investment advisor and wholly owned subsidiary of Genworth Financial. (*Id.* ¶ 11.) GFWM's Private Client Group provides investment advisor services to individual and

institutional clients. (*Id.*; *see also* Defs.' Opp'n at 6.) GFWM's Private Client Group originated as the BJ Group, which was founded in 1986 by Brinker and Sheldon Jacobs. (Am. Compl. ¶ 20; Defs.' Opp'n at 6 n.1.) Centurion Capital Group acquired the BJ Group in 2000, and General Electric ("GE") acquired Centurion Capital Group in 2001. (*Id.*) GE managed Centurion Capital Group under its subsidiary, GE Private Asset Management, Inc. (*Id.*) In 2005, GE Private Asset Management became Genworth Financial Asset Management, Inc., when GE sold its remaining shares to the public. (Am. Compl. ¶ 21.) Sometime thereafter, Genworth Financial Asset Management, Inc. changed its name to Genworth Financial Wealth Management ("GFWM"). For simplicity's sake and the purposes of this opinion only, the Court refers to Genworth Financial and GFWM collectively as "Genworth."

### 2. Representations About Brinker

On obtaining a client, Genworth typically made two different forms of communications: written and oral. For instance, Genworth would distribute various written materials to the investor-client. (*Id.* ¶¶ 22–31; *see also* Def.'s Opp'n at 1.) These materials included marketing materials, as well as an information booklet, that were sent to new and existing clients. They described the management aspects of the BJ Group Services portfolios, which served as the means through which clients' investments were assessed, allocated, and managed.[1] (Am. Compl. ¶¶ 1, 2, 22–30.) In

addition to providing prospective and current clients with written information, a Genworth account executive would typically speak directly with the client to discuss that client's investment profile, including such matters as risk tolerances, timelines, and the manner in which his or her money was to be invested. (*See* Pls.' Reply at 10–11; *see also* Tullman Decl. Exs. 81–85; Defs.'s Opp'n at 1–2.) Based on a given client's risk objectives and stated preferences, an account executive would then identify what he or she considered an appropriate portfolio (or portfolios) for that client.

Of central significance to this dispute are certain representations that defendants allegedly made to their prospective and current clients regarding Brinker's role in the management of the BJ Group Services portfolios. In particular, the Amended Complaint alleges that "[d]efendants routinely represented to prospective and current private clients that the Portfolio was being managed by Brinker, or at a minimum, [Genworth] was going to implement Brinker's recommendations, including mutual fund selection and asset allocation." (Am. Compl. ¶ 22.) The Amended Complaint further alleges that defendants, in their marketing materials to clients of Genworth's Private Client Group, described Brinker as "recommend[ing] asset allocations and fund selection for [Genworth's] management of accounts for the BJ Group Advisory Services." (*Id.* (internal quotation marks omitted).)

---

[1] Plaintiffs refer to both the "BJ Group Services Portfolio" and to the "BJ Group Services portfolios" in their complaint. (*See, e.g.*, Am. Compl. ¶¶ 22, 23.) In their opposition papers, defendants argue that "[t]here is no single 'Portfolio' as Plaintiffs suggest." (Defs.' Opp'n at 6.) Instead, there are various mutual fund portfolios for which asset allocation and market

timing recommendations may be implemented. (*Id.*) The Court need not determine which terminology is most appropriate to resolve the instant motion. However, given the nature of the allegations, and in order to avoid confusion, the Court elects to use the term "portfolios," as it seems clear from the record and both parties' description of the facts that investors' accounts were distributed among various portfolios during the Class Period.

According to plaintiffs, defendants made these written representations in various documents that were distributed to current and prospective investors. For instance, plaintiffs highlight the "Account Application" that defendants allegedly sent to all prospective clients. (*Id.* ¶ 23; *see also* Pls.'s Mem. at 3.) The Account Application provided investors the following information regarding Genworth's portfolios:

> The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer* newsletter.[2] Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to [Genworth] based on that analysis. [Genworth] implements Mr. Brinker's recommendations by selecting mutual funds for client accounts.

(Tullman Decl. Ex. 9, at 10.) The Account Application further stated that "[Genworth] shall provide the investment advisory services selected by the client." (*Id.* at 12.) Another written representation that plaintiffs identify is a Disclosure Brochure that defendants regularly sent to all of their new and current clients. (*See* Pls.'s Mem. at 4 & n.6; *see also* Tullman Decl. Ex. 10, Defs.' Interrogs. Resps. at 6 (stating that "[a]ll clients received a then-current account application and welcome kit . . . as well as

[Genworth's] . . . disclosure brochures containing the then-current Form ADV").) Within the Disclosure Brochure was a Form ADV, which stated, in relevant part:

> The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ("Bob") J. Brinker, author of the *Marketimer* newsletter. Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to [Genworth] based on that analysis. [Genworth's] Investment Management ("IM") Department implements Mr. Brinker's recommendations by selecting mutual funds for client accounts. [Genworth] pays Mr. Brinker annual fees, not based on assets under management, for his services, which include investment management services and marketing services, including referring potential clients to [Genworth's] Private Client Group division.

(Tullman Decl. Ex. 13, at 11; Am. Compl. ¶ 25; *see also id.* ¶ 27 (alleging same language in Disclosure Brochures from 2007 and 2008).)

Plaintiffs allege that defendants made additional representations throughout the Class Period in reports and brochures, always emphasizing Brinker's abilities and significant role in Genworth's investment services. For instance, plaintiffs allege that defendants stated the following in a 2004 Genworth report:

---

[2] By way of background, Brinker publishes a monthly newsletter, *Marketimer*, in which he sets forth his investment choices for the following model portfolios, known in the industry as aggressive growth, long-term growth, and balanced.

Balanced Growth: This portfolio is based on the Bob Brinker model, offered through our exclusive partnership with him. This objective is designed for clients' core holdings. . . . When Brinker is bullish, maximum targeted equity exposure is 60%.

(Am. Compl. ¶ 26.) Brochures sent to clients during the Class Period similarly highlighted Brinker's professional experience. For instance, in an Introductory Brochure, defendants made the following statements:

Bob Brinker is a rare breed in the investment field. An independent strategist with more than 25 years of experience, he makes bold pronouncements. He isn't beholden to Wall Street. . . .

We at Genworth Financial Asset Management, Inc. ("GFAM") have an exclusive relationship with Bob to offer one of the nation's leading tactical asset allocation strategies. Founded in 1986 and acquired by GFAM in 2000, BJ Group Services offers customized investment solutions tailored to meet clients' personal objectives. Long considered an expert in identifying market trends through his proprietary Marketimer model, Bob recommends asset allocation and fund selection for GFAM's management of accounts for the BJ Group advisory services.

Our experienced professionals work to implement Bob's investment strategy utilizing his proprietary tactical asset allocation model. . . .

(Tullman Decl. Ex. 2, at 3; *see also* Tullman Decl. Ex. 1, at 3.) Additionally, in Genworth's "BJ Group Services Overview," defendants made the following statements:

- "Long considered an expert in identifying market trends through his proprietary Marketimer model, Bob [Brinker] directs the asset allocation of The BJ Group Portfolios."

- "When it comes to helping affluent investors reach their financial goals, [Genworth] takes a unique perspective: yours. Let [Genworth] and Bob Brinker simplify your investment life."

(Tullman Decl. Exs. 15 & 16.) Along with these representations that defendants distributed to potential and existing clients, plaintiffs allege that defendants also featured Brinker on their website, including both an image of Brinker, as well as the following language: "Bob directs the asset allocation of the BJ Group portfolio" and performs "fund selection for [Genworth's] management of accounts for the BJ Group advisory services." (Am. Compl. ¶ 31.)

Plaintiffs also assert that defendants sent letters to prospective clients, all of which represented Brinker as a key component of Genworth's investment services. (*See* Tullman Decl. Ex. 17 (quoting a Genworth e-mail to potential client stating, "Thank you for your interest in Bob Brinker and Genworth Financial Asset Management, Inc. We are excited that you are considering our services and look forward to sharing with

you the tremendous difference that the combination of Brinker and Genworth Financial has made to so many investors like you.").) Moreover, in their deposition testimony, plaintiffs stated that any doubts or questions concerning the extent of Brinker's role in Genworth's services were resolved by oral communications with their respective financial advisors during the Class Period.[3]

According to plaintiffs, on the basis of the foregoing representations, plaintiffs believed that Brinker held a critical role in

---

[3] (*See, e.g.*, Tullman Decl. Ex. 81, Yoelin Dep. at 92 ("[I]t was extremely clear that the relationship that Genworth had with Bob Brinker was an exclusive one and it went beyond this document . . . In other words, they, Genworth, Ken Graham, assured me that they would implement mutual funds that Bob Brinker selected . . . ."), 95 (Q: What's your best recollection of what [your account executive, Ken Graham] said to you in that regard? A: I asked—I asked him probably point blank . . . I said the only reason I want to open an account with you and that I'm going to write you a check is the fact that you're going to implement Bob Brinker's recommendations as stated in your brochures and he said that's what we will do. So he reiterated verbally what was stated in writing in the brochures, in the promotional material. Q: So [the account executive, Ken Graham] reiterated what was in the brochures? A: He sure did and other sales material and the company information that came along with the application."), 111 ("I think you asked me earlier about some of the issues when I was filling out the application and when I was confused or became confused, that's when I called Ken just to make certain that what I understood from the documents was correct, was that Bob Brinker selects the mutual funds, we just buy them and based upon his recommendations. Otherwise, there was no way in the world I would have gone forward with Genworth."), 114 ("[A]s I watched my accounts change value during my relationship with Genworth and you may get to this later, . . . but I did not only speak with Ken [Graham]. . . . I think Alex took over my account and I brought this up with Alex, too, reaffirming that that was the case. Tim McMullan said the same thing and even Gurinder, the CEO, said the same thing."), 114 ("I read in print and the oral explanation just reaffirmed what was in print."), 350 ("I also believed up until, you know, what Tim, quote, told the truth, I believed him, I believed Alex, I believed Ken and I believed Gurinder."); Ex. 82,

Goodman Dep. at 94 ("By just reading the documentation and when I spoke on the phone, they would tell me that this is what Bob was recommending. . . . The particular funds."); Ex. 84, Yassick Dep. at 31–32 (Q: Was there any individual at Genworth that you believe was dishonest to you? A: To me? Um, anybody that acted as my account executive, yes. Q: So you believe that anyone who was your account executive at Genworth was dishonest to you? A: Yes. Q: Was there something specific that you believe was misrepresented to you? A: Yes. Q: And what was that? A: That they were following the Brinker portfolio asset allocations and fund selections."), 163 ("[I]n my conversations and in other documentation that I received, Bob Brinker was the one picking the assets and allocating what funds that GE should invest my personal portfolio in."), 214 ("A: Based on my conversation and the mailings that I received, um, I—I was under the impression that Bob Brinker was calling the shots and that we could do much better where—with GE or GFAM, whatever it was at that time, um, because of Brinker than where we had our funds at the existing time. Q: You said based on conversations. Do you recall with whom you had conversations in 2004? A: . . . It would have been whoever our account executive was at that time."), 217 ("Q: . . . I'm wondering what led you to believe that the strategy was the same throughout all of those different transitions from one company name to another? A: Based on the mailings that I received and based on conversations with GE employees."), 249–50 ("Q: Do you recall a conversation with Mr. Graham on February 9, 2004? A: The only thing I recall with that conversation is that we wanted to transfer the Roth IRAs . . . because GEPAM was . . . following Brinker's advice and Morgan Stanley was not."), 376 (Q: Do you recall asking any questions of Genworth regarding anything in this disclosure brochure? A: I believe after reading the brochures . . . I contacted . . . whoever my account representative . . . was at that time and asked them to, you know, tell me what this means in laymen terms and . . . you know, are we still on line with Brinker or is there something in here that I need to be aware of."); Ex. 85, Wasser Dep. at 187–88 (Q: Mr. Wasser, from where did you get the belief that Genworth was telling you that Mr. Brinker was picking all the mutual funds that your money was going to go into? A: From everything I read and from conversations with the . . . with Genworth.").)

guiding Genworth's selection of mutual funds and allocation of assets for its investors. For instance, representative plaintiff Steven Yoelin testified that documents he received from Genworth represented to him that Genworth's selection of mutual funds would be based on Brinker's recommendations.[4] Representative plaintiff Michael Goodman testified similarly about his understanding of the content of the documents he received from Genworth.[5] Other representative plaintiffs testified that Genworth's representations led them to believe Brinker was selecting the mutual funds and determining the proper asset allocation.[6] Moreover, plaintiffs explained that defendants' representations concerning Brinker led them to invest with Genworth in the first place, and to stay with Genworth in the future.[7]

---

[4] (*See* Tullman Decl. Ex. 81, Yoelin Dep. at 92 ("[I]t was extremely clear that the relationship that Genworth had with Bob Brinker was an exclusive one and it went beyond this document . . . ."), 111 (with respect to the various documents Yoelin received during the Class Period, "the gist of them . . . made it clear to me that Bob Brinker selects the mutual funds, Genworth buys or sells them depending on [Brinker's] recommendations"), 119–20 (stating that he "understood that Bob Brinker selects the specific funds and then Genworth, GE implements those recommendations on those funds"), 123 ("[T]he gist of all of the documents in total, both on the internet and that I received by—by mail led me to that belief."), 123–24 ("Q: I am just trying to determine where your impression came from, if it came from a document, if you saw in writing that Mr. Brinker was choosing funds or if you were looking at the documents and reaching the conclusion either on your own or after talking to Mr. Graham . . . . A: Documents led me to believe in black and white. I'm a doctor, so if it's not written down, it wasn't done. That's just how we believe. It was written down somewhere."), 135 (reviewing documents transmitted to Genworth clients and stating that he understood the indicated language to mean that Brinker was selecting mutual funds), 178 (reviewing Genworth materials and stating that the disclosure brochure language caused plaintiff to believe that Brinker was selecting the mutual funds), 350 ("I relied on all those documents and the documents were extremely clear.").)

[5] (*See* Tullman Decl. Ex. 82, Goodman Dep. at 93–94 ("My understanding was all the funds that they were buying were recommended by him . . . . By just reading the documentation and when I spoke on the phone, they would tell me that this is what Bob was recommending."), 114 ("I remember receiving quarterly printouts from them . . . saying that Bob Brinker would recommend . . the Funds in the group."), 119 ("Q: Do you have a recollection that Mr. Brinker ever said to you, 'I pick all of the funds that The BJ Group will place you into,' yes or no? A: I can't answer that as a yes or no because . . . there were documents—written statements signed by him saying that he's picking these funds over the years."), 247 ("In the documents it says that Bob Brinker picks funds."), 353 ("It was explicit in the—in the materials.").)

[6] (*See, e.g.*, Tullman Decl. Ex. 83, Schiller Dep. at 124 (stating that "everything I read and everything I heard, it sounded like Bob Brinker was picking the stocks. They [Genworth] were following his . . . mutual fund selections."), 247 ("In the documents it says that Bob Brinker picks funds."); Ex. 84, Yassick Dep. at 163 ("[I]n my conversations and in other documentation that I received, Bob Brinker was the one picking the assets and allocating what funds that GE should invest my personal portfolio in."), 217 ("Q: And you've testified to your understanding of what the strategy was, but I'm wondering what led you to believe that the strategy was the same throughout all of those different transitions from one company name to another? A: Based on the mailings that I received and based on conversations with GE employees."); Ex. 85, Wasser Dep. at 179 ("The BJ Group makes the picks of Bob Brinker's recommendations."), 178–81 (indicating marketing materials that caused Wasser to believe that Brinker would be selecting the funds for the BJ Group), 189 ("It seems to me in whatever I read, it intimates that they're choosing from Brinker's recommendations.").)

[7] (*See, e.g.*, Tullman Decl. Ex. 81, Yoelin Dep. at 95 (stating that the reason Yoelin decided to open an account with Genworth was "the fact that [Genworth] . . . implement[s] Bob Brinker's recommendations as stated in your brochures"), 111 ("[T]he only reason I went with Genworth is because Bob Brinker was picking the mutual funds."), 122 ("The gist of why I decided to go forward or the spirit of agreement was that fact. I—I didn't know these

### 3. Plaintiffs' Allegations of Fraud

Plaintiffs claim that the foregoing representations were fraudulent because "Brinker did not select the funds and Genworth did not implement his recommendations. In fact, Brinker did not even discuss fund selection with Genworth during the Class Period." (Pls.' Mem. at 6.) Specifically, plaintiffs maintain that a large portion of the funds selected for the investment portfolios were not selected or recommended by Brinker. (*See* Am. Compl. ¶ 32 ("Contrary to Defendants' representations that Brinker was selecting Funds for the Portfolio or that Defendants were purchasing Funds based on the recommendations by Brinker, in truth, the percentage of Funds being purchased for the Portfolio that were not Brinker selected/recommended Funds routinely exceeded 50%.").) Moreover, plaintiffs claim that these other funds "significantly underperformed" the funds that Brinker was, in fact, recommending. (*Id.* ¶ 35 (alleging that, "as a result of Genworth selecting non-Brinker recommended mutual funds, several of Genworth portfolios significantly underperformed Bob's published models by approximately 16 percentage points from 2003-2006. In 2006 alone . . . Genworth portfolios underperformed Bob's published models by roughly 50%").) Plaintiffs further contend that defendants elected to purchase funds that would be profitable to Genworth, *i.e.*, that would pay Genworth high administrative service fees ("ASFs"), instead of purchasing Brinker-recommended, lower expense funds. (*Id.* ¶ 37.) This strategy was "completely contrary" to Brinker's strategy. (*Id.* ¶ 38.) Moreover, plaintiffs assert that defendants often diverged from Brinker's asset allocation recommendations, sometimes as much as 20% during the Class Period. (*See id.* ¶ 34.) As an example, plaintiffs allege that, from 2003 to 2006, "Genworth's allocation to large cap stock funds was roughly double the allocation that Brinker recommended," whereas Brinker recommended allocations to small cap funds

---

people. I trusted Bob Brinker. I trusted the fact that he endorsed them. There was an exclusive arrangement. He was being paid."); Ex. 82, Goodman Dep. at 328 ("A: The purpose of going into the BJ Group was to have Bob Brinker picking my funds . . . instead of me doing it personally. Q: You believed that Mr. Brinker told you that's what he was doing? A: I believed that that's what he was doing. That was my belief of what was going on."), 348–49 ("[I]f I had known that when there was a fund that followed Brinker completely, if I had known that that existed, then I would have began in that fund and stayed in that fund throughout the time that Genworth had my money."), 352 ("When I invested my money with Genworth . . . or with Bob Brinker of The BJ Group, it was only because that's why, I followed Bob Brinker. I wanted Bob Brinker to do my fund selection."), 352–53 ("That was my expectation that Bob Brinker was—I was getting what Bob Brinker was giving me."); Ex. 83, Schiller Dep. at 204 ("I thought this [Genworth's portfolios] was over and above what was in the Marketimer. I thought, you know, this was . . . something extra to get for being . . . with The BJ Group."), 232 ("[B]ut you're selling the BJ Group. They should be following the Bob Brinker philosophy. So any time I read any of this it . . . seems like Bob Brinker should be knowledgeable and—and contributing."); Ex. 84, Yassick Dep. at 249–50 (noting Yassick's decision to switch from Morgan Stanley over to Genworth because Genworth was following Brinker's advice); Ex. 85, Wasser Dep. at 122 ("Q: Mr. Wasser, what caused you to look around to move your investment accounts away from North Folk? A: . . . Bob Brinker's newsletter suggested [ ] Genworth."), 124 ("I wanted someone to actively manage my money and the Brinker—and I liked Brinker and Brinker's money [ ] timer. . . Marketimer [ ] said that he was involved with [ ] Genworth and that's why I wanted Genworth."), 288 ("I was paying them to manage my funds. I—who would need them if I would just go by these things, by [Brinker's] newsletters? I pay them to find other ways, other investments that were—I thought that they were—worked with Brinker and he had a larger amount of things to buy and they chose from that, not only by his newsletter.").)

that Genworth "significantly underweighted." (*Id.*)

According to plaintiffs, Genworth did create and maintain portfolios that were designed to mimic Brinker's *Marketimer* Portfolios (referred to as "Brinker Basic" portfolios). (*Id.* ¶ 39.) However, plaintiffs allege that these portfolios were secret, unavailable to most clients, and used only as a "last ditch effort to retain clients." (*Id.*) In addition to hiding the Brinker Basic portfolios, defendants allegedly failed to disclose how their portfolios' returns compared to Brinker's published returns. (*Id.*)

\* \* \*

In sum, plaintiffs contend that they, along with the putative class members, invested their money with Genworth on the understanding that Genworth was managing its clients' investments in accordance with Brinker's recommendations concerning asset allocation and mutual fund selection. In actuality, according to plaintiffs, Brinker's role was far more limited and less influential than advertised.

### B. Procedural History

Plaintiffs filed the complaint on December 22, 2009, and an amended complaint on May 24, 2010.[8] Defendants filed a motion to dismiss the amended complaint on June 24, 2010. Plaintiffs opposed the motion on July 26, 2010, and defendants replied on August 5, 2010. On March 30, 2011, Judge Leonard D. Wexler, in an oral ruling, granted in part and denied in part the motion to dismiss, dismissing the state claims.

Magistrate Judge Arlene R. Lindsay presided over discovery until November 22, 2011, when Magistrate Judge Gary R. Brown was assigned to the case. Additional reassignments of the case occurred thereafter: this case was reassigned to Judge Denis R. Hurley, then back to Judge Wexler, and, finally, to the undersigned on April 25, 2012. The Court held a status conference with the parties on May 25, 2012. In August 2012, the parties submitted letters in which plaintiffs requested the entry of a briefing schedule to address the issue of class certification, and defendants opposed the same. The Court set a briefing schedule for plaintiffs' class certification motion at a telephone conference with the parties on September 7, 2012.

The parties appear to have operated under a bundling rule in their submissions. However, the docket is somewhat confusing as to when the particular submissions were filed. A review of the motions themselves, however, shows the following submission dates. On January 20, 2012, plaintiffs moved for class certification. Defendants opposed the motion on February 15, 2012. Plaintiffs replied to defendants' opposition on October 1, 2012. Defendants filed a sur-reply on January 22, 2013.

While the parties were briefing the issue of class certification, they also moved to strike various exhibits and declarations that had been submitted in support of, or in opposition to, class certification. On February 15, 2012, defendants moved to strike certain exhibits and portions of plaintiffs' motion for class certification. Plaintiffs opposed this motion on October 1, 2012. Also on February 15, 2012, defendants moved to strike the declaration and testimony of Harvey Pitt. Plaintiffs

<hr>

[8] In an additional amendment dated September 15, 2011, the parties stipulated to the joinder of plaintiff Ed Schiller to this action.

opposed on October 1, 2012, and defendants replied on January 22, 2013. On October 1, 2012, plaintiffs submitted a motion to strike the declarations and testimonies of Jeffrey Joseph, Timothy Knepp, and Ron Link. Defendants opposed on January 22, 2013. Plaintiffs also moved to strike the declaration of Dr. Bruce Stangle on October 1, 2012. Defendants opposed that motion on January 22, 2013.

On January 30, 2013, the Court heard oral argument on plaintiffs' motion for class certification and the various motions to strike. After oral argument, on March 28, 2013, plaintiffs submitted a notice of supplemental authorities. On May 9, 2013, defendants submitted their opposition to plaintiffs' supplemental authorities brief. This matter is fully submitted, and the Court has considered all of the parties' submissions.

## II. Standard of Review

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)) (internal quotation marks omitted). To establish that the exception is applicable to a given case, "a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011)). This typically will require a plaintiff to put forth sufficient admissible evidence—in the form of "affidavits, documents, or testimony"—to show that Rule 23's requirements have been met. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) [hereinafter *In re IPO*]. The party seeking class certification bears the burden of proving compliance with each of Rule 23's

requirements by a preponderance of the evidence. *Berks Cnty. Emps.' Ret. Fund v. First Am. Corp.*, 734 F. Supp. 2d 533, 536 (S.D.N.Y. 2010).

Generally, there are two steps that a district court must take when considering a motion for class certification pursuant to Rule 23. *See In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 82 (S.D.N.Y. 2007). First, "the court must be persuaded, 'after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). These prerequisites are as follows:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–02 (2d Cir. 2008) ("In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy."). Once a court has concluded that Rule 23(a)'s four requirements have been satisfied, it must then proceed to the second step, *i.e.*, determine "whether the class is maintainable pursuant to one of the

subsections of Rule 23(b)." *Vivendi*, 242 F.R.D. at 83; *see also Comcast*, 133 S. Ct. at 1432 (noting that, in addition to satisfying Rule 23(a)'s requirements, a party "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)"). Generally speaking, Rule 23(b) addresses the types of relief available, as well as the rights of absent class members. *See* Fed. R. Civ. P. 23(b).

In this case, plaintiffs seek certification under Rule 23(b)(3). (*See* Pls.' Mem. at 21–30.) Rule 23(b)(3) "was intended to dispose of all other cases in which a class action would be convenient and desirable, including those involving large-scale, complex litigation for money damages." *Seekamp v. It's Huge, Inc.*, No. 09-CV-00018 (LEK/DRH), 2012 WL 860364, at *6 (N.D.N.Y. Mar. 13, 2012) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998) (internal quotation marks omitted)). In particular, Rule 23(b)(3) authorizes class certification when plaintiffs establish, "by a preponderance of the evidence, that: (1) common questions predominate over questions affecting individual plaintiffs; and (2) class resolution is the best means of adjudicating the case." *Id.* at *9; *see* Fed. R. Civ. P. 23(b)(3).

When considering whether Rule 23's requirements have been met, the Supreme Court has instructed courts that it "may be necessary for [them] to probe behind the pleadings before coming to rest on the certification question," and further, "that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-mart*, 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 160–61 (internal quotation marks omitted)). This analysis often will "overlap with the merits of the plaintiff's underlying claim," as questions concerning class certification may be "enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (quoting *Falcon*, 457 U.S. at 160) (internal quotation mark omitted). However, the Court is mindful that, although its analysis in the class certification context must be "rigorous," "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (citation and internal quotation marks omitted). That is, "[m]erits questions may be considered to the extent—*but only to the extent*—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195 (emphasis added). The rigorous analysis required to assure "actual, not presumed conformance" with Rule 23(a) also applies with "equal force to all Rule 23 requirements, including those set forth in Rule 23(b)(3)." *In re IPO*, 471 F.3d at 33 & n.3 (citation and internal quotation marks omitted). Thus, for a plaintiff to prevail on a motion for class certification, he or she must make more than merely "'some showing'" that Rule 23's requisites have been satisfied. *Vivendi*, 242 F.R.D. at 83 (quoting *In re IPO*, 471 F.3d at 35–36.).

In light of the foregoing principles, the Second Circuit has set forth the following standards that a district court must follow in considering class certification:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule

23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re IPO*, 471 F.3d at 41. With this framework in mind, the Court turns to the instant case.

## III. DISCUSSION

Plaintiffs seek class certification under Rule 23(b)(3). Thus, they must prove by a preponderance of the evidence, *inter alia*, "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). For the reasons discussed herein, plaintiffs fail to establish the predominance requirement. Accordingly, the Court denies plaintiffs' motion for class certification without analysis of Rule 23's other requirements. *See, e.g.*, *In re Canon Cameras Litig.*, 237 F.R.D. 357, 359 (S.D.N.Y. 2006) ("Here, while the Court harbors doubts that plaintiffs have satisfied all the requirements of Rule 23(a), it need not reach that question because it is plain that they do not begin to satisfy the requirements of Rule 23(b).").

In general, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citation and internal quotation marks omitted). It is considered a more "demanding criterion than the commonality inquiry under Rule 23(a)." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). Here, the underlying cause of action is securities fraud under Section 10(b) and Rule 10b-5. To prevail on claims under Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008); *see, e.g.*, *Halliburton*, 131 S. Ct. at 2184; *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122 (2d Cir. 2013).

Here, as is often the case, the reliance element, also known as transaction causation, presents the obstacle to class

certification. *See, e.g.*, *Halliburton*, 131 S. Ct. at 2184 ("Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Id.* at 2185. However, such an individualized inquiry runs contrary to the predominance requirement of Rule 23(b)(3). As the Supreme Court recognized in *Basic Inc. v. Levinson*, "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones." 485 U.S. 224, 242 (1988); *see also Wal-Mart*, 131 S. Ct. at 2552 n.6. Thus, a plaintiff seeking class certification under Rule 23(b)(3) must demonstrate a common method of proving reliance. *Cf. In re IPO*, 471 F.3d at 42 ("[E]stablishing reliance individually by members of the class would defeat the requirement of Rule 23 that common questions of law or fact predominate over questions affecting only individual members.").

In the instant case, plaintiffs propose two common methods of proving reliance on a class-wide basis: (1) a rebuttable presumption of reliance; and (2) circumstantial evidence of class-wide reliance. The Court considers each theory and, for the reasons explained *infra*, concludes that neither applies here.

## A. Presumptions of Reliance

A securities fraud plaintiff may satisfy the predominance requirement by establishing the applicability of a rebuttable presumption of reliance. *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 CIV. 1898 (SAS), 2006 WL 2161887, at \*4 (S.D.N.Y. Aug. 1, 2006) ("In order to satisfy the predominance requirement of Rule 23(b)(3) on the issue of transaction causation, Teamsters must avail itself of a presumption of reliance . . . ."), *aff'd*, 546 F.3d 196 (2d Cir. 2008); *cf. In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 241 (2d Cir. 2012) (holding that the failure to qualify for reliance presumption "typically renders trial unmanageable, precluding a finding that common issues predominate"); *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 78 (2d Cir. 2004) (holding that plaintiffs fail to establish predominance requirement if they are not entitled to presumption of reliance); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) ("[T]he [Supreme] Court recently clarified that—unless plaintiffs successfully invoke a class-wide presumption of reliance—the predominance requirement 'would often be an insuperable barrier to class certification, since each of the individual investors would have to prove reliance on the alleged misrepresentation.'" (quoting *Wal-Mart*, 131 S.Ct. at 2552 n. 6)). The Supreme Court has "found a rebuttable presumption of reliance in two different circumstances." *Stoneridge*, 552 U.S. at 159. First, "under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." *Stoneridge*, 552 U.S. at 159. The Supreme Court set forth this presumption of reliance in *Basic*. *See* 485 U.S. at 247. Second, "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge*, 552 U.S. at

159. This presumption derives from the Supreme Court's decision in *Affiliated Ute*. *See* 406 U.S. at 153–54.

### 1. Fraud-on-the-Market Presumption

As an initial matter, plaintiffs do not invoke the fraud-on-the-market presumption of reliance. (*See* Pls.' Mem. at 23–30; Pls.' Reply at 29–36.) Nor could they, as that theory applies only "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities." *Basic*, 485 U.S. at 247; *see Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 967 F.2d 742, 748 (2d Cir. 1992) (describing fraud on the market theory as "permit[ting] a plaintiff to rely on the integrity of open, well-developed markets rather than requiring proof of direct reliance on a defendant's conduct, which ordinarily would be difficult to come by given the difference between today's markets and the face-to-face transactions underlying the old common law fraud cases, in which reliance played an essential role"); *see also Teamsters Local 445*, 2006 WL 2161887, at *5 ("The fraud on the market presumption applies only if the market for the security is open and developed enough so that it quickly incorporates material information into the price of the security, *i.e.*, the market must be *efficient*."). Here, plaintiffs identify no "efficient market" or market price for the particular securities in which the putative class invested. Accordingly, the fraud-on-the-market presumption does not apply in this case.

### 2. *Affiliated Ute* Presumption

#### a. Legal Standard

The *Affiliated Ute* presumption applies to claims "involving primarily a failure to disclose" by one with a duty to disclose. 406 U.S. at 153; *see, e.g.*, *Stoneridge*, 552 U.S. at 159; *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005).[9] In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Affiliated Ute*, 406 U.S. at 153–54.

Unfortunately, "articulating this rule is easier than applying it," given the difficulty in distinguishing between claims predicated primarily on misrepresentations, to which the *Affiliated Ute* presumption does not apply, and claims predicated primarily on omissions, to which the presumption does apply. *Smith Barney Transfer Agent Litig.*, 290 F.R.D. at 47. As many courts have noted, "[a] statement is misleading when it omits the truth. Thus, in most securities fraud cases, an affirmative misstatement can be cast as an omission and vice versa." *Id.*; *see, e.g.*, *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981) ("In many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that that prior statement still stands, then the omission may also be termed a misrepresentation. The labels by themselves, therefore, are of little help."); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 494 n.12

---

[9] Defendants do not contest that they owed a duty to disclose material information to the putative class members (*see, e.g.*, Tullman Decl. Ex. 64, Ahluwalia Dep. at 270 (acknowledging that Genworth account executives held a fiduciary obligation to their clients, and that the fund selection process was one in which the final decision was not made by the individual salesperson, but by the "front end of the process . . . That's our fiduciary obligation.")), and the Court assumes that such a duty existed for purposes of deciding the instant motion.

(S.D.N.Y. 2011) ("An omission can be both a failure to disclos[e] or a materially misleading statement."); *Teamsters*, 2006 WL 2161887, at *4 ("Distinguishing between omissions and affirmative misstatements . . . is no simple task.").

Given the difficulty in determining whether the *Affiliated Ute* presumption applies, "[w]hat is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute*, in which no positive statements exist: reliance as a practical matter is impossible to prove." *Wilson*, 648 F.2d at 93. As Judge Pauley recently explained:

> The *Affiliated Ute* doctrine, in other words, is a pragmatic one. When a defendant's fraud consists primarily of omissions, "[r]equiring a plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000); *see also Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975) ("[I]n instances of total non-disclosure, as in *Affiliated Ute*, it is of course impossible to demonstrate reliance[.]"). Accordingly, reliance is presumed when it would be impossible to prove.

*Smith Barney Transfer Agent Litig.*, 290 F.R.D. at 47. By contrast, "[w]here positive statements are central to the alleged fraud, thereby eliminating the evidentiary problems

inherent in proving reliance on an omission, the *Affiliated Ute* presumption does not apply." *Teamsters Local 445*, 2006 WL 2161887, at *5.

### b. Application

Here, the crux of plaintiffs' claims is that defendants misrepresented Brinker's role in selecting mutual funds and allocating assets for the BJ Group Services portfolios. (*See, e.g.*, Am. Compl. ¶ 1 ("This case arises from the fraudulent scheme perpetrated by Defendants through Genworth's marketing, solicitation, sale and management of the Portfolio. The scheme was facilitated by Defendants, who knowingly, recklessly and/or with intent to deceive disseminated to prospective and current investors materially misleading representations regarding the Portfolio and its 'exclusive' management agreement with Robert 'Bob' Brinker ('Brinker').").) In support of their securities fraud claim, plaintiffs point to various written statements in which Genworth allegedly misrepresented Brinker's role. (*See, e.g.*, *id.* ¶¶ 24 ("The BJ Group Service offers clients tactical asset allocation by implementing recommendations from Robert ('Bob') J. Brinker, author of the *Marketimer* newsletter. Mr. Brinker analyzes economic trends and financial markets and makes asset allocation recommendations to [Genworth] based on that analysis. [Genworth] implements Mr. Brinker's recommendations by selecting mutual funds for client accounts."), 28 ("We at [Genworth] have a long standing relationship with Bob [Brinker] to offer one of the nation's most well-known tactical asset allocation strategies. Founded in 1986 and acquired by [Genworth] in 2000, BJ Group Services offers customized investment solutions tailored to meet clients' personal objectives. Long considered an expert in identifying market trends through his proprietary Marketimer model, Bob

recommends asset allocation and fund selection for [Genworth's] management of accounts for the BJ Group advisory series. Our experienced professionals work to implement Bob's investment strategy utilizing his proprietary tactical asset allocation model.").) Plaintiffs claim that these representations were false.

Moreover, the alleged omissions that plaintiffs identify are merely the inverse of defendants' alleged misrepresentation concerning Brinker's role in providing investment advice. Specifically, plaintiffs assert that defendants failed to disclose the following material information to them: (1) the existence of the Brinker Basic models, which were designed to mimic Brinker's Marketimer porfolios, but were offered only as a last resort to retain clients; (2) Genworth's policy of considering ASFs in selecting mutual funds; (3) Genworth's inability to implement all of Brinker's mutual fund and asset allocation recommendations, due to operational constraints; and (4) the fact that Brinker played no role in Genworth's clients' investments. (Pls.' Reply at 34.) Essentially, the Brinker Basic models, which implemented Brinker's recommendations, are what plaintiffs claim they were promised but did not receive. In other words, the fact that the Brinker Basic portfolios were hidden from plaintiffs matters here only because plaintiffs claim that defendants promised such portfolios. Instead, plaintiffs assert that Genworth selected lower-performing funds with higher ASFs. According to plaintiffs' own amended complaint, this strategy ran "completely contrary to the Brinker strategy." (Am. Compl. ¶ 38 ("Although Bob Brinker has preached for more than 25 years about the need to keep expenses low, every single alternative/substitute fund that Genworth selected paid them extra, which came directly out of clients' returns.").) Again, the

selection of funds with higher ASFs is significant to plaintiffs primarily because it did not comport with Brinker's strategy. Finally, the alleged omissions concerning Genworth's inability to implement Brinker's recommendations and Brinker's actual role at Genworth are clearly representations couched as omissions. As defendants observe, the alleged omission of Brinker's true role at Genworth, and Genworth's ability to follow his recommendations, were important to plaintiffs only because plaintiffs claim they were promised Brinker's advice. In sum, although couched as failures to disclose, the alleged omissions merely restate plaintiffs' core misrepresentation claim. Indeed, plaintiffs' own theory of their case, as reflected in the Amended Complaint, demonstrates that these omissions were significant because they contradicted the affirmative representations made by Genworth. (*See* Am. Compl. ¶ 3 ("*Contrary to Defendants' representations* that the Portfolio was being managed based upon the Brinker recommendations, the percentage of non-Brinker recommended Funds being purchased for the Portfolio routinely exceeded 50%. By not implementing Brinker's tactical asset allocation and fund selection, Genworth was able to generate for itself extra revenues by selecting alternate mutual funds that paid higher administrative and service fees. Defendants purchased these funds, instead of purchasing funds recommended by Brinker, notwithstanding that these funds routinely underperformed Funds recommended by Brinker. Moreover, *contrary to Defendants' representation*, Genworth did not have an 'exclusive' management agreement with Brinker.") (emphasis added).)

Moreover, to the extent that plaintiffs' claims rely to some extent on the alleged omissions, independently, plaintiffs' claims do not *primarily* concern omissions. *Cf.*

*Affiliated Ute*, 406 U.S. at 153 (presumption applies to claims "involving primarily a failure to disclose"). If anything more than the inverse of defendants' representations, the omissions merely "exacerbated the misleading nature of the affirmative statements" concerning Brinker. *See Starr*, 412 F.2d at 109 n.5. That is not enough to trigger the *Affiliated Ute* presumption. *See id.* A comparison of this case to other, distinguishable cases further demonstrates that plaintiffs' claims do not concern primarily a failure to disclose. For instance, in *Fogarazzo v. Lehman Brothers, Inc.*, the court applied the *Affiliated Ute* presumption to a claim premised on both representations and omissions. 263 F.R.D. 90, 106 (S.D.N.Y. 2009). However, in *Fogarazzo*, unlike here, the court held that the alleged failure to disclose "made the analysis reports themselves misleading." *Id.* Likewise, in *In re Parmalat Securities Litigation*, the court applied the *Affiliated Ute* presumption where defendants "failed to disclose material facts that made the reporting of certain information and transactions, although perhaps not deceptive in themselves, otherwise misleading." No. 04-MD-1653 (LAK), 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008). Here, unlike in those cases, plaintiffs allege (and have proffered evidence) that defendants' representations were themselves misleading. In other words, the representations are not misleading only when considered in conjunction with the facts that defendants allegedly failed to disclose (except, of course, to the extent that a representation is necessarily a *mis*representation only when considered in conjunction with the truth).

Finally, the rationale for the *Affiliated Ute* presumption—that reliance is impossible to prove where "no positive statements exist"—supports this Court's conclusion that the presumption does not apply to this case. *See Wilson*, 648 F.2d at 93. Here, plaintiffs allege that defendants made numerous representations concerning Brinker's role in the management of the BJ Group Service portfolios, upon which plaintiffs could have relied. Given the presence of numerous affirmative representations concerning Brinker, establishing reliance does not pose the particular evidentiary challenge warranting the *Affiliated Ute* presumption. *Cf. Smith Barney Transfer Agent Litig.*, 290 F.R.D. at 48 (concluding that *Affiliated Ute* presumption applied where reliance on omissions would have been impossible to prove). For all of the foregoing reasons, this Court concludes that the *Affiliated Ute* presumption does not apply to this case.

### B. Circumstantial Evidence of Class-Wide Reliance

Proceeding without either of the two recognized presumptions of reliance, plaintiffs nonetheless assert that they can establish class-wide reliance simply on the basis of defendants' materially uniform representations to all members of the putative class. Essentially, plaintiffs contend that all members of the putative class must have relied on defendants' uniform representations concerning Brinker, "[g]iven the obvious importance of Brinker's recommendations to Genworth investors." (Pls.' Mem. at 27.) In particular, plaintiffs cite the report of their expert—former SEC Chairman Harvey Pitt—which concludes that the documents containing defendants' representations about Brinker "are the types of materials that investors . . . rely upon when making investment decisions," and that the representations concerning Brinker "would have been relief upon by . . . all proposed class members." (Tullman Decl. Ex. 61, at 14.) For the following reasons, this Court concludes that plaintiffs have failed to establish a common method of proving reliance.

### 1. Legal Standard

In support of their proposed method of proving class-wide reliance by circumstantial evidence, plaintiffs cite two Second Circuit decisions applying the predominance requirement of Rule 23(b)(3) to the reliance element of fraud claims (outside the securities context). First, in *Moore*, the Second Circuit held that "evidence of materially uniform misrepresentations is sufficient to demonstrate the nature of the misrepresentation; an individual plaintiff's receipt of and reliance upon the misrepresentation may then be simpler matters to determine." 306 F.3d at 1255. "*Moore* therefore suggests that a finding of uniformity facilitates a finding of reliance." *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 302 (D. Conn. 2009). Second, in *McLaughlin v. American Tobacco Co.*, the Second Circuit clarified its holding in *Moore* by holding that "proof of misrepresentation—even widespread and uniform misrepresentation—only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof." 522 F.3d 215, 223 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). Significantly for plaintiffs, the *McLaughlin* decision then suggested that "proof of reliance by circumstantial evidence may be sufficient under certain conditions," but that the plaintiffs in that case had failed to show such evidence. *Id.* at 225.

The decisions cited by *McLaughlin* reveal what the Second Circuit had in mind when it referred to circumstantial evidence of reliance. In particular, the Second Circuit cited *Klay v. Humana, Inc.*, an Eleventh Circuit decision concerning health maintenance organizations' alleged misrepresentations to doctors concerning how much they would reimburse the doctors for medical services. *See generally* 382 F.3d 1241 (11th Cir. 2004), *abrogated on other grounds by Bridge*, 553 U.S. 639. "In *Klay*, the court concluded that it did 'not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due." *McLaughlin*, 522 F.2d at 225 n.7 (quoting *Klay*, 382 F.3d at 1259). On this basis, the Second Circuit recognized that "payment may constitute circumstantial proof of reliance upon a financial representation." *Id.* Significantly, *McLaughlin* distinguished *Klay* from the facts before it, which concerned allegations that defendant-tobacco companies had deceived consumers into believing that light cigarettes were healthier than full-flavored cigarettes. *Id.* The Second Circuit held:

> [A]ssuming that most individuals are led to believe that they will get paid when they sign a contract calling for payment is very different from assuming that most individuals purchase a consumer good in reliance upon an inference that they draw from its marketing and branding rather than for some other reason.

*Id.*

More recently, the Second Circuit applied *McLaughlin* to a set of facts very similar to those in *Klay*. Specifically, in a case involving allegedly fraudulent overbilling, the Second Circuit held that "payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon

the invoice's implicit representation that the invoiced amount was honestly owed." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (citing *McLaughlin*, 522 F.3d at 225 & n.7; *Klay*, 382 F.3d at 1259).

## 2. Application

Even assuming *arguendo* that the foregoing line of cases—none of which involved securities fraud—may apply to this securities fraud case, the Court concludes here that plaintiffs cannot prove class-wide reliance by common, circumstantial evidence.[10] As described *supra*, the Second Circuit has required that the inference of reliance—*i.e.*, that each class member was aware of the misrepresentation at issue and relied upon it—be almost inescapable in order to support class certification of a fraud case under Rule 23(b)(3). For instance, in *U.S. Foodservice Inc. Pricing Litigation*, the Second Circuit held that it is reasonable to infer reliance on fraudulently inflated invoices from the fact that customers paid the invoice price. 729 F.3d at 120. Similarly, in the district court cases cited favorably by *McLaughlin*, reliance on a demand for payment was evident from the fact of payment. *See Westways World Travel, Inc.*

---

[10] Defendants dispute the applicability of this doctrine to securities fraud claims. They are correct that none of these cases involved securities fraud, and, therefore, that none of these cases could have employed the *Basic* or *Affiliated Ute* presumptions of reliance. *See, e.g., Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086 (JMF), 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013) (noting that *Basic* and *Affiliated Ute* presumptions do not apply to common law fraud claims). However, because plaintiffs have failed to establish sufficient circumstantial evidence of class-wide reliance in this case, the Court need not decide whether such a method of common proof is available to the securities fraud plaintiff who cannot establish the applicability of the *Basic* or *Affiliated Ute* presumptions.

*v. AMR Corp.*, 218 F.R.D. 223, 238 (C.D. Cal. 2003) (reasonable to infer reliance on demand for payment from the fact of payment); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 561 (E.D. Va. 2000) ("In the case at bar, the Court faces a scheme premised upon standardized forms and even the use of the process of the courts. It is difficult to conceive how those who made payments on the deficiency judgments could be found to have not relied. Those individuals clearly made payments in reliance upon the assurance that the process of repossession, sale and all subsequent steps were taken in conformity with the law and that their rights were protected. To conclude otherwise would deny human nature, run counter to the traditional presumption in favor of actors operating under rational economic choice, and leave the Court with an absurd conclusion."). In all of these cases, the fact of payment gives rise to the reasonable inference of reliance because it is almost certain that any individual would pay another individual only upon becoming aware of a demand for payment and relying on it. In other words, outside the context of charitable giving, it is eminently reasonable to assume that individuals do not simply give their money away.

In the case at bar, the Court cannot say with the same degree of confidence that all members of the putative class invested with Genworth in reliance on defendants' statements concerning Brinker's role there. First, the fact that all members of the putative class invested in the BJ Group Services portfolios does not necessarily mean that each putative class member even read or heard defendants' representations regarding Brinker. *Cf. Halliburton*, 131 S. Ct. at 2184 (noting that, absent *Basic* or *Affiliated Ute* presumptions of reliance, traditional method of demonstrating reliance requires a "showing that [the plaintiff] was

aware of a company's statement"); *McLaughlin*, 522 F.3d at 226 (noting that "differences in plaintiffs' knowledge and levels of awareness" defeat class-wide reliance). [11] Second, even if every class member learned about Brinker's purported role in managing investment portfolios, on the record before this Court, it would be pure speculation to assume that every member of the putative class relied upon defendants' representations in deciding to invest with Genworth. Stated differently, it is reasonable to assume that at least some members of the putative class invested in the BJ Group Services portfolios for other reasons, and did not care whether Brinker or someone else was managing the portfolios. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 269 F.R.D. 252, 265 (S.D.N.Y. 2010) (concluding that plaintiffs failed to establish common circumstantial evidence of reliance, because "[w]hile the evidence presented by plaintiffs here is convincing on the question of whether investors generally rely on credit ratings, it does nothing to refute the fact that in *this* case some sophisticated investors chose not to rely—or relied only minimally—on the credit ratings prior to investing in the Rated Notes."); *cf. McLaughlin*, 522 F.3d at 225 (declining to infer class-wide reliance, where "each plaintiff in this case could have elected to purchase light cigarettes for any number of reasons"). In sum, this case is fundamentally different from cases involving a misrepresentation that prompts a payment, where the payment alone clearly

demonstrates that the payor became aware of the misrepresentation and relied on it.

The Court reaches this conclusion notwithstanding the opinion of Harvey Pitt, plaintiff's expert witness, who concluded in general terms that defendants' documents "are the types of materials that investors, in my professional experience, rely upon when making investment decisions," and that "all proposed class members" would have relied upon defendants' representations concerning Brinker.[12] (*See* Tullman Decl. Ex. 61, at 14.) In essence, Pitt's opinion supports a finding of a "substantial likelihood that a reasonable investor would find [the representations concerning Brinker] important in making an investment decision," *i.e.* that these representations were material. *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) (defining materiality). However, plaintiffs' evidence that defendants made uniform representations that were material, without more, cannot suffice as a common method of proving class-wide reliance. To hold otherwise would allow plaintiffs to circumvent entirely the *Basic* and *Affiliated Ute* presumptions. As noted *supra*, class-wide reliance may be shown under *Basic* where a given statement was material, but only where the statement was also publicly made, and the security at issue traded on an efficient market. *Affiliated Ute* also provides a common method of proving reliance—by showing that the omission at issue was material—but only in cases involving

---

[11] Plaintiffs need to show some common method of proving that each member of the class read or heard the representations at issue because neither presumption of reliance applies here. *Cf. In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 291 (S.D.N.Y. 2003) ("With the [fraud-on-the-market] presumption, a plaintiff need not prove that she read or heard the misrepresentation that underlies her securities claim.").

[12] As discussed *infra*, although defendants move to strike the Pitt declaration, the Court has considered it (as well as the exhibits and portions of plaintiffs' memorandum that defendants seek to strike) and finds that plaintiffs' motion for class certification still fails. Thus, defendants' motions to strike are moot. Similarly, the declarations that plaintiff seeks to strike are not material to the Court's decision and have not been relied upon. Thus, plaintiffs' motions to strike are also moot.

primarily a failure to disclose. Here, having abandoned any claim to the *Basic* presumption, and having unsuccessfully invoked *Affiliated Ute*, plaintiffs are not entitled to prove class-wide reliance simply by showing that the representations and omissions at issue were uniform and material. If they could, it would be pointless in any case to consider whether *Basic* or *Affiliated Ute* apply. Such an approach would collapse the reliance element into the materiality element in all securities fraud cases. The *de facto* abolition of reliance as a separate element of securities fraud in all cases, even if only for purposes of Rule 23(b)(3)'s predominance requirement, is an unacceptable consequence of plaintiffs' argument. *Cf. Halliburton*, 131 S. Ct. at 2184 (instructing that the predominance requirement "often turns on the element of reliance" in a securities fraud case).[13]

\*　　\*　　\*

In sum, plaintiffs have failed to establish by a preponderance of the evidence a common method of proving that all class members relied on defendants' alleged representations and omissions. Thus, if this case went to trial, each class member's reliance would have to be proven individually. In other words, individual issues predominate, thereby precluding class certification under Rule 23(b)(3). *See, e.g.*, *In re IPO*, 471 F.3d at 42 ("[E]stablishing reliance individually by members of the class would defeat the requirement of Rule 23 that common questions of law or fact predominate over questions affecting only individual members.").

---

[13] For this reason, the Court doubts whether circumstantial evidence of reliance would ever suffice as a common method of proof in a securities fraud case where the plaintiff fails to establish the applicability of either the *Basic* or *Affiliated Ute* presumption.

## IV. MOTIONS TO STRIKE

In addition to their extensive briefing regarding the question of class certification, the parties have also submitted several motions to strike. In particular, plaintiffs have moved to strike the declarations of Dr. Bruce Stangle, Jeffrey Joseph, Timothy Knepp, and Ron Link, and defendants seek to strike the declaration of Harvey Pitt. Defendants also have moved to strike certain exhibits and portions of plaintiffs' memorandum in support of class certification.

Generally, "[m]otions to strike are . . . looked upon with disfavor." *Calibuso v. Bank of Am. Corp.*, 893 F. Supp. 2d 374, 383 (E.D.N.Y. 2012) (quoting *Chenensky v. N.Y. Life Ins. Co.*, No. 07-CV-11504, 2011 WL 1795305, at \*1 (S.D.N.Y. Apr. 27, 2011)) (internal quotation marks omitted). However, "a motion to strike that addresses issues 'separate and apart from the issues that will be decided on a class certification motion' is not procedurally premature." *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (quoting *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06-CV-6198, 2008 WL 161230, at \*3 (S.D.N.Y. Jan. 16, 2008)).

Having considered all of the evidence in the record, including the challenged declarations and exhibits, the Court elects not to resolve whether these declarations or any of the corresponding exhibits should be excluded because even if the declarations that plaintiff seeks to strike are not considered by the Court, and even if the declaration of Pitt (as well as all other materials defendants seek to strike) is considered, the Court concludes that class certification is improper here for the reasons discussed *supra*. Because the Court has not relied on any of the declarations submitted by defendants and has considered the Pitt

declaration and all of plaintiffs' submissions in denying plaintiffs' motion for class certification, the Court denies the parties' respective motions to strike as moot. *See, e.g.*, *Borghese Trademarks Inc. v. Borghese*, No. 10-CV-5552 (JPO)(AJP), 2013 WL 143807, at \*20 (S.D.N.Y. Jan. 14, 2013) (denying motion to strike as moot where court's decision "did not rely" on it); *Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 230 (D. Conn. 2005) (same).

## IV. CONCLUSION

For the reasons set forth herein, the Court denies plaintiffs' motion for class certification, and denies all motions to strike as moot.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: April 15, 2014
        Central Islip, NY

\*        \*        \*

Plaintiffs are represented by Bryan L. Arbeit, Jeffrey Kevin Brown, Lenard Leeds, Matthew Ian Marks, Michael Alexander Tompkins, and Rick Ostrove of Leeds Brown Law, P.C., One Old Country Road, Carle Place, NY 11514, David Corey Katz, James E. Tullman, Joseph Harry Weiss, and Michael Allen Rogovin of Weiss & Lurie, 1500 Broadway, 16th Floor, New York, NY 10036, and Debbie E. Lanin, Debbie E. Lanin Attorney at Law, 27 Beaupre Court, Huntington, NY 11743. Defendants are represented by Mark S. Mulholland of Ruskin Moscou Faltischek, P.C., 1425 RXR Plaza, East Tower, 15th Floor, Uniondale, NY 11556, and Reid L. Ashinoff, Brendan E. Zahner, and Sandra Denise Hauser of Dentons US LLP, 1221 Avenue of the Americas, New York, NY 10020, and Joshua Seth Akbar of Dentons US LLP, 2398 E. Camelback Road, Suite 1100, Phoenix, AZ 85016.