UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

№ 09-CV-5603 (JFB)(GRB)

———————

MICHAEL J. GOODMAN, ET AL.,

Plaintiffs,

VERSUS

ASSETMARK, INC., ET AL.,

Defendants.

———————

**MEMORANDUM AND ORDER**
October 17, 2014

———————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Michael J. Goodman, Clarice Yassick, Steven Yoelin, Martin Wasser, and Edward Schiller (collectively, "plaintiffs") commenced this securities fraud class action against defendants AssetMark, Inc. ("AssetMark"), Genworth Holdings, Inc. ("Genworth Holdings"), and Gurinder S. Ahluwalia ("Ahluwalia") (collectively, "defendants") on December 22, 2009.[1] They allege that defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and breached their fiduciary duties to plaintiffs. The crux of these claims is that defendants misrepresented the role that Robert Brinker ("Brinker")—an individual renowned for his expertise in the investment field—played in the management of the BJ Group Services portfolios. According to plaintiffs, they and other members of the putative class relied upon that misrepresentation in deciding to invest with defendants. They claim to have lost millions of dollars as a result.

In an oral ruling on March 30, 2011, the Honorable Leonard D. Wexler granted defendants' motion to dismiss the breach of fiduciary duty claim pursuant to the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), which states that "[n]o covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal

---

[1] Until recently, Genworth Holdings, Inc. was known as Genworth Financial, Inc. (*See* Stipulation & Order, May 28, 2014, ECF No. 203.) AssetMark was formerly known as Genworth Financial Wealth Management, Inc. ("GFWM"). (*See id.*) GFWM changed its name to AssetMark after Genworth Financial, Inc. sold GFWM. (*See id.*) In this Memorandum and Order, the Court refers to the entities by their current names.

1

court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A). On April 15, 2014, after the instant case was reassigned to the undersigned, the Court denied plaintiffs' motion for class certification of the federal securities law claims. *See generally Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90 (E.D.N.Y. 2014). Now, as the first step in their effort to attain class certification of their previously dismissed breach of fiduciary duty claim, plaintiffs move for reconsideration of Judge Wexler's order dismissing that claim in light of the Supreme Court's recent decision in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014). For the following reasons, the Court denies the motion.

I. BACKGROUND

The Court set forth the facts and procedural history of this case in its April 15, 2014 Memorandum and Order. *See Goodman*, 300 F.R.D. at 94–98. The Court reserves discussion of certain allegations in the amended complaint for its analysis of the specific issue raised by the pending motion.

Plaintiffs filed the motion for reconsideration on July 25, 2014. Defendants filed their opposition on September 5, 2014, and plaintiffs filed their reply on September 19, 2014. The Court heard oral argument on October 14, 2014. This matter is fully submitted, and the Court has considered all of the parties' submissions.

II. STANDARD OF REVIEW

Rule 54(b) states that a court may revise an order prior to entering final judgment. *See* Fed. R. Civ. P. 54(b). The Second Circuit has "limited district courts' reconsideration of earlier decisions under Rule 54(b) by treating those decisions as law of the case, which gives a district court discretion to revisit earlier rulings in the same case, subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964)). Therefore, a district court may not revise a prior order "unless there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.'" *Id.* (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). "The party moving for reconsideration bears the burden of demonstrating an intervening change of controlling law." *In re Fannie Mae 2008 ERISA Litig.*, No. 09-CV-1350 (PAC), 2014 WL 1577769, at *3 (S.D.N.Y. Apr. 21, 2014) (citing *In re Rezulin Prods. Liability Litig.*, 224 F.R.D. 346, 350 (S.D.N.Y. 2004)).

III. DISCUSSION

Plaintiffs claim that the Supreme Court's decision in *Troice* constitutes an intervening change of controlling law that warrants revision of Judge Wexler's order dismissing the breach of fiduciary duty claim. For the following reasons, the Court disagrees.

A. Legal Landscape

1. SLUSA

SLUSA states, in relevant part, that "[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in

any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A). Congress enacted SLUSA in 1998 to "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [Private Securities Litigation Reform Act, 15 U.S.C. §§ 77z-1, 78u-4 ("PSLRA")]," *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 (2006), which had "established uniform standards for class actions alleging securities fraud, including more stringent pleading requirements for certain securities fraud class actions brought in federal courts," *Romano v. Kazacos*, 609 F.3d 512, 517 (2d Cir. 2010).

"A 'covered class action' is a lawsuit in which damages are sought on behalf of more than 50 people." *Dabit*, 547 U.S. at 83; *see* 15 U.S.C. § 78bb(f)(5)(B). "A 'covered security' is one traded nationally and listed on a regulated national exchange." *Dabit*, 547 U.S. at 83; *see* 15 U.S.C. § 78bb(f)(5)(E) (adopting definition of "covered security" set forth in 15 U.S.C. § 77r(b)). The term "covered security" includes "mutual funds that are issued by a registered investment company." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 750 F. Supp. 2d 450, 453 n.9 (S.D.N.Y. 2010) (citing cases); *see, e.g.*, *Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1351 n.2 (11th Cir. 2008); *Beary v. ING Life Ins. & Annuity Co.*, 520 F. Supp. 2d 356, 362 (D. Conn. 2007).

In *Dabit*, the Supreme Court held that the nexus between the material misrepresentation or omission and the purchase or sale of a covered security (*i.e.*, the "in connection with" requirement) is satisfied where "the fraud alleged 'coincide[s]' with a securities transaction— whether by the plaintiff or by someone else." 547 U.S. at 85 (quoting *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)). "The 'coincide' requirement is broad in scope, and courts have used various terms to describe it." *Romano*, 609 F.3d at 521 (internal citation omitted). The "standard is met where plaintiff's claims turn on injuries caused by acting on misleading investment advice—that is, where plaintiff's claims necessarily allege, necessarily involve, or rest on the purchase or sale of securities." *Id.* at 522 (internal citation and quotation marks omitted).

2. *Troice*

*Troice* presented the following issue: "whether [SLUSA] encompasses a class action in which the plaintiffs allege (1) that they 'purchase[d]' *uncovered* securities (certificates of deposit that are *not* traded on any national exchange), but (2) that the defendants falsely told the victims that the *uncovered* securities were backed by *covered* securities." 134 S. Ct. at 1062 (emphasis in original). The Supreme Court held that SLUSA does not cover such an action. *Id.*

More specifically, the Supreme Court held that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Id.* at 1066. In reaching this holding, the Supreme Court observed that the "in connection with" language of SLUSA "suggests a connection that matters," and that "a connection matters where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security, not to purchase or to sell an uncovered security." *Id.* Moreover, the Supreme Court

3

concluded that "the 'someone' making that decision to purchase or sell must be a party other than the fraudster. If the only party who decides to buy or sell a covered security as a result of a lie is the liar, that is not a 'connection' that matters." *Id.*

The Supreme Court's application of these principles to the facts of *Troice* is instructive. The plaintiffs in *Troice* were private investors who had purchased certificates of deposit in Stanford International Bank with the expectation "that Stanford International Bank would use the money it received to buy highly lucrative assets." *Id.* at 1064. Instead, Allen Stanford "and his associates used the money provided by new investors to repay old investors, to finance an elaborate lifestyle, and to finance speculative real estate ventures." *Id.*[2] As the Supreme Court noted, "the complaints allege[d] misrepresentations about the *Bank's* ownership of covered securities— fraudulent assurances that the Bank owned, would own, or would use the victims' money to buy *for itself* shares of covered securities." *Id.* at 1071 (emphasis in original). In other words, the Stanford International Bank was purchasing covered securities for its own benefit, and not on behalf of the plaintiffs. Because the Bank had allegedly made misrepresentations concerning the purchase of covered securities only *for itself*, "the necessary 'connection' between the materiality of the misstatements and the statutorily required 'purchase or sale of a covered security'" was lacking, and SLUSA did not apply. *Id.*

The *Troice* decision emphasized the difference between this factual scenario and scenarios described in prior Supreme Court opinions. As *Troice* observed, those prior decisions involved "victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained *an ownership interest* in financial instruments that fall within the relevant statutory definition." *Id.* at 1066 (emphasis in original). The facts in *Troice* were different because the plaintiffs admittedly did not take, or try to take, any ownership interest in covered securities. *See id.* at 1064–65, 1071.

Writing in dissent, Justice Kennedy suggested that the majority's use of the term "ownership interest" might encompass some situations "where the victim buys or sells shares in a defendant fund that itself owns equities, . . . such as when a victim has some interest in the defendant's supposed portfolio." *Id.* at 1080 (Kennedy, J., dissenting). The majority did not respond to this observation. However, the majority did explicitly refute the dissent's claim that *Troice* breaks new ground in the interpretation of SLUSA. *See id.* at 1066 (noting that "[w]e do not here modify *Dabit*," and that "prior case law supports our interpretation"). In fact, in response to Justice Kennedy's dissent, the majority opinion observed that "the *only* issuers, investment advisers, or accountants that today's decision will continue to subject to state-law liability are those who do not sell or participate in selling securities traded on U.S. national exchanges." *Id.* at 1068 (emphasis in original).

### 3. *Herald*

Since *Troice*, the Second Circuit has issued one decision interpreting SLUSA. *See In re Herald*, 753 F.3d 110 (2d Cir. 2014) [hereinafter *Herald II*]. Some background on

---

[2] Allen Stanford was ultimately convicted of mail fraud, wire fraud, conspiracy to commit money laundering, and obstruction of a Securities and Exchange Commission investigation. He was sentenced to a prison term and ordered to forfeit six billion dollars. *See Troice*, 134 S. Ct. at 1064.

4

that case is helpful to understand the meaning of *Troice*.

Before the Supreme Court issued *Troice*, the Second Circuit held in *Herald* that SLUSA precluded state law claims against banks who were allegedly complicit in the Ponzi scheme run by Bernard Madoff. *See In re Herald*, 730 F.3d 112, 118–120 (2d Cir. 2013) [hereinafter *Herald I*]. The plaintiffs in *Herald* had allegedly purchased "interests in foreign feeder funds, interests that all parties concede[d] are not included within the definition of 'covered security.'" *Id.* at 118. Nonetheless, the Second Circuit held in *Herald I* that SLUSA covered the state law claims because, "on the very face of plaintiffs' complaints, the liability of JPMorgan and BNY is predicated not on these banks' relationship with plaintiffs or their investments in the feeder funds but on the banks' relationship with, and alleged assistance to, Madoff Securities' Ponzi scheme, which indisputably engaged in purported investments in covered securities on U.S. exchanges." *Id.* at 118–19.

The plaintiffs in *Herald* sought rehearing in the Second Circuit after *Troice* issued. In *Herald II*, the Second Circuit denied the petition for rehearing and held that *Troice* "confirms the logic and holding of [*Herald I*]." *See* 753 F.3d at 113. In particular, the Second Circuit emphasized that the plaintiffs in *Troice* "were not seeking, directly or indirectly, to purchase covered securities." *Id.* (citing *Troice*, 134 S. Ct. at 1062). By contrast, the Second Circuit noted that the plaintiffs in *Herald* had "'tried to take . . . an ownership interest in the statutorily relevant securities,' *i.e.*, covered securities," by investing with Madoff Securities through intermediary banks. *Id.* (quoting *Troice*, 134 S. Ct. at 1067). Accordingly, the Second Circuit held that SLUSA covered the state law claims and denied the petition for rehearing. *Id.*

B. Application

Plaintiffs contend that *Troice* requires the revival of their breach of fiduciary duty claim. More particularly, they argue that SLUSA does not cover the breach of fiduciary duty claim because "the Plaintiffs here placed their funds in an 'investment advisory service' and did not purchase covered securities—only the Defendants, the persons accused of fraud, purchased covered securities." (Pls.' Mem., at 11.)

The Court begins its analysis of this argument by examining the allegations in the amended complaint. *See, e.g.*, *Grund v. Del. Charter Guarantee & Trust Co.*, 788 F. Supp. 2d 226, 240 (S.D.N.Y. 2011) ("Courts have held that it is the allegations made in the complaint that form the basis of their SLUSA analysis . . . ."); *Dacey v. Morgan Stanley Dean Witter & Co.*, 263 F. Supp. 2d 706, 709 (S.D.N.Y. 2003) ("In deciding whether SLUSA preempts a lawsuit, courts examine what the 'private party [is] alleging.'" (quoting 15 U.S.C. § 78bb(f)(1))). Here, plaintiffs allege that defendants "routinely represented to prospective and current private clients that the Portfolio was being managed by Brinker, or at a minimum, [GFWM] was going to implement Brinker's recommendations, including mutual fund selection and allocation." (Am. Compl. ¶ 22.) In addition, they allege that, "[c]ontrary to Defendants' representations that Brinker was selecting Funds for the Portfolio or that Defendants were purchasing Funds based on the recommendations by Brinker, in truth, the percentage of Funds being purchased for the Portfolio that were not Brinker selected/recommended Funds routinely exceeded 50%." (*Id.* ¶ 32.) They also claim that, "as a result of Genworth selecting non-Brinker recommended mutual funds, several of Genworth portfolios significantly underperformed Bob's published models by

5

approximately 16 percentage points from 2003-2006. In 2006 alone . . . Genworth portfolios underperformed Bob's published models by roughly 50%." (*Id.* ¶ 35.) In other words, plaintiffs claim that defendants breached their fiduciary duties by "failing to purchase Funds selected/recommended by Brinker, but instead in purchasing Funds that paid Defendants higher administrative and services fees." (*Id.* ¶ 53(f).)[3]

Judge Wexler held that these allegations required dismissal of the breach of fiduciary duty claim under SLUSA, and *Troice* does not compel a different result. Contrary to plaintiffs' position, *Troice* does not stand for the broad proposition that SLUSA cannot apply whenever the defendant accused of fraud, instead of the plaintiff, was the one who purchased the covered securities. *Herald II* forecloses that position because, in that case, it was Madoff Securities (the "fraudster," to borrow a word from *Troice*) who "engaged in purported investments in covered securities on U.S. exchanges." *Herald I*, 730 F.3d at 118–19. Instead, what mattered in *Herald II* was that the plaintiffs, unlike the plaintiffs in *Troice*, had "tried to take . . . an ownership position in the statutorily relevant securities,' *i.e.*, covered securities," by placing their money in feeder funds. *See Herald II*, 753 F.3d at 113 (quoting *Troice*, 134 S. Ct. at 1067).[4] In the instant case, as well, plaintiffs were seeking to take an ownership interest in certain covered securities (Brinker-recommended mutual funds), but instead ended up taking

---

[3] At oral argument, counsel for plaintiffs also suggested that plaintiffs did not take, and did not try to take, an ownership interest in mutual funds (*i.e.*, covered securities), but instead took an ownership interest in a "Portfolio" that held mutual funds. The amended complaint states otherwise; specifically, it alleges that plaintiffs tried to take an ownership interest in certain mutual funds selected by Brinker, but that they ended up taking an ownership interest in different mutual funds. (*See, e.g.*, Am. Compl. ¶¶ 24–25, 27 (describing defendants' representations concerning the selection of mutual funds for client accounts), ¶ 32 ("Contrary to Defendants' representations that Brinker was selecting Funds for the Portfolio or that Defendants were purchasing Funds based on the recommendations by Brinker, in truth, the percentage of Funds being purchased for the Portfolio that were not Brinker selected/recommended Funds routinely exceeded 50%."), ¶ 33 (alleging that defendants purchased mutual funds not selected by Brinker), ¶ 35 (alleging that "the non-Brinker selected/recommended Funds that were being purchased by the Defendants for the Portfolio significantly underperformed the Funds that were being recommended by Brinker"), ¶ 53(f) (alleging that defendants breached fiduciary duty "by failing to purchase Funds selected/recommended by Brinker, but instead in purchasing Funds that paid Defendants higher administrative and services fees").) In opposition to the pending motion, defendants have submitted, *inter alia*, a September 30, 2009 account statement for plaintiff Steven Yoelin, which confirms that plaintiffs held a direct ownership interest in certain mutual funds. (*See* Zahner Decl. Ex. A.) At the motion to dismiss stage on a Rule 12(b)(6) motion, the Court cannot consider documents outside the pleadings. However, the Court need not rely on this extraneous exhibit given the clear allegations of the amended complaint. Moreover, even if the plaintiffs' ownership interest in mutual funds were indirect (as plaintiffs now contend), *Herald II* confirms that even an indirect ownership interest in covered securities also triggers SLUSA. Similarly, although counsel suggested at oral argument that one plaintiff's money was not invested in any mutual funds at a particular point in time, SLUSA still applies because plaintiff allegedly intended for such money to be invested in covered securities.

[4] Plaintiffs' counsel contended at oral argument that the critical factor in *Herald II* was that the defendant banks were not themselves the alleged fraudsters, which could distinguish that decision from the instant case. The Court disagrees. In fact, even in the *Herald* case, the plaintiffs alleged that the defendant banks knowingly assisted Madoff in committing his fraudulent Ponzi scheme. *See Herald I*, 730 F.3d at 119 ("The complaints, fairly read, charge that JPMorgan and BNY knew of the fraud, failed to disclose the fraud, and helped the fraud succeed—in essence, that JPMorgan and BNY were complicity in Madoff's fraud."); *see also id.* at 116–17.

and maintaining an ownership interest in different covered securities (other mutual funds), based upon alleged misrepresentations made by defendants. Accordingly, plaintiffs' breach of fiduciary duty claim alleges misrepresentations and omissions of material facts in connection with the purchase of mutual funds, and SLUSA requires dismissal of this claim. *See, e.g.*, In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 603–04 (S.D.N.Y. 2006) (holding that SLUSA precluded breach of fiduciary duty claim based upon allegations of "improper steering" to particular mutual funds).[5]

The Court notes that its conclusion is consistent with the only other district court decision in this Circuit to have considered *Troice* and *Herald II*. *See In re Harbinger Capital Partners Funds Investor Litig.*, No. 12-CV-1244 (AJN), 2014 WL 3694991 (S.D.N.Y. July 7, 2014). In that case, Judge Nathan considered *Herald II* and determined that the "dispositive fact" in *Troice* is whether a plaintiff takes, or tries to take, either a direct or indirect ownership interest in a covered security. *See id.* at *2 ("In drawing this distinction, the Second Circuit unmistakably adopted a broad reading of *Troice* under which even an indirect ownership interest in covered securities—for instance, the interest conveyed by an investment in a feeder fund—triggers SLUSA preclusion."). Based on this reading of *Troice* and *Herald II*, Judge Nathan held that SLUSA precluded the plaintiffs' state law claims, "which allege[d] that Defendants' misrepresentations and omissions induced them to hold hedge fund investments that . . . conveyed an indirect ownership interest in covered securities (in this case, SkyTerra stock)." *Id.*

In contrast to *Harbinger Capital*, which this Court finds persuasive, the Court does not find applicable the decision in *In re Tremont Securities Law, State Law, and Insurance Litigation*, No. 08-CV-11117, 2014 WL 1465713 (S.D.N.Y. Apr. 14, 2014). There, Judge Griesa held that SLUSA did not preclude state law claims based upon allegations that plaintiffs purchased limited partnership interests (uncovered securities) in funds, which invested in covered securities managed by Bernard Madoff. *See id.* at *1. Those allegations come markedly closer to the allegations in *Troice* than the allegations made in the instant case. Moreover, even if the Court's decision here runs contrary to *Tremont Securities*, the Court notes that the *Tremont Securities* decision did not have the benefit of *Herald II*. Indeed, that decision appears to have rejected defendants' argument—that the partnerships were nothing more than a conduit to invest in securities managed by Madoff—by describing *Herald I* as a "pre-*Troice* decision[]." *See id.* at *3. Of course, since then, the Second Circuit has confirmed in *Herald II* that *Herald I* remains good law post-*Troice*. Accordingly, this Court rejects plaintiffs' invitation to rely exclusively upon *Tremont Securities*.

In sum, the Court concludes that Judge Wexler's decision remains good law after *Troice*. Therefore, the Court denies

---

[5] To the extent plaintiffs' counsel argued at oral argument that *Troice* applies in any situation where the investment advisor has discretion to choose the covered security (even where the plaintiff intends to take, takes, or maintains an ownership in that covered security), the Court disagrees. Nothing in *Troice*, any other Supreme Court decision, or any Second Circuit decision suggests such a holding. In fact, the language in *Troice* and *Herald II*, discussed *supra*, states the contrary.

plaintiffs' motion to reinstate the breach of fiduciary duty claim.[6]

IV. CONCLUSION

For the reasons set forth herein, the Court denies plaintiffs' motion to reinstate their breach of fiduciary duty claim.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: October 17, 2014
       Central Islip, NY

\* \* \*

Plaintiffs are represented by Bryan L. Arbeit, Jeffrey Kevin Brown, Lenard Leeds, Matthew Ian Marks, Michael Alexander Tompkins, and Rick Ostrove of Leeds Brown Law, P.C., One Old Country Road, Carle Place, NY 11514, and by David Corey Katz, James E. Tullman, Joseph Harry Weiss, and Michael Allen Rogovin of Weiss & Lurie, 1500 Broadway, 16th Floor, New York, NY 10036. Defendants are represented by Mark S. Mulholland of Ruskin Moscou Faltischek, P.C., 1425 RXR Plaza, East Tower, 15th Floor, Uniondale, NY 11556, and by Reid L. Ashinoff, Brendan E. Zahner, and Sandra Denise Hauser of Dentons US LLP, 1221 Avenue of the Americas, New York, NY 10020, and by Joshua Seth Akbar of Dentons US LLP, 2398 E. Camelback Road, Suite 1100, Phoenix, AZ 85016.

---

[6] The Court rejects plaintiffs' argument that defendants are estopped from opposing this motion because, in their opposition to plaintiffs' motion for class certification, defendants argued that all members of the putative class had not invested in a single, common security. That position is not "clearly inconsistent" with defendants' current position in opposing the pending motion, the Court never adopted that position in denying the motion for class certification, and defendants derive no unfair advantage in asserting these two positions. *See, e.g.*, *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (holding that judicial estoppel applies if "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel" (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001))).